UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN ASHTON,                          )
                                      )
        Plaintiff,                    )
                                      )
vs.                                   )  CIVIL ACTION NO. 2:06CV-226-D
                                      )
FLORALA MEMORIAL                      )
HOSPITAL; BLAIRE HENSON;              )
RUSSELL PAGE, D.O., and               )
EMERALD COAST EYE                     )
INSTITUTE, P.A.,                      )
                                      )
        Defendants.

## MOTION FOR SUMMARY JUDGMENT

Comes now Defendant, Russell Page, D.O., one of the Defendants in the above

entitled action, and moves this Honorable Court that it enter summary judgment in favor

of Defendant, Russell Page, D.O., pursuant to Rule 56, *F.R.Civ.P.* on the grounds that

there exists no genuine issue of material fact and this Defendant is entitled to prevail as a

matter of law.

This motion is based upon:

      1.     The affidavit of Russell Page, D.O., submitted herewith as Exhibit

           "A."

      2.     The medical records of Florala Memorial Hospital attached to the

           affidavit of Russell Page, D.O and marked as Exhibit "B."

      3.     The affidavit of Peter Zloty, M.D., submitted herewith as Exhibit

           "C."

4. The affidavit of James C. Jones, D.O., submitted herewith as Exhibit "D".

5. The deposition of John Ashton, pertinent portions of which are submitted herewith as Exhibit "E."

This the 27th day of February, 2007.

Respectfully submitted,

/s/ *Alan Livingston*
ALAN LIVINGSTON, (LIV007)
*Attorney for Defendant,*
*Russell Page, D.O.*
LEE & McINISH, ATTORNEYS
Post Office Box 1665
Dothan, Alabama 36302
Telephone (334) 792-4156
Facsimile (334) 794-8342
alivingston@leeandmcinish.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2007, I electronically filed the forgoing with the clerk of the court using the SM/ECF system which will send notification of such filing to the following:  A. Riley Powell, IV, Tabor Novak and Jack B. Hinton, Jr.

Dated this the 27th day of February, 2007.

/s/ *Alan C. Livingston*
OF COUNSEL

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN ASHTON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:06CV-226-D |
| | ) | |
| | ) | |
| FLORALA MEMORIAL | ) | |
| HOSPITAL; BLAIRE HENSON; | ) | |
| RUSSELL PAGE, D.O., and | ) | |
| SAMUEL E. POPPELL, M.D., | ) | |
| | | |
| Defendants. | | |

**EXHIBIT**
tabbies® "*A*"

## AFFIDAVIT IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Before me, the undersigned authority, personally appeared Russell Page, D.O.,

who being by me first duly sworn, did depose and say as follows:

My name is Russell Page, D.O., and I am a physician licensed to practice medicine in the State of Alabama and I have been so licensed at all times material to this affidavit. I am one of the Defendants named in the above entitled action pending before the United States District Court for the Middle District of Alabama. I have personal knowledge of the things and matters set forth in this affidavit and I make the same in support of the Motion for Summary Judgment filed on my behalf in this case.

I practice medicine in the field of emergency medicine and I was so practicing on March 12, 2004. On March 12, 2004, I was covering the emergency room at Florala Memorial Hospital in Florala, Alabama. At such time, I was practicing my specialty of emergency room medicine. At approximately 1:30 PM, I was notified that a patient by the name of John A. Ashton had arrived in the emergency room at Florala Memorial Hospital. I saw Mr. Ashton in the emergency room and I took a history from him and examined his injury. The patient had suffered a trauma to his left eye. He stated that he had been "poked in the eye" and he could

see light only out of the eye. It is my recollection that the patient was brought to the emergency room by the Florala Police Department. The patient was examined by me and it was clear to me that he needed care and treatment beyond that which was available at Florala Memorial Hospital. It was my opinion that the patient needed to be seen by an ophthalmologist. Florala Memorial Hospital did not have an ophthalmologist on its staff. Consequently, I contacted Dr. Poppell in Fort Walton Beach, Florida about the patient's injury. Dr. Poppell is an ophthalmologist and Mr. Ashton's injury would be within the scope of Dr. Poppell's specialty. I spoke with Dr. Poppell by telephone about Mr. Ashton's injury and Dr. Poppell agreed to accept the patient. Dr. Poppell asked me to transfer the patient to his office in Fort Walton Beach, Florida for further treatment.

Mr. Ashton did not have any means of transportation to Dr. Poppell's office and he stated that he had no family who could take him to Dr. Poppell's office in Fort Walton Beach, Florida. Consequently, it was necessary for the patient to be transported by the rescue squad. I then arranged for a transfer of this patient from Florala Memorial Hospital to Dr. Poppell's office for further treatment. Subsequently, the rescue squad came to Florala Memorial Hospital and transported Mr. Ashton from the hospital. I understood that he was being transported to Dr. Poppell's office. After the patient left Florala Memorial Hospital, I had no further contact with him, Dr. Poppell or the rescue squad. I was unaware of any difficulties encountered by the patient in Florida and no one contacted me with a request for any further instructions, care or treatment of this patient.

At the time the patient was transferred from Florala Memorial Hospital, the patient's condition was stable. I complied with all of the instructions of Dr. Poppell regarding stabilization of the patient's eye injury, including the placement of a protective eye patch. At no time did I refuse to treat Mr. Ashton, however, his injury was not within the scope of my specialty, emergency room medicine and Mr. Ashton needed to be seen by an ophthalmologist such as Dr. Poppell.

Florala Memorial Hospital emergency room is not equipped or staffed to perform eye surgery and I am not trained in eye surgery. It would have been inappropriate for me to undertake any kind of surgical procedure on the Plaintiff's eye at Florala Memorial Hospital because I am not trained in eye surgery and the appropriate equipment for eye surgery was not available to me at Florala Memorial Hospital emergency room.

During the time that John A. Ashton was a patient at the Florala Memorial Hospital on March 12, 2004, I acted within the standard of care for emergency room physicians practicing emergency room medicine and at no time did I deviate from the applicable standard of care in my dealings with Mr. Ashton. The fact that Mr. Ashton may have been uninsured did not affect any of the medical decisions that I made, nor did his lack of health care insurance change anything that I did in connection with this emergency room visit. I would have done exactly the same for any other patient, insured or uninsured, who presented with such an injury. Referral to an ophthalmologist is the standard of care for a person with an eye injury such as that suffered by Mr. Ashton.

Attached to this affidavit is a true and correct copy of all of the emergency room records of John A. Ashton for the date of March 12, 2004.

RUSSELL PAGE, D.O.

STATE OF ALABAMA,

COUNTY OF Houston

Sworn to and subscribed before me this the 15th day of February, 2007.

NOTARY PUBLIC

My commission expires: 1-16-08



# OUTPATIENT AND EMERGENCY RECORD

| HOSPITAL | | DATE | TIME | DOCTOR NOTIFIED | DOCTOR ARRIVED | | | FAMILY PHYSICIAN |
|---|---|---|---|---|---|---|---|---|
| 27-3372 | 3-12-04 | 13 | 18 | 1330 | 1370 | | | |

PATIENT NAME (LAST, FIRST, MIDDLE): Ashton John A

BILLING ADDRESS: 1617 East 7th One    CITY: Florala    STATE: Al.    ZIP: 36442    EMPLOYER:    SS#: 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

BIRTHDATE: 1-27-52    AGE: 51    SEX: M

BROUGHT BY: □ SELF □ RELATIVE □ AMBULANCE ☒ POLICE □ OTHER

GUARANTOR NAME (LAST, FIRST, MIDDLE):

BILLING ADDRESS:    CITY:    STATE:    ZIP:    EMPLOYER:

EXHIBIT "B"    tabbies

**INSURANCE INFORMATION**

FINANCIAL CLASS: ☒ Self Pay
1. BC/BS 2. MEDICARE 3. COMMERCIAL 4. SELF-PAY 5. MEDICAID 6. WORKMAN'S COMP. 7. M/C-MCAID 8. OTHER

NAME OF INS. CO. ____ CONTRACT# ____ GROUP# ____
INSURED THROUGH ____ RELATIONSHIP ____ PHONE ____

**NURSING ASSESSMENT:** C/O trauma to left eye, stated he was poked in eye. Pt has pink drainage from left eye, red area to inner lid.

R.N. SIGNATURE C Bradly RN

CONDITION ON ADMISSION: Stable

LAST TETANUS: U.T.D

ROUTINE MEDS: Ø

**ALLERGIES:** PCN

**PHYSICIAN'S REPORT:**
Iris is Dilated Ø —
+ small hyphema
pt can see light on Ø

| | T | 97.0 | P | 86 | R | 20 | BP | 119/77 | TIME | 1320 |
|---|---|---|---|---|---|---|---|---|---|---|
| | T | | P | | R | | BP | | TIME | |
| | T | | P | | R | | BP | | TIME | |

**DIAGNOSIS:** Blunt trauma to L Eye. Damage — I. Iridal — (Iris dilated)

MEDS GIVEN | TIME–SITE–ROUTE–SIGNATURE

**PHYSICIAN'S ORDERS:** + Metal protective patch

Antibiotic oint left eye.

O₂ sat 96.70

**BRIEF HISTORY:** Assaulted by another person. Stand Chambers O.S.

TREATMENTS DONE | TIME – SIGN.

DISPOSITION OF CASE: ☒ DISMISSED □ ADMITTED □ TRANSFERRED to Dr Poppell MD (office) in Fort Walton    CONDITION ON DISMISSAL: Stable

HOW DISMISSED: □ AMBULATORY □ WHEELCHAIR □ STRETCHER □ OTHER

ACCOMPANIED BY: □ SELF □ RELATIVE □ POLICE □ OTHER    TIME OUT 1600

## CHARGES
(DOES NOT INCLUDE ATTENDING PHYSICIAN'S FEE)

| | |
|---|---|
| EMERGENCY | $ |
| CENTRAL SUPPLY | |
| LABORATORY | |
| X-RAY | |
| PHARMACY | |
| OXYGEN | |
| LOCAL ANES. | |
| OTHER | |
| TOTAL | $ |

PHYSICIAN'S FEE $
BILL TO
ADDRESS
BILLED □ PAID □ DATE

**AUTHORIZATION FOR MEDICAL AND/OR SURGICAL TREATMENT**
I, THE UNDERSIGNED, A PATIENT IN THE ABOVE-NAMED HEREBY AUTHORIZE THE ATTENDING PHYSICIAN (AND WHOMEVER HE MAY DESIGNATE AS HIS ASSISTANTS) TO ADMINISTER SUCH TREATMENT AS IS NECESSARY, WITH THE EXCEPTION OF

PATIENT SIGNATURE OR RESPONSIBLE PARTY

**AUTHORIZATION FOR RELEASE OF INFORMATION**
I, THE ABOVE-NAMED PATIENT AT THE ABOVE-NAMED FACILITY, HEREBY AUTHORIZE THE SAID FACILITY TO FURNISH SUCH PROFESSIONAL INFORMATION, IN ACCORDANCE WITH THE POLICY OF THE FACILITY, AS MAY BE NECESSARY FOR THE COMPLETION OF MY PATIENT CARE INSURANCE CLAIMS BY THE ABOVE-NAMED THIRD PARTY (HEALTH INSURANCE CARRIER) FROM THE MEDICAL RECORDS COMPILED DURING MY PRESENT PATIENT STAY AND HEREBY RELEASE THE SAID FACILITY FROM ALL LEGAL LIABILITY THAT MAY ARISE FROM THE RELEASE OF THE INFORMATION REQUESTED.

PATIENT SIGNATURE OR RESPONSIBLE PARTY

**AUTHORIZATION OF HOSPITAL BENEFITS/GUARANTEE OF PAYMENT**
IN CONSIDERATION FOR SERVICE RENDERED OR TO BE RENDERED BY THE ABOVE-NAMED HOSPITAL, I HEREBY ASSIGN TO SAID HOSPITAL THE BENEFITS DUE ME COVERING HOSPITAL EXPENSE UNDER THE ABOVE-NAMED INSURANCE POLICY INSOFAR AS THEY ARE NECESSARY TO COVER SUCH EXPENSE.
I AGREE THAT, SHOULD THE AMOUNT BE INSUFFICIENT TO COVER THE ENTIRE HOSPITAL EXPENSE, I WILL BE RESPONSIBLE FOR PAYMENT OF THE DIFFERENCE, AND THAT IF THE NATURE OF THE DISABILITY BE SUCH THAT IT IS NOT COVERED BY THE SAID POLICY, I WILL BE RESPONSIBLE TO THE HOSPITAL FOR PAYMENT OF THE ENTIRE BILL.
AGREEMENT TO PAY: THE UNDERSIGNED ACCEPTS THE FEE CHARGED AS A LAWFUL DEBT AND HEREBY AGREES TO PAY SAID FEE AS OUTLINED ABOVE INCLUDING THE COST FOR COLLECTION, ATTORNEY FEES, AND COURT COSTS IF SUCH BE NECESSARY, WAIVING NOW AND FOREVER THE RIGHT TO CLAIM EXEMPTION UNDER THE CONSTITUTION AND LAWS OF THE STATE OF ALABAMA, OR ANY OTHER STATE.

PATIENT SIGNATURE OR RESPONSIBLE PARTY

INSTRUCTIONS TO PATIENT: Dr Poppel accepts 911-A Mar Walt Drive Ft Walton — 315 Pa — RN

FLO62

DIAGNOSIS: _Blunt trauma to L. Eye. Dimsig_    2 level -    Ant. biotic oint left ey.

PHYSICIAN'S ORDERS:    (has detached

_Metal protective patel_

TREATMENTS DONE    _O2 sat 96%_    TIME — SIGN.

BRIEF HISTORY: _Assaulted by with person_
_blunt trauma O.S_

DISPOSITION OF CASE: ☐ DISMISSED ☐ ADMITTED ☒ TRANSFERRED    _to Dr. Poppell MD (others) in Fort Walton_    CONDITION ON DISMISSAL:
HOW DISMISSED: ☐ AMBULATORY ☐ WHEELCHAIR ☐ STRETCHER ☐ OTHER _____    _Stable_
ACCOMPANIED BY: ☐ SELF ☐ RELATIVE ☐ POLICE ☐ OTHER _____    TIME OUT _1600_

## CHARGES
(DOES NOT INCLUDE ATTENDING PHYSICIAN'S FEE)

☐ EMERGENCY    $ _____
☐ CENTRAL SUPPLY    _____
☐ LABORATORY    _____
☐ X-RAY    _____
☐ PHARMACY    _____
☐ OXYGEN    _____
☐ LOCAL ANES.    _____
☐ OTHER    _____
TOTAL    $ _____

PHYSICIAN'S FEE $ _____
BILL TO
ADDRESS _____
BILLED ☐ PAID ☐ DATE _____

### AUTHORIZATION FOR MEDICAL AND/OR SURGICAL TREATMENT

I, THE UNDERSIGNED, A PATIENT IN THE ABOVE-NAMED HOSPITAL, HEREBY AUTHORIZE THE ATTENDING PHYSICIAN (AND WHOMEVER HE MAY DESIGNATE AS HIS ASSISTANTS) TO ADMINISTER SUCH TREATMENT AS IS NECESSARY, WITH THE EXCEPTION OF

PATIENT SIGNATURE OR RESPONSIBLE PARTY

### AUTHORIZATION FOR RELEASE OF INFORMATION

I, THE ABOVE-NAMED PATIENT AT THE ABOVE-NAMED FACILITY, HEREBY AUTHORIZE THE SAID FACILITY TO FURNISH SUCH PROFESSIONAL INFORMATION, IN ACCORDANCE WITH THE POLICY OF THE FACILITY, AS MAY BE NECESSARY FOR THE COMPLETION OF MY PATIENT CARE INSURANCE CLAIMS BY THE ABOVE-NAMED THIRD PARTY (HEALTH INSURANCE CARRIER) FROM THE MEDICAL RECORDS COMPILED DURING MY PRESENT PATIENT STAY AND HEREBY RELEASE THE SAID FACILITY FROM ALL LEGAL LIABILITY THAT MAY ARISE FROM THE RELEASE OF THE INFORMATION REQUESTED.

PATIENT SIGNATURE OR RESPONSIBLE PARTY

### AUTHORIZATION OF HOSPITAL BENEFITS/GUARANTEE OF PAYMENT

IN CONSIDERATION FOR SERVICE RENDERED OR TO BE RENDERED BY THE ABOVE-NAMED HOSPITAL, I HEREBY ASSIGN TO SAID HOSPITAL THE BENEFITS DUE ME COVERING HOSPITAL EXPENSE UNDER THE ABOVE-NAMED INSURANCE POLICY, INSOFAR AS THEY ARE NECESSARY TO COVER SUCH EXPENSE.
I AGREE THAT, SHOULD THE AMOUNT BE INSUFFICIENT TO COVER THE ENTIRE HOSPITAL EXPENSE, I WILL BE RESPONSIBLE FOR PAYMENT OF THE DIFFERENCE, AND THAT IF THE NATURE OF THE DISABILITY BE SUCH THAT IT IS NOT COVERED BY THE ABOVE POLICY, I WILL BE RESPONSIBLE FOR PAYMENT FOR THE ENTIRE BILL.
AGREEMENT TO PAY: THE UNDERSIGNED ACCEPTS THE FEE CHARGED AS A LAWFUL DEBT AND PROMISES TO PAY SAID FEE AS OUTLINED ABOVE INCLUDING THE COST FOR COLLECTION, ATTORNEY FEES, AND COURT COSTS IF SUCH BE NECESSARY, WAIVING NOW AND FOREVER THE RIGHT TO CLAIM EXEMPTION UNDER THE CONSTITUTION AND LAWS OF THE STATE OF ALABAMA, OR ANY OTHER STATE.

PATIENT SIGNATURE OR RESPONSIBLE PARTY

INSTRUCTIONS TO PATIENT: _Dr Poppell accepts  911-A Mar Walt Drive_
_Ft Walton — 315PM — RP_

X _____    _____    _____    _____
PATIENT SIGNATURE    MEDICAL RECORDS / DATE    TIME    PHYSICIAN'S SIGNATURE    FORM 10-ER-1

## OUT-PATIENT AND EMERGENCY RECORD

FLO63

# FLORALA MEMORIAL HOSPITAL

P.O. Box 189 • 24273 Fifth Avenue • Florala, Alabama 36442
(334) 858-3287

## Emergency Department
# MEDICAL SCREENING EXAMINATION

☑ 1-Emergent

☐ 2-Urgent

☐ 3-Non-Urgent

Patient Name _Ashton, John_    Age _____   DOB _____

Address _____ City _____ State _____ Zip _____

# _____ Phone# _____

Chief Complaint _____

Nursing Assessment _See ER Sheet_

| Patient Preference | |
|---|---|
| ER MD ✓ Private MD _____ | |
| ER MD Per Private MD _____ | |

### VITAL SIGNS

BP _____   Date _____

T _____   Time _____

P _____

R _____   HT 5'6'

WT _103_

| Visual Acuity | Time to Tx Area |
|---|---|
| OU _____ | _____ |
| OS _____ | MD Notified |
| OD _____ | _____ |

ALLERGIES _____

Present Medication (including Dosage & Frequency) _____

| PMH | YES | NO | SOCIAL HX | | MIS HX | | Means of Arrival |
|---|---|---|---|---|---|---|---|
| Cardiac | | ✓ | Tobacco | Yes | LMP | | ___ W/C |
| Diabetes | | ✓ | Alcohol | Yes | IMMUNIZATIONS | | ___ Stretcher |
| Kidney | | ✓ | DASA: YES ___ NO ___ | | UTD _____ | | ✓ Walked |
| Respiratory | | emphysema | COMMENTS | | >5YRS _____ | | ___ Carried |
| Psychiatric | | ✓ | | | TX PTA _____ | | ___ Ambulance |
| Seizures | | ✓ | | | ASA/Tylenol _____ | | |
| Cancer | | ✓ | | | Splints _____ | | Condition on Arrival |
| Sickle Cell | | ✓ | | | Bandages _____ | | ✓ Satisfactory |
| Hypertension | ✓ | ✓ | appendectomy | | Bleeding Control _____ | | ___ Serious |
| Surgery | ✓ | ✓ | shoulder | | | | ___ Critical |
| | | | knee sur | | | | ___ DOA |

✓ Trauma
___ Medical
___ OB
___ Other

Other Agencies Notified:
Police _____
Coroner _____
DHR _____

NURSES SIGNATURE _C Bragg RN_   R.N.

FLO 64

FHH-61

ARTMENT
CORD

FL RALA MEMORIAL HOSPITAL

| NT NAME (LAST, FIRST, MIDDLE) | | | REV CAT | BASE C/S | DUE DATE YY MM DD | ADMIT CLERK | DATE | TIME |
|---|---|---|---|---|---|---|---|---|
| Ashton, John | | | | | | | 3-12-04 | |

GRANTOR NAME (LAST, FIRST, MIDDLE) | STREET ADDRESS | CITY STATE | ZIP | TELEPHONE NO.

## SPRAIN, FRACTURE & SEVERE BRUISES

Elevate the injured part above level of heart to lessen swelling. If pillows flatten, use chair cushions with pillows or blanket for comfort.

Ice packs also help prevent swelling, especially during the first 48 hours.

Place ice in plastic or rubber bag, cloth covering, after 48 hours, use heat.

If you have an elastic bandage, rewrap it if too tight or loose. Remove at bedtime and replace in A.M.

If you have a cast, keep it perfectly dry at all times.

Wiggle toes or fingers to help prevent swelling in the cast - this should be done often if it does not cause pain.

If the part swells anyway, or gets cold, blue or numb or pain increases markedly, have it checked promptly.

Use crutches.

## BACK AND NECK INJURY INSTRUCTIONS

☐ USE HEAT OR COLD ON THE INJURED AREA - whichever seems to help the most. Be careful not to burn yourself.

☐ Rest as much as possible until you are improved.

☐ Avoid positions and movement that make the pain worse.

☐ Relax emotionally - if you are tense the problem will only be worse.

☐ Gentle but firm message will increase circulation in sore muscles and helps to clear the soreness.

☐ Wear special collar when out of bed.

## HEAD INJURY INSTRUCTIONS

Persons who receive blows to the head may have injuries that cannot always be seen by X-ray or examination soon after accident. For the next 24 hours it is important that these instructions be followed:
☐ Awaken the patient every two hours, even at night to be sure he knows where he is and is not confused.
☐ Check eyes to see that both pupils are of equal size.
☐ Prevent the taking of sleeping pills, tranquilizers or alcohol.
☐ Restrict excessive work or play.

Call your family doctor or local hospital immediately if the patient:
☐ Develops severe headache.
☐ Vomits more than twice within a short time.
☐ Is confused, faints or is hard to awaken.
☐ Has a pupil of one eye larger than the other.
☐ Complaints of double vision.
☐ Shows abnormal behavior such as staggering or walking into things.

## X-RAY INSTRUCTIONS

Your X-rays have been read by the attending physician in the emergency Dept. For your added protection, your X-rays will be read the next day by Radiology Dept. If any abnormalities are found that have not been called to your attention, you and your doctor will be called immediately. (Please be advised that the emergency Dept. is a phone number where you can be reached.) Sometimes fractures or abnormalities may not show up on X-rays for several days. If your symptoms continue or get worse, call your doctor. More X-rays may need to be taken. If you are referred to another physician, come by the hospital and pick up copies of your X-rays and take them with you to the doctor's office.
Please call ahead to X-ray Dept.

## WOUND CARE (Cuts, Abrasions, Burns, Stitches

☐ Keep the dressings clean and dry ........................................

☐ Elevate the wound to help relieve soreness and to help speed wound healing.

☐ Despite the greatest care any wound can be infected. If your wound becomes red, swollen, shows pus or red streaks, or feels sore instead of less sore as days go by, you must report to your doctor right away.

☐ Dressing should be changed in _____ days.

☐ Treatment rendered _____

☐ Tetanus Toxoid given _____
250 units of tetanus immune globulin was given. To complete your immunization, you must receive two additional doses of toxoid 4-5 weeks apart. Call your physician for the next dose.

☐ Warm soaks to area 4 times daily, 20-40 minutes each time.

☐ Continuous warm compresses.

## VOMITING & DIARRHEA

☐ Do not feed anything for 4 hours.

☐ After 4 hours, if there is no vomiting and/or diarrhea, offer 2 tablespoons (1 ounce) of any of the following clear liquids: Coke, Gingerale, 7-up, weak tea, Gatorade or Jello water. If patient is hungry you may add 1 teaspoon of sugar to each ounce of fluid.

☐ UNDER NO CIRCUMSTANCES USE MILK OR MILK PRODUCTS.

☐ The 2 tablespoons of liquid may be offered every hour. If after 4 hours no vomiting has occurred, the amount may be slowly increased.

☐ Using no more than 1/2 glass (4 ounces) of liquid at a time continue this treatment for 24 hours.

☐ Contact your doctor's office for further instructions after 24 hours.

## GENERAL INSTRUCTIONS

) Stay in bed / may go to bathroom.

) Use vaporizer.

) Drink large amounts of liquids.

) Take _____ aspirin every 4 hours.

) Avoid any use of injured part.

) You need not necessarily limit activity.

) Fill prescriptions given to you from Emergency Dept. and take as directed.

## FEVER OVER 102

☐ Sponge with lukewarm water in the tub.

☐ If temperature increases or persists for 24 hours, see your family doctor.

## EYE INJURY

☐ Any eye injury is potentially hazardous

☐ Any increasingly severe discomfort, redness or sudden impairment of vision should be reported immediately to your physician or eye specialist below.

☐ Do not drive with eye patch.

## ANIMAL OBSERVATION

Instructions for observation of any animal that may have bitten a human if that animal is available for observation.

☐ Have animal taken to veterinarian for observation.

☐ If the owner should refuse to take the animal to the veterinarian, notify the County Health Officer of the situation.

ADDITIONAL INSTRUCTIONS _Transport by Ambulance to MD office_

I hereby acknowledge receipt of all instructions indicated above. I understand that I have received EMERGENCY treatment only and that I may be released before all my medical problems are known or treated. I will arrange for follow-up care as indicated above. I understand that if my conditions worsen or new symptoms appear, I should contact my Doctor immediately.

PATIENT'S SIGNATURE | NURSES SIGNATURE C Brasl RN | PHYSICIAN'S SIGNATURE

SCHOOL AND WORK EXCUSE PATIENT NAME | | DATE

☐ No work for _____ days
☐ Light duty for _____ days
☐ May return to work on _____

☐ No school for _____ days
☐ No Physical Education for _____ days
☐ May return to school on _____

PHYSICIAN'S SIGNATURE _____ FLO65

CORALA MEMORIAL HOSP       L   P.O. Box 189 • 24273 Fifth Avenue • Flor    Alabama 36442

## EMERGENCY DEPARTMENT

| GUARANTOR NAME AND ADDRESS | PATIENT NO. | PATIENT NAME | DR. NO. | DATE |
|---|---|---|---|---|
| | 189-3372 | Ashton, John | | 3-12-04 |

| DATE OF BIRTH | TELEPHONE NO. | CODE | INSURANCE DESCRIPTION | CERTIFICATE NO. |
|---|---|---|---|---|
| 9-27-52 | | | | Self |

| DESCRIPTION | CODE | FEE | DESCRIPTION | CODE | FEE | DESCRIPTION | CODE | FEE | DESCRIPTION | CODE | FEE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **E/M Care** | | | **E.N.T.** | | | 2.6 - 7.5 cm | 12002 | | | | |
| New Patient | | | Control Nasal Hemorrhage | | | 7.6 - 12.5 cm | 12004 | | | | |
| Level 1 | 99281 | | Simple Anterior | 30901 | | 12.6 - 20.0 cm | 12005 | | | | |
| Level 2 | 99282 | | Complex Anterior | 30903 | | 20.1 - 30 cm | 12006 | | | | |
| Level 3 | 99283 | | Posterior | 30905 | | Simple Face, Ears, Eye, | | | | | |
| Level 4 | 99284 | | | | | Nose, Lips | | | | | |
| Level 5 | 99285 | | **Nails** | | | Up to 2.5 cm | 12011 | | | | |
| | | | Avulsion, Simple | 11730 | | 2.6 - 5.0 cm | 12014 | | | | |
| **Emergency Procedures** | | | Subungal Hematoma | 11740 | | 7.6 - 12.5 cm | 12015 | | | | |
| Endotracheal Intubation | 31500 | | Nailbed Reconstruction | 11760 | | **Burn & Debridement** | | | | | |
| CVP Line | 36489 | | | | | Initial 1st Degree Burn | 16000 | | | | |
| A-Line Percutaneous | 36620 | | **Arthrocentesis** | | | Debr. Burn & Dressing | | | | | |
| IV Therapy, MD present | 90780 | | Small Joint / Bursa | 20600 | | Small 5% | 16020 | | | | |
| Thrombolysis by IV | 92977 | | Intermed. Joint / Bursa | 20605 | | Medium 5 - 10% | 16025 | | | | |
| C P R | 92950 | | Major Joint / Bursa | 20610 | | Large > 10% | 16030 | | | | |
| | | | | | | Debrid. Eczematous | | | | | |
| **Critical Care** | | | **Wound & Lacer. Repair** | | | Infected Skin | | | | | |
| Critical Care, 1st Hr. | 99291 | | Complicated or Over | | | Up to 10% | 11000 | | | | |
| Care, ½ x ___ units | 99292 | | 7.5 cm Any Area | 13300 | | Partial Thickness | 11040 | | | | |
| | | | Complex Trunk | | | | | | | | |
| **Additional Procedures** | | | 1.1 - 2.5 cm | 13100 | | **Dislocation** | | | | | |
| Tube Thoracostomy | 32020 | | 2.6 - 7.5 cm | 13101 | | TM Joint | 21480 | | | | |
| Direct Life Line Support | 99288 | | Complex Scalp, Arms, Legs | | | A/C Separation | 23540 | | | | |
| Paracentesis | 49080 | | 1.1 - 2.5 cm | 13120 | | Shoulder | 23650 | | | | |
| Emerg Vaginal Delivery | 59409 | | 2.6 - 7.5 cm | 13121 | | Elbow, Nursemaid | 24640 | | | | |
| Lumbar Puncture | 62270 | | Complex Face, Genitalia, | | | Finger, Metacarpophalangeal | 26700 | | | | |
| Ipecac Administration | 99175 | | Hands, Feet 1.1 - 2.5 cm | 13131 | | Finger, IP Joint | 26770 | | | | |
| N G Tube Lavage / Asp | 91105 | | 2.6 - 7.5 cm | 13132 | | Patella | 27560 | | | | |
| Change Gastrostomy Tube | 43760 | | Comp. Eye, Nose, Ear, Lip | | | Toe, IP Joint | 28660 | | | | |
| Urine Cath, Simple | 53670 | | 1.0 cm or less | 13150 | | | | | | | |
| Urine Cath, Complex | 53675 | | 1.1 - 2.5 cm | 13151 | | | | | | | |
| Transcutaneous Pacing | 92953 | | 2.6 - 7.5 cm | 13152 | | ICDA CODE | | DATE OF LAST PAYMENT | | | |
| Elective Cardioversion | 92960 | | Layered Scalp, Trunk, | | | | | | | | |
| | | | Extremities, Up to 2.5 cm | 12031 | | | | PREVIOUS BALANCE | INSURANCE | PATIENT | |
| **Minor Surgery** | | | 2.6 - 7.5 cm | 12032 | | | | | | | |
| Incision / Drainage | | | 7.6 - 12.5 cm | 12034 | | | | TODAY'S CHARGES | | | |
| Abscess, Simple | 10060 | | 12.6 - 20.0 cm | 12035 | | | | | | | |
| Abscess, Complicated | 10061 | | Layered Neck, Hands, | | | | | PAID ON ACCOUNT | | | |
| Hematoma, Simple | 10140 | | Feet, External Genitalia | | | | | | | | |
| Aspiration Abscess | 10160 | | Up to 2.5 cm | 12041 | | | | CHECK | CASH | | |
| Other: (Name Site) | | | 2.6 - 7.5 cm | 12042 | | | | ADJ. | | | |
| | | | 7.6 - 12.5 cm | 12044 | | | | TOTAL DUE | | | |
| **Foreign Body Removal** | | | 12.6 - 20.0 cm | 12045 | | **Closed Fracture** | | | | | |
| Subcutaneous, Simple | 10120 | | Layered Face, Ears, | | | Nasal Fracture | 21310 | | | | |
| Subcutaneous, Complic. | 10121 | | Nose, Lips | | | Rib, uncomplicated | 21800 | | | | |
| Muscle, Simple | 20520 | | Up to 2.5 cm | 12051 | | Clavicular | 23500 | | | | |
| Intranasal | 30300 | | 2.6 - 5.0 cm | 12052 | | Phalangeal, Shaft | 26720 | | | | |
| Pharynx | 42809 | | 5.1 - 7.5 cm | 12053 | | Phalangeal, Distal | 26750 | | | | |
| Ear | 69200 | | 7.6 - 12.6 cm | 12054 | | Great Toe | 28490 | | | | |
| Eye, Superficial | 65205 | | Simple Neck, Trunk, | | | Other Toe | 28510 | | | | |
| Impacted Cerumen | 69210 | | Genitalia, Extremities | | | | | | | | |
| | | | Up to 2.5 cm | 12001 | | | | | | | |

DIAGNOSIS:

PHYSICIAN SIGNATURE:

FLO66

CONSENT FOR TREATMENT

y agree and give my consent for the admission/treatment _____ J. Ashton _____ (myself or name of pi    ) to

ALA MEMORIAL HOSPITAL, hereinafter referred to as the Hospital, under the care of the attending physician, his associates, partners, ts or designees. I consent to any and all hospital care, which encompasses radiological procedures, laboratory procedures, diagnostic procedures, sia, and nursing or medical/surgical treatment which my physician, his associates, partners, assistants or designees may deem necessary or advisable, ie general and special instructions of the same, during my hospitalization.

ideration of the hospital care and treatment to be rendered to me by the Hospital, I agree and consent to the following conditions:

**NERAL DUTY NURSING.** The Hospital provides only general duty nursing care. Under this system nurses are called to the bedside of the by a signal system. If the patient is in such condition as to need continuous or special duty nursing care, it is agreed that such must be arranged by the or his legal representative, or his physicians, and the Hospital shall in no way be responsible for failure to provide the same and is hereby released from all liability arising from the fact that said patient is not provided with such additional care.

**DICAL AND SURGICAL TREATMENT.** I agree and understand that all physicians, dentists and oral surgeons treating me or the patient in are responsible and liable for their own acts or omissions and the Hospital is not responsible or liable for the acts and omissions of the entioned. I am aware that the practice of medicine is not an exact science and further state that no guarantee has been or can be made as to the results of tments of examinations in the Hospital. The undersigned recognizes that all doctors of medicine furnishing services to the patient, including the gist, pathologist, anesthetist and the like are independent contractors and are not employees or agents of the hospital.

**SIGNMENT OF INSURANCE BENEFITS.** In order to correctly process your insurance claim, the patient or responsible party is responsible viding at the time of service, the most current address, phone number and insurance information. The undersigned hereby assigns and authorizes it directly to the Hospital, of any hospital benefits, sick benefits, injury benefits due because of liability of a third-party, or proceeds of all claims g from the liability of a third-party, payable by any party, organization, et cetera, to or for the patient unless the account for this hospital, outpatient nt or series of outpatient treatments is paid in full upon discharge or completion of outpatient treatments. If eligible for Medicare, the undersigned s Medicare services and benefits. The undersigned further agrees that this assignment will not be withdrawn or voided at any time until this account for pitalization is paid in full. The undersigned understands that they are responsible for any hospital charges not covered by their insurance company and ually obligates himself to pay the account of the Hospital in accordance with the regular rates and terms of the Hospital.

**YMENT AGREEMENT.** The undersigned individually obligates himself to the payment of the Hospital account incurred by the patient in nce with the regular rates and terms of the Hospital at the time of patient's discharge. If the patient fails to make payment when due and the account s delinquent or is turned over to a collection agency or an attorney for collection, the undersigned shall pay all collection agency fees, court costs and y's fees. The undersigned agrees that any patient or guarantor overpayments collected on the above admission or outpatient treatments may be applied to any delinquent account for which the patient or guarantor is legally responsible at the time of collection of the overpayment.

**SIGNMENT OF PHYSICIAN BENEFITS.** In the event that I, the patient, in addition to hospital benefits, am entitled to any physician's s of any type whatsoever arising out of a policy of insurance insuring me or any other party's liability to me, I hereby assign said benefits to any an rendering care or treatment during this stay or outpatient visits, to be applied to my bill.

**LEASE OF MEDICAL INFORMATION.** I authorize the Hospital and any physician rendering care or treatment to release medical and ting documentation of same as compiled in the medical records during this admission or outpatient visit for purposes of benefit payment.

**EDICARE PATIENT CERTIFICATION.** I certify that the information given by me in applying for payment under Title XVIII of the Social y Act is correct. I authorize any holder of medical or other information about me to release to the Social Security Administration or its intermediaries or s any information needed for this or a related Medicare claim. I permit a copy of this authorization to be used in place of the original and request nt of authorized benefits be made on my behalf.

**UVATE ROOM DIFFERENCE.** I agree and understand that if I request a private room for myself or the patient, I am responsible for the entire room difference.

**RSONAL VALUABLES AND BELONGINGS.** It is understood and agreed that the Hospital maintains a safe for the safekeeping of money, les and personal belongings and the Hospital shall not be liable for the loss or damage to any articles or personal property while I am hospitalized unless ticles are deposited with the Hospital in the safe and receipts are issued describing said items.

**DVANCE DIRECTIVE ACKNOWLEDGEMENT.** Please read and initial the following statements:

1. I have been given written materials about my right to accept or refuse medical treatments. _____ (initial)
2. I have been informed of my rights to formulate Advance Directives. _____ (initial)
3. I understand that I am not required to have an Advance Directive in order to receive medical treatment at this facility. _____ (initial)
4. I understand that the terms of any Advance Directive that I have executed will be followed by the Hospital and my caregivers to the extent permitted by law. _____ (initial).
5. I have executed an Advance Directive _____ (initial) OR I have not executed an Advance Directive. _____ (initial)

**ATIENT RIGHTS: The patient has the right to:**

1. considerate and respectful care;
2. obtain from his physician complete current information concerning his diagnosis, treatment, and prognosis in terms the patient can be reasonably expected to understand. When it is not medically advisable to give such information to the patient, the information should be made available to an appropriate person in his behalf. He has the right to know, by name the physician responsible for coordinating his care;
3. receive from his physician information necessary to give informed consent prior to the start of any procedure and/or treatment. Except in emergencies, such information for informed consent should include but not necessarily be limited to the specific procedure and/or treatment, the medically significant risks involved, and the probable duration of incapacitation. Where medically significant alternatives for care or treatment exist, or when the patient requests information concerning medical alternatives, the patient has the right to such information. The patient also has the right to know the name of the person responsible for the procedure and/or treatment;
4. ~~refuse treatment to the extent permitted by law and to be informed of the medical consequences of his action;~~
5. every consideration of his privacy concerning his own medical care program. Case discussion, consultation, examination, and treatment are confidential and should be conducted discreetly. Those not directly involved in his care must have the permission of the patient to be present;
6. expect that all communications and records pertaining to his care should be treated as confidential;
7. expect that within its capacity the Hospital must make reasonable response to the request of a patient for services. The Hospital must provide evaluation, service, and/or referral as indicated by the urgency of the case. When medically permissible, a patient may be transferred to another facility only after he has received complete information and explanation concerning the needs for and alternatives to such a transfer. The institution to which the patient is to be transferred must first have accepted the patient for transfer;
8. obtain information as to any relationship of the Hospital to other health care and educational institutions insofar as his care is concerned. The patient has the right to obtain information as to the existence of any professional relationships among individuals, by name, who are treating him.
9. be advised if the hospital proposes to engage in or perform human experimentation affecting his care or treatment. The patient has the right to refuse to participate in such research projects;
10. expect reasonable continuity of care. He has the right to know in advance what appointment times and physicians are available and where. The patient has the right to expect that the hospital will provide a mechanism whereby he is informed by his physician or delegate of the physician of the patient's continuing health care requirements following discharge;
11. examine and receive an explanation of his bill regardless of source of payment;
12. know what Hospital rules and regulations apply to his conduct as a patient.

**NOTICE OF PRIVACY PRACTICES:** *Required pursuant to Health Insurance Portability and Accountability Act of 1996 (HIPAA).* I wledge that I have received a copy of the Facility's Notice of Privacy Practices that provides information about how the facility may use and disclose my cted health information.

ndersigned certifies that they have read this entire document and are the patient, or are dully authorized by the patient or by the law to execute bove agreement and accepts and understands its terms.

_____          X _____          3-12-0
Bradley RN                      Patient                                Date

                                X _____          _____
                                Patient's Agent/Guarantor/Relationship          Date

FLO67

## PHYSICIAN'S CERTIFICATION STATEMENT (PCS)
## FOR AMBULANCE TRANSPORT

• Medicare requires that ambulance providers obtain a signed PCS for the provision of non emergency transports. The completion of this form rests with the attending physician and should be with the medical information at the time of transport.

PATIENT: _John A Ashton_   DATE OF TRANSPORT: _03-12-04_

DATE OF BIRTH: _9-27-52_   SOC. SEC. # _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_

PLACE OF ORIGINATION: _Flosah Memorial_   DESTINATION: _Samuel E Poppell MD_
_911 N. Mar Walt Drive_
_Ft Walton Bch. FL_
_1-850-862-4001_

OPTION 1: Ambulance Is Not Medically Necessary.

____NO   In my professional medical opinion, this patient does not require transport by ambulance and can safely be transported by other means because the patient can safely support him/herself while seated in wheelchair or car and does not require monitoring by trained personnel.

____NO   This transfer is at the request of the patient or representative and is not medically necessary.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

OPTION 2: Ambulance Medically Necessary.

. Ambulance transport is required because:

____Bedbound.  At time of service: The HCFA definition of _bedbound_ is the inability to get up from bed without assistance, the inability to ambulate and the inability to sit in a chair, including wheelchair.

____Needs Continual Medical Supervision.  This patient needs continual medical supervision and transport by other means may place the patient's general welfare in jeopardy or cause impairment of bodily function.

____ALS Care Required.  Due to _current or potential condition_, an ALS (IV, ETT, EKG, etc.) attendant is required.

. Describe current _physical_ condition of patient that makes transportation by ambulance medically necessary (i.e. Contractures, Must be turned every 2 hours, May exhibit aggressive behavior without warning, Persistent Vegetative State, etc).

_____

_____

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

he patient is being:

____Transferred to another facility for a higher level of care because required services, equipment, or personnel are not available at this facility. Specify: _____

____Discharged to:   ____Home,   ____ECF,   ____SNF, or   ____Rehab Facility.

____YES ____NO   This was the closest appropriate facility for this patient's needs.

. certify that the above information represents an accurate assessment of the patient's medical condition(s) and that In my professional medical opinion, this patient requires transport by ambulance and should not be transported by any other means. I understand that this information will be used HCFA to support the determination of medical necessity for ambulance service.

tending Physician _____

thorized Signature: _C Bradly RN_   Date: _03-12-04_   **FLO68**

RN, PA, CNS, or DISCHARGE PLANNER (circle one)

# FLORALA MEMORIAL HOSPITAL

P.O. BOX 189 • FLORALA, ALABAMA 36442
(334) 858-3287

## Procedure: Documentation of Transfer

Date: *3-12-04*     Name *John Ashton*     MR # _____
                                          ER# _____

**Florala Hospital Physician:**
☑ A. Decision to transfer due to diagnosis          ☐ B. Decision to transfer due to patient request

Receiving Physician called:     Dr. *Pippell*

Receiving Hospital: *Office Harton*     Person Accepting: *B Pippell*

**Transfer by:**
☐ A. Private Car                                    ☐ C. Emergency transfer with paramedic or nurse
☑ B. Non-emergency ambulance with EMT               ☐ D. Helicopter Service: _____
                                                       Time Called: _____

If helicopter, follow hospital prodecure for chopper.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Stabilization of Patient:** *(Complete A, B or C below:)*

A. I certify that the patient suffered from an emergency medical condition but was stabilized at the time of transfer.

   Dr. _____

   *If the physician is not physically present at the time of transfer, signature of a qualified medical person after direct consultation with the physician.*

   For physician by: _____

   Subsequent countersignature of Dr. _____

B. I certify that patient suffered from an emergency medical condition and was in an unstabilized condition and based upon the reasonable risks and benefits and upon the information available at the time, the benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risk to the individual's condition from effects of the transfer.

   The unstabilized patient -- or a person acting on the patient's behalf -- has requested the transfer in writing and has been informed of the hospital's obligations and of the risks and benefits of transfer.

   Dr. _____

   *If the physician is not physically present at the time of transfer, signature of a qualified medical person after direct consultation with the physician.*

   For physician by: _____

   Subsequent countersignature of Dr. _____

   The risks and benefits to the unstabilized patient (and to the fetus if the patient is in labor)

   are: _____

   _____

C. The patient or the patient's representative is requesting transfer in writing and against medical advice and after being informed of the risks and benefits of transfer (if unstable, complete the risks and benefits summary above.)

   Dr. _____
   *If physician is not physically present at the time of transfer, signature of qualified medical person after direct consultation with physician.*

   For physician by: _____

Subsequent countersignature of Dr. _____

FLO69

Page 1 of 2

FHH-90

mentation of Transfer        FLORALA MEMORIAL HOSPITA                    Page 2 of 2

List name and address of any on-call physician who failed or refused to appear within a reasonable time after being called:

Dr. _____        Dr. _____

Address _____        Address _____

**Sent to receiving facility:**
- ☑ Records related to emergency medical condition
- ☑ Preliminary diagnosis
- Results of any tests: *(circle)*    lab    x-ray    ABG    EKG
- ☐ Informed Written Consent of Patient (copy)

- ☑ Observation of signs or symptoms
- ☑ Treatment provided

- ☐ Other _____

**Nursing Information communicated to receiving nurse:**
- ☑ Yes    Name of Receiving Nurse: *Affria*

0. **Personal belongings:**
- ☐ Sent with patient
- ☐ Sent with family

1. Departure Time: **1600** _____    *C Bradly RN*
                                                        Signature of Person Completing Form

## Transfer

his is to certify that I ____ *John Ashton* ____ have been examined at

_____ and that I have:

|  |  |  |
|---|---|---|
| **table atient (check one)** | ☐ | 1. Given my consent to a transfer from this hospital to another facility, I acknowledge that I have been fully informed of the risks and benefits involved in the transfer. I hereby release the attending physician and the hospital from all responsibility for ill effects that may result from the transfer. |
|  | ☐ | 2. Refused to consent to transfer to another facility against the advice of my attending physician. I acknowledge I have been fully informed of the risks involved and hereby release the attending physician and hospital from all responsibility for ill effects that may result from the Refusal to Consent to Transfer. |
| **Unstable atient (check one)** | ☐ | 1. Requested a transfer from this hospital to another facility, I acknowledge that I have been fully informed of the risks and benefits involved in the transfer and I have requested the transfer. I hereby release the attending physician and the hospital from all responsibility for any ill effects that may result from the transfer. |
|  | ☐ | 2. Have not requested a transfer from this facility. I acknowledge that I have been fully informed of the risks and benefits involved. I hereby release the attending physician and the hospital from all responsibility for any ill effects that may result from my failure to request a transfer. |
| **R atients (check one)** | ☐ | 1. Consented to treatment or examination. |
|  | ☐ | 2. Refused to consent to treatment or examination or both against the advice of the attending physician. I acknowledge that I have been informed of the risks and benefits involved and hereby release the attending physician and hospital from all responsibility for any ill effects that may result from my Refusal to Consent to Treatment or Examination. |
| **LL atients** | ☑ | 1. The risks and benefits of transfer are (include risks and benefits to fetus if patient is in labor): |

*A — Not Significant*

*A = Outh Signs available*

R Patients    ☐    4. I acknowledge that I have been told of the hospital's obligation to provide screening and emergency medical treatment.

*[signature]*

tient's Signature

_____

gnature of Legally Responsible Person for Patient

_____

itness    *C Bradly RN*                                                FLO70

itness _____

| ATIENT NAME | ACCOUNT NO. | ROOM NO. | ADMIT DATE | DISCHARGE DATE | P. |
|---|---|---|---|---|---|
| FON JOHN A | 3828505 | 0   0 | 3/12/04 | 3/12/04 | 1 |

| NTOR NO. | GUARANTOR ADDRESS | FINANCIAL CLASS | INSURANCE PLANS 1   2   3 | BILLING DATE |
|---|---|---|---|---|
| | ASHTON JOHN A 1617 SEVENTH AVE FLORALA AL 36442 | P | 0   0   0 | 3/13/04 |

| | | AGE | DOCTOR NAME |
|---|---|---|---|

| ATE OF ERVICE | SERVICE CODES | CHARGE DESCRIPTION | QUANTITY | 51 UNIT PRICE | PAGE R AMOUNT | INSURANCE CODE |
|---|---|---|---|---|---|---|
| 12/04 | 264002 | ER LEVEL 2 | 1 | 0.00 | 75.00 | |
| 12/04 | 274012 | ER ROOM PHYSICIAN | 1 | 0.00 | 75.00 | |
| 12/04 | 213149 | CS EYE PADS | 1 | 0.00 | 9.00 | |
| | 519657 | Antibotic eye oint. | 1 | | 63.00 | |
| | | ******* DEPARTMENTAL SUMMARY ******* | | | | |
| | | Pharmacy | | | 63.00 | |
| | | CENTRAL SUPPLY NON-STERIL | | | 9.00 | |
| | | EMERGENCY ROOM | | | 75.00 | |
| | | ER PHYSICIAN'S FEES | | | 75.00 | |
| | | | | | 222.00 | |

| | | TOTAL CHARGES | | | 159.00 | |
| | | LESS PAYMENTS | | | 0.00 | |

PAY THIS AMOUNT ➡

159.00    FLO71

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN ASHTON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:06CV-226-D |
| | ) | |
| | ) | |
| FLORALA MEMORIAL | ) | |
| HOSPITAL; BLAIRE HENSON; | ) | |
| RUSSELL PAGE, M.D., and | ) | |
| SAMUEL E. POPPELL, M.D., | ) | |
| | | |
| Defendants. | | |

EXHIBIT
tabbies® " C "

## **AFFIDAVIT**

Before me, the undersigned authority, personally appeared Peter Zloty, M.D., who being by me first duly sworn, did depose and say as follows:

My name is Peter Zloty, M.D., and I have personal knowledge of the things and matters set forth in this affidavit. I am a physician licensed to practice medicine in the State of Alabama and I have been so licensed during all time material to this affidavit. I practice the specialty of ophthalmology in the City of Dothan, Alabama, and I am on the medical staff of Flowers Hospital and Southeast Alabama Medical Center. A true and correct copy of my curriculum vitae is attached to this affidavit as Exhibit "A."

On March 12, 2004, I saw John Ashton as a patient in the emergency room at Flowers Hospital in Dothan, Alabama. On the night of March 12-13, 2004, I performed surgery on Mr. Ashton's left eye as a result of an injury which he had received earlier in the day. Mr. Ashton's injury was consistent with having been struck in the eye with a fist or some other blunt object. Mr. Ashton told me that he had been punched in the eye by a person wearing brass knuckles. His injury was not consistent with having been stuck in the eye with the blade of a screwdriver.

In my examination and subsequent treatment of John Ashton, I found that he had suffered a ruptured globe but the injury was contained within the eye itself. Thus, the injury was contained and sterile until the time that I opened the eye surgically. Consequently, it is my opinion that any delay in surgical treatment of the injury had no effect on the ultimate outcome in the case. In fact, any loss of vision in the left eye was probably due to Mr. Ashton's non-compliance as a patient post-operatively. Mr. Ashton failed to keep follow-up appointments with retina specialists after he was discharged from the hospital and this non-compliance more likely than not, caused or contributed to any loss of vision. I felt that the patient achieved a good surgical outcome and that his prognosis was reasonably good after surgery. However, it was essential that he receive follow-up care after discharge from the hospital, which he did not do.

The type injury received by Mr. Ashton is an injury that requires the treatment of eye surgeon and it not typically treated by emergency room physicians. It is my understanding that Mr. Ashton was brought to the emergency room at Florala Memorial Hospital following his injury on March 12, 2004. I understand that he was seen in the emergency room by the emergency room physician on call. There is nothing that the emergency room could or should have done other than make arrangements to have the patient transferred to the care of an ophthalmologist. An emergency room physician such as Dr. Russell Page in Florala should not attempt to perform any surgical or other procedures on an eye injury such as that suffered by John Ashton. It would have been inappropriate in my opinion for Dr. Page to have undertaken any type of surgical or other operative procedure on Mr. Ashton's eye. It was appropriate and proper for Dr. Page to arrange for the transfer of the patient to the care of an ophthalmologist. In my opinion, the ultimate outcome in this case was in no way influenced by anything that occurred at Florala Memorial Hospital. Had this patient received surgery earlier in the day on March 12, 2004, his outcome would almost certainly have been the same.

PETER ZLOTY, M.D.

STATE OF ALABAMA,

COUNTY OF HOUSTON.


Sworn to and subscribed before me this the 20 day of _February_ , 2007.

_Elizabeth Ann Johnson_
NOTARY PUBLIC

My commission expires: _8 -6 -07_

# CURRICULUM VITAE

## PETER ZLOTY, M.D.
103 CREEK RIDGE ROAD
DOTHAN, ALABAMA 36301
(334) 794-3440

Personal Info

Birthdate:    April 16, 1960
Birthplace:   Buffalo, New York

Education:

Rensselaer Polytechnic Institute
Troy, New York 12181
Biomedicine Major (Accelerated two year program)
Bachelor of Science, 1980

Albany Medical College of Union University
Albany, New York 12208
Doctor of Medicine, 1984

Albany Medical Center Hospital
Albany, New York 12208
Categorical Diversified Medical Internship, 1984-1985

Diplomat of the National Board of Medical Examiners, 1985
NBME Number 299152

Combat Casualty Care Course (C4) Certification
Fort Sam Houston, Texas, July 1985

Albany Medical Center Hospital
Albany, New York 12208
Residency in Ophthalmology, 1988-91

Albany Medical College of Union University
Albany, New York 12208
Fellowship, Corneal and External Diseases, Anterior Segment Surgery 1991-92
Michael W. Belin, M.D. Preceptor

Board Certification, American Board of Ophthalmology, 1993

Current Position:

>   Staff Physician, Cornea, External Disease, and Refractive Surgery
>   Southeast Eye Clinic, 102 Doctors Drive,
>   Dothan, Alabama 36301   March 2006 – Present

Previous Positions:

>   Director, Cornea, External Disease, and Refractive Surgery
>   Eye Institute of the South, 2800 Ross Clark Circle SW,
>   Dothan, Alabama 36301   July 1992 – March 2006

>   Director, General Ophthalmology Service
>   Albany Medical College
>   Albany, New York 12208   July 1991-1992

>   Staff Physician
>   On Call Medical Services
>   76 North Greenbush Road
>   Troy, New York 12180  March 1989 – June 1992

Military Services:

>   Staff Physician, Newport Naval Hospital 1985 to 1988
>   Lieutenant, Medical Corps, United States Navy
>   Emergency Room Physician, General Medical Officer
>   Brig Medical Officer, Surgical Support Team Leader
>   Emergency Medical Technician Instructor

Licensure:

>   Alabama Medical License, June 1992 #16585
>   Georgia Medical License, October 1992 #36327
>   Florida Medical License, April 1994 #ME0066014
>   New York State Medical License, October 1988 #175610-1 (inactive status)
>   Rhode Island and Providence Plantations Medical License, August 1985 #6736 (inactive status)
>   Advanced Cardiac Life Support Instructor Certification, April 1988
>   Advanced Cardiac Life Support Provider Certification, August 1993
>   Advanced Trauma Life Support Provider Certification, August 1989

Awards and Honors:

    Medical Student Research Award, 1981
    Albany Medical College
    Albany, New York

    Sigma Xi Research Society Induction, 1982
    Albany Chapter
    Albany, New York

    American Medical Association Physician Recognition Award
    Continuing Medical Education 1988

    Promoted to Lieutenant Commander, Medical Corps
    United States Naval Reserve
    Date of rank: February 1990
    Honorable Discharge April 1993

Organizations, Societies, Activities:

    Member, American Academy of Ophthalmology 1993 – Present

    Member, Ocular Microbiology and Immunology Group 1991 – Present

    Student Council Class Representative, 1981-1982
    Albany Medical College, Albany, New York

    Sigma Xi Research Society Associate member, 1982 – Present

Research:

    Summer Research Fellowship, 1981
    Department of Thoracic Surgery
    Albany Medical College, Albany, New York

    Summer Research Fellowship, 1982
    Department of Thoracic Surgery
    Albany Medical College, Albany, New York

    Naval Blood Research Laboratory, July – August 1983
    Boston University Medical School
    Boston, Massachusetts
    "Evaluating the functional characteristics of SRBC rosette-reactive T cells derived from non-human primates."

Albany Medical Center Giant Papillary Conjunctivitis Clinical Studies 1989-90
Bausch and Lomb In Vision Research Grant Finalist

Co-Investigator: Allergan Pharmaceutical Corporation
Topical .3% Ofloxacin Sstudy, 1990-1992

Co-Investigator: Chiron Pharmaceutical Corporation Ophthalmic Surgical Solution
Additive Study, 1991 – 1992

Assistant Investigator: Sandimmune Topical Cyclosporine High Risk Corneal
Transplantation Study, 1991-1992

Assistant Investigator: PAR Corneal Topography System, Development of a
Photoablative Subsystem, 1990 – 1992

Presentations:

Albany Medical College Research Recognition Presentation
"Outstanding Research Endeavor"
"Non-specific suppressor cell development in tumor-bearing mice"
Zloty, P, Bennett JA, McKneally MF
Presented November 1981

Optic Nerve Head Compliance During Artificially Induced Ocular Hypertension
Mehta NJ, Zloty P, Cutro JA, Simmons SI
ARVO Poster Presentation, April 1990

Albany Ophthalmologic Update
"A Rational Approach to Antibiotic Prophylaxis"
Zloty P
Presented May 1991

Ocular Microbiology and Immunology Group
"Granulocyte Colony Stimulating Factor in an HIV Patient with Pseudomonas Corneal
Ulcer"
Zloty P, Scroggins SA, Belin NW
Presented October 12, 1991

Contact Lens Association of Ophthalmologists
"Clinical Performance of the Acuvue, NewVues, and SeeQuence disposable contact lens
in Giant Papillary Conjunctivitis"
Bucci FA, Lapatynsky MO, Zloty P
Poster Presentation January 1992

Contact Lens Association of Ophthalmologists
"PAR CTS: Development of a Photoablative Subsystem, The Imaging of Post Operative Corneas"
Belin MW and Zloty P
Lecture presentation January 1992

American Society of Cataract and Refractive Surgery
Evaluation of a Low Cost, Hand Held, Direct Reading Microscope for Measuring RK Blade Extension
Belin MW, Zloty P, Battu V
Lecture Presented May 1993

Publications:

Bennett JA, Zloty P, McKneally MF: Cimetidine blocks the development of tumor-induced suppressor T cell activity. International Journal of Immunopharmacology, Vol 4 (4); 280, July 1982 (presented at the Second International Conference on Immunopharmacology), Washington, D.C., July 5-9, 1982.

"Clinical Performance of the Acuvue, NewVues, and SeeQuence Disposable Contact Lens in Giant Papillary Conjunctivitis",
Bucci FA, Lopatynsky MO, Zloty P
CLAO Journal (in press).

Zloty P, Belin MW, Antibiotics, Steroids and Tetanus Immunization.
In RA Catalano (Ed), "Ocular Emergencies" Philadelphia: W.B. Saunders, 1992; Chap 17, pp.497-512.

Belin MW, Zloty P. Accuracy of the Par Corneal Topography System with spatial misalignment. CLAO J 1993; 19:64-68.

Zloty P, Belin MW, Ocular Infections Caused By Pseodomonas Aeruginosa. In Baltch-Smith (Ed), "Psuedomonas Aeruginosa Infections and Treatment" New York: Marcel Dekker, Inc., 1994; Chap 12, pp.371-400.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN ASHTON, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:06CV-226-D |
| | ) | |
| | ) | |
| FLORALA MEMORIAL | ) | |
| HOSPITAL; BLAIRE HENSON; | ) | |
| RUSSELL PAGE, M.D., and | ) | |
| SAMUEL E. POPPELL, M.D., | ) | |
| | ) | |
|     Defendants. | | |

EXHIBIT
tabbies®  "D"

## **AFFIDAVIT**

Before me, the undersigned authority, personally appeared James C. Jones, D.O.,

who being by me first duly sworn, did depose and say as follows:

> My name is James C. Jones, D.O., and I am a physician licensed to practice medicine in the State of Alabama and I have been so licensed during all times material to this affidavit. I am board certified in the specialty of emergency medicine and I have been so certified for more than ten years. I practice emergency medicine in the emergency department of Southeast Alabama Medical Center, located in Dothan, Alabama. I was so practicing on March 12, 2004 and for more than one year prior to that date.

> I have reviewed the medical records of Florala Memorial Hospital for the emergency department visit of John Ashton, which occurred on March 12, 2004. I have also reviewed the subsequent medical records of Flowers Hospital regarding the hospitalization and surgery of John Ashton.

I have been retained to review these records on behalf of Russell, Page, D.O., the emergency room physician on call on March 12, 2004 at Florala Memorial Hospital.

I am familiar with the standard of care for physicians practicing emergency medicine and the treatment required for patients presenting with eye injuries such as Mr. Ashton. Based upon my review of the records, it is my opinion that Dr. Page met the applicable standard of care for physicians practicing emergency medicine in a hospital such as Florala Memorial Hospital. A hospital such as Florala Memorial Hospital would not typically have an ophthalmologist on staff, nor would such a hospital have the necessary equipment to perform eye surgery on a patient with an injury such as the injury suffered by John Ashton. Consequently, it was appropriate, and within the standard of care, for Dr. Page to arrange for the transfer of the patient to the care of an ophthalmologist or eye surgeon. A patient suffering an injury such as that suffered by Mr. Ashton requires the care of an eye surgeon and an emergency physician would not be trained or qualified to perform surgery on such a patient. Therefore, it is my opinion that transfer of the patient to the care of an ophthalmologist was appropriate and required under the circumstances of this case. It is my opinion that Dr. Page properly stabilized the patient prior to the transfer of the patient to the care of the ophthalmologist. There was nothing else that could have been done to stabilize the patient prior to transfer and there was no treatment that Dr. Page could have or should have undertaken in connection with this patient. All of the actions undertaken by Dr. Page in connection with this patient were appropriate, given the fact that the patient presented at a small, rural hospital without the facilities or staff necessary to care for an injury such as that suffered by Mr. Ashton.

This the 26 day of February, 2007.

_____
JAMES C. JONES, D.O.

STATE OF ALABAMA,

COUNTY OF HOUSTON.

Sworn to and subscribed before me this the 26th day of February , 2007.

_Cathy Barclay_
NOTARY PUBLIC

My commission expires: 2-9-2010

```
 1          IN THE UNITED STATES COURT FOR THE
 2               MIDDLE DISTRICT OF ALABAMA
 3                    NORTHERN DIVISION
 4  JOHN ASHTON,              )
            Plaintiff,         )
 5                            )
       VS.                    )
 6                            )
    FLORALA MEMORIAL HOSPITAL; )  CASE NO. 2:06CV-226-D
 7  BLAIRE HENSON; RUSSELL     )
    PAGE, M.D., and SAMUEL E.  )
 8  POPPELL, M.D.,             )
            Defendant.         )
 9
10          The deposition of JOHN ASHTON, taken by
11  the Defendants, pursuant to the Federal Rules of
12  Civil Procedure, before Kimberly B. Faucette, Certified
13  Court Reporter and Notary Public in and for the State of
14  Alabama at Large, at the Powell Law Firm, Andalusia,
15  Alabama, on the 15th day of December, 2006, at 10:00
16  a.m., pursuant to notice.
17              *    *    *    *    *
    APPEARANCES:
18  FOR THE DEFENDANTS:
    FOR RUSSELL PAGE, M.D.:            FOR THE PLAINTIFF:
19  MR. ALAN C. LIVINGSTON             MR. COREY D. BRYAN
    MR. WILLIAM NICHOLS                Attorney at Law
20  Attorney at Law                    Andalusia, Alabama
    Dothan, Alabama
21
    FOR FLORALA HOSPITAL:              ALSO PRESENT:
22  MR. TABOR NOVAK                    MR. BLAIRE HENSON
    Attorney at Law
23  Montgomery, Alabama

24  FOR SAMUEL POPPELL, M.D.:
    MR. JACK B. HINTON
25  Attorney at Law
    Montgomery, Alabama
```

---

```
 1          S T I P U L A T I O N S
 2          It is stipulated by and between counsel for
 3  the parties that this deposition is taken at this time
 4  by Kimberly B. Faucette, Court Reporter and Notary
 5  Public, State at Large, who is to act as commissioner
 6  without formal issuance of commission to her; that said
 7  deposition shall be taken down stenographically,
 8  transcribed, and certified by the commissioner.
 9          Except for objections as to the form
10  of questions, no objections need be made at the time of
11  the taking of the deposition by either party, but may be
12  interposed by either party at the time the deposition is
13  read into evidence, which shall be ruled upon by the
14  Court on the trial of the cause upon the grounds of
15  objection then and there assigned.
16
17
18
19
20
21
22
23
24
25          *    *    *    *    *
```

EXHIBIT

"E"

tabbies

---

```
 1             JOHN ASHTON
 2  having been first duly sworn, testified as follows,
 3  to-wit:
 4
 5               EXAMINATION
 6
 7  BY MR. LIVINGSTON:
 8
 9  Q    Tell us your name, please, sir.
10  A    John Kevin Ashton.
11  Q    What was the middle name?
12  A    Kevin.
13  Q    K-E-V-I-N?
14  A    Yes, sir.
15  Q    What is your home address?
16  A    1618 East 7th Avenue, Florala, Alabama.
17  Q    How long have you lived at that address?
18  A    About seven years.
19  Q    Who lives at that address with you?
20  A    Nobody.  I live by myself.
21  Q    Are you married?
22  A    No, sir.
23  Q    Have you ever been married?
24  A    Yes, sir.
25  Q    How many times?
```

---

```
 1  A    Once.
 2  Q    Did that marriage end in divorce?
 3  A    Yes.
 4  Q    What is your ex-wife's name?
 5  A    Beth Ann Nuss.
 6  Q    N-U-S-S?
 7  A    N-U-S-S.
 8  Q    Where was Ms. Nuss from?
 9  A    Danville, Pennsylvania.
10  Q    And how long were y'all married?
11  A    About two years.
12  Q    And where did you live during the term of that
13  marriage?
14  A    In a town called Washingtonville,
15  Pennsylvania.
16  Q    Were there any children born of that marriage?
17  A    Two.
18  Q    Where do they live?
19  A    Danville, Pennsylvania.
20  Q    What are your children's names?
21  A    John, Junior, and Zabrina Marie,
22  Z-A-B-R-I-N-A.
23  Q    Is John, Junior, married?
24  A    Yes, sir.
25  Q    What is his wife's name?
```

17

```
 1    A    I was doing a job at his house, doing
 2  Sheetrock. He just come up behind me, and he was drunk.
 3    Q    So you were putting Sheetrock in at his house?
 4    A    Yes, sir.
 5    Q    Was he paying you to do that?
 6    A    I was doing it as a friend.
 7    Q    So Grady Odom was a friend of yours?
 8    A    Yes, sir.
 9    Q    And he was intoxicated while you were working?
10    A    Highly.
11    Q    And were you intoxicated?
12    A    No, sir.
13    Q    Had you had anything to drink before you got
14  to the hospital that day?
15    A    No, sir.
16    Q    So he comes up behind you and pokes you in the
17  eye with a screwdriver?
18    A    Yes, sir.
19    Q    Were any charges brought against him for that
20  event?
21    A    He was charged with assault.
22    Q    What happened to those charges?
23    A    I have no idea.
24    Q    Did you ever have to go to court to testify in
25  the case against Mr. Odom?
```

18

```
 1    A    I ain't heard nothing about nothing on that.
 2    Q    And you haven't asked, I take it?
 3    A    I have asked, but I hadn't got no answers.
 4    Q    Tell me who you asked.
 5    A    Gary Hutchinson at the Covington County
 6  District Attorney's office.
 7    Q    And what did Mr. Hutchinson tell you?
 8    A    He didn't know at the time.
 9    Q    Have you followed up on that to find out the
10  status of the criminal charges against Mr. Odom?
11    A    I can't get any answers.
12    Q    I mean, if you haven't followed up, that would
13  be a reason you didn't get any answers. My question,
14  though: Have you followed up to find out what the
15  status is?
16    A    I have made a lot of phone calls.
17    Q    How many times have you talked to Mr.
18  Hutchinson to find out the status?
19    A    About four times.
20    Q    And the first time, you told me that he said
21  he didn't know anything about the case?
22    A    Right.
23    Q    What about the other four times on follow-up?
24    A    They were seeing if the grand jury was going
25  to indict him. That is all the far I got.
```

19

```
 1    Q    And when is the last time you talked to Mr.
 2  Hutchinson about the case?
 3    A    Two years ago.
 4    Q    I understand that when this incident occurred
 5  and you had the screwdriver stuck in your eye, you went
 6  to the hospital in Florala?
 7    A    Yes, sir.
 8    Q    How did you get there?
 9    A    Chief of Police, Lamar Mitchell.
10    Q    Was he there when the event happened?
11    A    He come by right after it happened.
12    Q    Do you know why he happened to come by right
13  after it happened?
14    A    Just patrolling.
15    Q    It was just fortuitous that he happened to
16  come by about the time you injured your eye?
17    A    Yes, sir.
18    Q    Did he come into the house where it happened?
19    A    Yes. He took me out of the house.
20    Q    Why was the Chief of Police coming into the
21  house?
22    A    Because he seen it. He just happened to be
23  coming by and he seen me bleeding and everything.
24    Q    Were you still in the house?
25    A    I was coming out the front door.
```

20

```
 1    Q    I thought you said he took you out of the
 2  house?
 3    A    He come in as I was coming out the door and he
 4  just grabbed me and took me out of the house.
 5    Q    So you went out the front and he came in the
 6  front?
 7    A    At the same time, yes.
 8    Q    So you were coming out and he was coming in;
 9  correct?
10    A    Yes, sir.
11    Q    And then you went on out of the house and then
12  he later came out?
13    A    No. Me and him left at the same time. He
14  took me to the hospital.
15    Q    Did he actually go into the house?
16    A    Stepped in to grab me, yes.
17    Q    How did he know he needed to come in and grab
18  you?
19    A    Probably before I done something to him,
20  probably.
21    Q    So the police chief was afraid you would
22  injure him?
23    A    I believe so.
24    Q    What would make the police chief think that
25  you would injure him?
```

21

```
1     A    He knows me.
2     Q    He knows that you would be a threat to attack
3  a police officer?
4     A    No.  No.  No.  No danger of that.
5  Self-preservation.
6     Q    But for whatever reason -- tell me the police
7  officer's name?
8     A    Lamar Mitchell.
9     Q    -- from past experience with you, he was
10  afraid that an attack might be forthcoming?
11     A    Yes, sir.
12     Q    So he wanted to get you before you attacked
13  him?
14     A    Before I made a mistake, yes, sir.
15     Q    So did he handcuff you?
16     A    No, sir.
17     Q    Did he take you out to his car?
18     A    Yes, sir.
19     Q    Was he in a patrol car?
20     A    In the police car, yes.
21     Q    Did he put you in the back?
22     A    No.
23     Q    Put you in the front?
24     A    Yes, sir.
25     Q    And what about Mr. Odom, where was he?
```

22

```
1     A    Still in the house.
2     Q    And where was this house?
3     A    On -- they changed the name of the street now.
4  Fifth Street.
5     Q    Mr. Odom's house was on Fifth Street in
6  Florala?
7     A    Yes, in Florala.  They call it Pecan Street
8  now.
9     Q    And Mr. Mitchell, because he was afraid you
10  might attack him, took you and put you in the police car
11  and drove you to the hospital?
12     A    Yes, sir.
13     Q    Was anyone else in the car as y'all rode to
14  the hospital?
15     A    No, sir.
16     Q    Did Mr. Mitchell stay at the hospital with
17  you?
18     A    For a little while.
19     Q    About how long did he remain there?
20     A    Until they put me in the ambulance.
21     Q    To go to Florida?
22     A    Yes, sir.
23     Q    Tell me what happened once you got to the
24  hospital and Officer Mitchell took you into the
25  hospital.  Tell me what all happened.
```

23

```
1     A    When we got there, the doctor just looked at
2  me standing there in the emergency room and he just
3  called an ambulance.
4     Q    He looked at your eye?
5     A    No, sir.  He just looked at me.  He knew I
6  needed something that they didn't have the facility for,
7  is what I understand.
8     Q    And they said you needed an ambulance and to
9  go somewhere else?
10     A    Yes, sir.
11     Q    Was that Dr. Page?
12     A    Yes, sir.
13     Q    You had seen Dr. Page before, hadn't you?
14     A    Yes, sir.  I know him.
15     Q    You had been treated by Dr. Page on many
16  occasions in the emergency room?
17     A    No, sir.
18     Q    Several occasions?
19     A    No, sir.
20     Q    How many occasions?
21     A    Once before that.
22     Q    What had he treated you before on once before
23  that?
24     A    I don't remember what it was.
25     Q    But it was your opinion that he looked at you
```

24

```
1  and knew that you needed to go somewhere else; is that
2  what you are telling us?
3     A    He seen me standing in the hallway, and then
4  that was the extent of it.
5     Q    So he immediately began to make arrangements
6  to get you seen somewhere else?
7     A    All I know is they put me in an ambulance and
8  I went for a joyride.
9     Q    Before we leave on the ambulance, I am trying
10  to find out what all you recall about Dr. Page and his
11  involvement with your care.  And from what I understand
12  you are telling me is, all he did was look at you and
13  make arrangements for you to be transferred by
14  ambulance; is that your best recollection?
15     A    To my recollection, yes, sir.
16     Q    Did he put a patch over your eye?
17     A    No, sir.
18     Q    Did he put any ointment or cream in your eye?
19     A    No, sir.
20     Q    Any medications at all?
21     A    No, sir.
22     Q    How long did you remain there at the hospital?
23  Do you know?
24     A    It wasn't very long.
25     Q    How many times while you were there at the
```

25

1   hospital in Florala did you actually see Dr. Page, just
2   that one time in the hallway or more than one time?
3       A    That's it.
4       Q    That was it?
5       A    Yeah.
6       Q    Did you see any nurses?
7       A    I don't remember.  Everything that was going
8   on, I don't remember.
9       Q    You don't remember whether there were any
10  nurses that provided any care to you?
11      A    I didn't get any care.
12      Q    Did they take you back to a room or did you
13  just remain in the hallway?
14      A    In the hallway.
15      Q    You never left the hallway?
16      A    No, sir. .
17      Q    Never went to an exam room?
18      A    No, sir.
19      Q    Did anyone ever look at your eye?
20      A    No, sir.
21      Q    Did you think that Dr. Page was an eye
22  specialist?
23      A    No, sir.
24      Q    You knew that he was an emergency room doctor,
25  because you had seen him before?

26

1       A    Yes, sir.
2       Q    And you understood that eye injuries were not
3   his specialty?  You knew that, didn't you?
4       A    He is a doctor.
5       Q    Did you want him to operate on you or did you
6   want an eye specialist to operate on you?
7       A    The best I could get is what I wanted.
8       Q    Which would be an eye specialist; right?
9       A    More or less.
10      Q    I mean, you wouldn't want a foot doctor
11  operating on your eye, would you?
12      A    I don't believe so, sir.
13      Q    You would want somebody who is trained in eye
14  surgery to do the surgery on your eye, if that was
15  necessary?
16      A    Yes, sir.
17      Q    Did you have any reason to believe that Dr.
18  Page was an eye surgeon?
19      A    Excuse me.
20      Q    Did you have any reason to believe that Dr.
21  Page was an eye surgeon?
22      A    No, sir.
23      Q    Did you understand that he was making the
24  arrangements to have you seen by an eye specialist?
25      A    I didn't know anybody was doing anything.

27

1            I was just in the hallway.
2       Q    You told me that Dr. Page told you it was
3   beyond his care and that he needed to get you seen by a
4   specialist, is that not correct?
5       A    He said he wasn't going to look at it.
6       Q    Did he say why?
7       A    No, sir.
8       Q    And, then, he said he was making arrangements
9   to have you transferred elsewhere?
10      A    Nobody told me nothing.
11      Q    So you didn't know what was going on?
12      A    No, sir.
13      Q    You are waiting out in the hallway and didn't
14  know why you were being transferred, but you knew that
15  Dr. Page was not an eye specialist?
16      A    I didn't know what was going on, period.
17      Q    So they didn't tell you one way or the other?
18      A    No, sir.
19      Q    They just let you wait until the ambulance
20  came?
21      A    Yes, sir.
22      Q    And when the ambulance came, what did they
23  tell you?
24      A    The paramedic told me to get
25  and get in the ambulance.

28

1       Q    Did anybody from the hospital tell you where
2   you were going or why?
3       A    No, sir.
4       Q    Did Dr. Page ever talk to you again?
5       A    No, sir.
6       Q    Back up just a minute to the time that Dr.
7   Page first saw you in the hallway and you said that he
8   looked at you and told me that it was something that he
9   could not handle.  Tell me what you recall he did say to
10  you.
11      A    Just that he couldn't touch that.
12      Q    Anything else?
13      A    (Witness shakes head.)  I was standing there
14  with the chief.  I was lucky, I think, to be breathing
15  at that time.
16      Q    Why were you lucky to be breathing?
17      A    I was in a lot of pain.  It just didn't make
18  any sense to me.
19      Q    So you were confused?
20      A    A little bit.
21      Q    And your memory of this event is somewhat
22  vague, I understand?
23      A    I remember who done it and where it was.
24      Q    But I am talking about at the hospital.  You
25  told me you couldn't remember whether any nurses saw you

29

1  or not and you couldn't remember what people said.

2      A    I didn't see any nurses.

3      Q    So, now, you are saying there were no nurses

4  there?

5      A    I didn't see any.  The only person at the

6  hospital when I walked into the emergency room was Dr.

7  Page, standing there.

8      Q    And he said this is something that I can't

9  touch?

10     A    He said, I ain't touching it.

11     Q    And then he turned around and walked away?

12     A    That is exactly what he done.

13     Q    And you just stood there in the hallway?

14     A    Yes.

15     Q    Did you ever even sit down?

16     A    I was in too much pain, I believe, to sit

17  down.

18     Q    So you were just standing in the hallway until

19  the ambulance came?

20     A    More or less.

21     Q    Well --

22     A    That is what I was doing, with the chief.

23     Q    You and the chief waited on the ambulance?

24     A    We stood there in the hallway.

25     Q    Did you ever go into the emergency room at

30

1  all?

2      A    No, sir.

3      Q    Just waited in the hallway?

4      A    In the backdoor, there is a hallway and then

5  the emergency room, I was right there in the hallway.

6      Q    And then in a fairly short time, the ambulance

7  comes and you are taken away?

8      A    I really don't know how long it was.  I really

9  don't know.

10     Q    But your recollection is it was a fairly short

11  time?

12     A    Maybe thirty minutes; maybe fourty-five.

13     Q    Fair enough.  And when the ambulance comes,

14  the ambulance driver tells you, or the ambulance

15  attendant tells you to get on the stretcher, you are

16  going in the ambulance?

17     A    Yes, sir.

18     Q    Did the ambulance driver or attendant tell you

19  where you were going?

20     A    When we started leaving, he told me where we

21  were going.

22     Q    Tell me what he told you.

23     A    He said, We are going to Fort Walton Beach.  I

24  said, Do what?  He said, We are going to Fort Walton

25  Beach.

31

1      Q    Did he tell you why you were going to Fort

2  Walton Beach?

3      A    He said I was supposed to go to some doctor.

4      Q    Did you understand that some doctor to be an

5  eye specialist?

6      A    I guess, yeah.

7      Q    Because that is what you needed, an eye

8  specialist?

9      A    I needed a surgeon.

10     Q    And you knew there was not an eye surgeon at

11  Florala?

12     A    Right.

13     Q    So you understood you were being transferred

14  to the care of an eye surgeon?

15     A    Supposedly, yes.

16     Q    And we now know that was Dr. Poppell?

17     A    Yes, sir.

18     Q    How many people were on the ambulance?

19     A    Two.

20     Q    The driver and an attendant?

21     A    Yes.

22     Q    And do you remember their names?

23     A    Jason, I remember, he was the paramedic.

24     Q    Would that be Jason Smith?

25     A    Yes, sir.  But I can't remember what the

32

1  girl's first name was.  Valerie, I think.

2      Q    What was her last name?

3      A    I have no idea.

4      Q    She was the driver?

5      A    No, sir.

6      Q    Jason drove?

7      A    Yes, sir.

8      Q    And did Valerie stay in the back of the

9  ambulance with you?

10     A    Yes, sir.

11     Q    At the time the ambulance left the hospital at

12  Florala to take you to the eye specialist, as you have

13  told us, had anybody at Florala provided you with any

14  care for your injury?

15     A    No, sir.

16     Q    Had you ever had anybody look at your injury?

17     A    Not at Florala.

18     Q    And no treatment, whatsoever, was provided

19  there?

20     A    None.

21     Q    Do you know if Dr. Page talked with Dr.

22  Poppell?

23     A    No.

24     Q    You wouldn't know one way or the other?

25     A    I have no idea.

33

1   Q    So you don't know what he did or what
2   arrangements that Dr. Page made?
3   A    No, sir.
4   Q    But you knew you needed to see an eye surgeon
5   and now you thought, for some reason, you were going to
6   see an eye surgeon?
7   A    Yes, sir.
8   Q    And you don't know who made those
9   arrangements?
10  A    I had no idea.
11  Q    Tell me what happened after the ambulance
12  leaves Florala headed to Fort Walton Beach.
13  A    We go to Fort Walton Beach.
14  Q    Is the siren going?
15  A    Oh, yes.
16  Q    Emergency transfer?
17  A    Yes, sir.
18  Q    They were driving fast and all that stuff?
19  A    They were flying.
20  Q    The police chief, Mr. Mitchell, Chief
21  Mitchell, stayed behind?
22  A    No.  No.  When we left in the ambulance, that
23  is the last I seen of Lamar.
24  Q    So he did not go with you or provide escort?
25  A    No, sir.

34

1   Q    Was he still there when you left the hospital,
2   to the best of your knowledge?
3   A    As they were putting me in the ambulance, I
4   remember him walking toward his car.
5   Q    Do you remember anything he said?
6   A    No.
7   Q    Do you know if he talked to Dr. Page?
8   A    I have no idea.
9   Q    Did he stay out there with you in the hallway
10  that whole time, waiting on the ambulance?
11  A    Yes, sir.
12  Q    Do you know if he talked with any of the
13  medical personnel?
14  A    I couldn't tell you.  I don't know.
15  Q    Were you intoxicated while you were at the
16  hospital?
17  A    No, sir.
18  Q    Had you had anything at all to drink that day?
19  A    No.  The night before.
20  Q    Do you know why the medical personnel there at
21  the hospital would say that you smelled of alcohol?
22  A    Probably because I drank the night before.
23  Q    So what you had to drink the night before was
24  still affecting you?
25  A    Kind of, I guess you could say.  I mean, I

35

1   drank the night before.
2   Q    How much did you drink the night before?  Do
3   you remember?
4   A    I couldn't tell you.
5   Q    Was it a lot?
6   A    Normal, I guess.
7   Q    Tell me what is normal for you.
8   A    A six pack.
9   Q    Do you drink a six pack most every night?
10  A    Not every night.
11  Q    Most nights?
12  A    I drink when I feel like I want to have a cold
13  beer.
14  Q    So you had had approximately six beers the
15  night before and you felt that was still affecting you
16  somewhat when you got to the hospital?
17  A    No.  I didn't feel it affected me.  I drank
18  six the night before.
19  Q    If the medical personnel at the hospital
20  smelled alcohol on your breath, the reason was because
21  you had been drinking the night before?
22  A    Probably.
23  Q    But you had not been drinking any that day,
24  the day of the injury?
25  A    No, sir.  I was working.

36

1   Q    And what time of day did this attack happen
2   when Mr. Odom stuck the screwdriver in your eye?
3   A    I would say approximately 11:00 or 11:30.
4   Q    And then the police chief just happens by the
5   house moments after the attack occurred?
6   A    Yes, sir.
7   Q    And the police chief is concerned that you
8   might attack him, so he takes you out and puts you in
9   the police car and takes you immediately to the
10  hospital?
11  A    Yes, sir.
12  Q    And have you told me everything that you
13  remember occurred while you were at the hospital in
14  Florala?
15  A    That is all that happened.
16  Q    Do you remember anything else that occurred at
17  the hospital?
18  A    There wasn't nothing else that happened, sir.
19  Q    Not that you know about?
20  A    Not that I know about.
21  Q    I just want to make sure I know everything
22  that you know.  That is the reason I am asking it
23  several different ways.  I am not trying to be
24  argumentative with you.
25  But if there is something else that happened that

37

1  you remember that you and I haven't talked about, I need
2  to know about it.
3      A    That is what happened.
4      Q    Do you remember talking with anybody else at
5  the hospital, other than the people we have already
6  talked about?
7      A    No, sir.  I don't remember talking to anybody
8  at all.  I just knew I was in pain.
9      Q    So the only conversation with anybody at the
10  hospital in Florala that you recall was the very brief
11  conversation with Dr. Page?
12     A    I never said a word to him.
13     Q    He just looked and said, This is not something
14  I can handle, and turned around and walked away, and in
15  a few minutes, you are gone in an ambulance?
16     A    To my recollection.
17     Q    Very good.  That is fine.
18          And you received no medications of any description?
19     A    No, sir.
20     Q    The ambulance takes off, headed to Fort
21  Walton, sirens, lights, driving fast.  Tell me what
22  happens then.
23     A    We got to this Doctor's office down there.
24     Q    And that would be Dr. Poppell's office?
25     A    Yes, sir.

38

1      Q    And tell me what happens when you get there?
2      A    They took me inside.  He looked at me, said he
3  couldn't do nothing.  I remember the ambulance driver
4  saying, Well, can you send him to a hospital?  He said,
5  no, I can't do that.
6      Q    Now, you have got to help me with who is
7  saying what now?
8      A    Dr. Poppell said, no, he could not to that.
9      Q    Dr. Poppell said he could not send you to a
10  hospital?
11     A    Yes, sir.
12     Q    But the ambulance driver said he wanted to
13  take you to a hospital?
14     A    An Alabama ambulance driver couldn't take me
15  to a Florida hospital.
16     Q    I am sorry.  Tell me that again so I can make
17  sure I understand you.
18     A    He said he wasn't sending me to no hospital.
19     Q    Dr. Poppell said he would not send you to a
20  hospital?
21     A    Right.
22     Q    And the ambulance driver said what?
23     A    Said, we can't take him.  You have got to call
24  somebody to come and get him and take him to a Florida
25  hospital.  I remember that.

39

1      Q    Where did this conversation take place?
2      A    At Dr. Poppell's office.
3      Q    In the office?
4      A    In the office.
5      Q    In the waiting room or in the exam room?
6      A    In a room.
7      Q    In an examining room.  So he took you into an
8  examining room and said he couldn't help you there, that
9  you needed to go to a hospital?
10     A    He said he couldn't help me.
11     Q    So the ambulance driver -- would that be Jason
12  Smith?
13     A    Yes, sir.
14     Q    -- was in the room there with you?
15     A    Yes, sir.
16     Q    What about Valerie?
17     A    She was out in the ambulance.  Jason was the
18  only one in the room.
19     Q    So Jason and you and Dr. Poppell are in the
20  room, the exam room?
21     A    Yes, sir.
22     Q    And Dr. Poppell said he could not help you?
23     A    Yes, sir.
24     Q    And that you needed to go to a hospital?  Am I
25  right?  Did I understand that?

40

1      A    I needed to go somewhere.
2      Q    Needed to go somewhere else besides his
3  office?
4      A    Right.
5      Q    And Jason said, You need to call somebody to
6  come get him?
7      A    Yes, sir.
8      Q    But Dr. Poppell said he couldn't do that?
9      A    Right.
10     Q    So what happens?
11     A    Jason put me back in the ambulance.  I
12  remember him calling his supervisor, Dr. Bob at the Opp
13  Hospital.
14     Q    Doctor who?
15     A    Bob Williams, I think his name was.
16     Q    At the Opp Hospital, is that Mizell?
17     A    Because it was Opp Rescue.
18     Q    I see.
19     A    He wanted to know what to do, because this
20  doctor down here refused to send me to a hospital.  So
21  they had no idea what to do with me.
22     Q    So he was calling back to the hospital in Opp,
23  asking for instructions on what to do?
24     A    Yes, sir.
25     Q    So what happened after he got those directions

41

1  from -- you said, Dr. Bob?
2  A    Right.  They had no idea where to send me.
3  Q    Okay.
4  A    So we ended up on about a seven-hour ambulance
5  ride.
6  Q    To where?
7  A    Back to Opp.
8  Q    Back to Mizell?
9  A    But first we stopped at Crestview.  He was
10 talking.  We sat there probably an hour, trying to
11 figure out where to take me.
12 Q    You said, "we stopped at Crestview."  Stopped
13 at Crestview Hospital or just stopped on the road?
14 A    Stopped at a store in Crestview.
15 Q    Not the Crestview Hospital?
16 A    No, sir.
17 Q    And this is Jason talking on the phone?
18 A    To Dr. Bob.
19 Q    And you say they sat there about an hour?
20 A    Yes, sir.
21 Q    And after that hour, where did you go from
22 Crestview?
23 A    Dr. Bob called him back and told him to bring
24 me to Opp.
25 Q    To Mizell?

42

1  A    To Mizell Hospital.
2  Q    Did he do that?
3  A    Yes, sir.  We went to Mizell.
4  Q    Tell me what happened when you get to Mizell.
5  A    They told him to put me back in the ambulance
6  and take me to Dothan.
7  Q    Did they do that?
8  A    Yes, sir.
9  Q    And did anybody examine you at Mizell?
10 A    No, sir.
11 Q    Was there an eye specialist at Mizell
12 Hospital?
13 A    I have no idea.
14 Q    You didn't see one, if there was one there?
15 A    No, sir.
16 Q    And you still felt like you needed to see an
17 eye specialist?
18 A    I needed to see somebody.
19 Q    So they took you to Dothan?
20 A    Yes, sir.
21 Q    To which hospital?
22 A    To Flowers Hospital.
23 Q    Did anybody see you at Flowers Hospital?
24 A    Dr. Zloty.
25 Q    Peter Zloty?

43

1  A    Yes, sir.
2  Q    Was he an eye specialist?
3  A    Yes, sir.
4  Q    And tell me what Dr. Zloty told you.
5  A    His exact words, I can tell you his exact
6  words.
7  Q    Please, sir.
8  A    He said, What kind of fool sent you over here
9  seven hours later?  He got on the phone and called Dr.
10 Poppell.
11 Q    And he talked to Dr. Poppell, or at least that
12 is your understanding?
13 A    He cussed him out is what he done.
14 Q    Could you hear that conversation?
15 A    No, sir.  I was in a room.
16 Q    What makes you think he cussed out Dr.
17 Poppell?
18 A    He wasn't happy.
19 Q    Tell me what he said that makes you think
20 that.
21 A    You could tell he wasn't happy just by
22 listening to him.  He just wasn't happy.
23 Q    And you understand that he called Dr. Zloty
24 and had a conversation with him, but you did not hear
25 that conversation?

1  A    Yes, sir.
2  Q    And then he comes back and talks to you.
3  A    He came back and told me he was going to take
4  me to the operating room.
5  Q    And did he do that?
6  A    Yes, sir.
7  Q    And surgery was performed on your eye?
8  A    Yes, sir.
9  Q    By the way, is it your right eye or your left
10 eye?
11 A    My left eye.
12 Q    And tell me what kind of surgery you
13 understand that Dr. Zloty did.
14 A    He put fourteen stitches in it.  It was cut
15 wide open.  He had to pop it back in my head.
16 Q    That is what he did?
17 A    I spent five days in the hospital.
18 Q    All at Flowers?
19 A    Yes, sir.
20 Q    Did it affect your vision?
21 A    Yes, sir.
22 Q    Tell me how your vision is today, as a result.
23 A    I don't have any in my left eye.
24 Q    Are you blind in the left eye?
25 A    Yes, sir.