UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN ASHTON, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION NO. CV2:06cv226-D |
| | ) | |
| FLORALA MEMORIAL HOSPITAL; | ) | |
| BLAIRE HENSON; RUSSELL PAGE, | ) | |
| M.D. ; and SAMUEL E. POPPELL, | ) | |
| M.D., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## MOTION FOR SUMMARY JUDGMENT
## BY DEFENDANTS BLAIR HENSON AND FLORALA MEMORIAL HOSPITAL

The defendants, designated by the plaintiff as Florala Memorial Hospital and Blaire Henson, move this Court enter its order granting Summary Judgment in favor of each of them, and for grounds would show unto the Court that each is entitled to a judgment in their favor as a matter of law. There are no genuine issues of material fact between the plaintiff and these defendants that would warrant submission of this cause to a jury.

This Motion is based upon the pleadings, the earlier Memorandum Opinion and Order of this Court entered October 5, 2006, the Affidavit of Dr. Russell Page D.O. with attached emergency room records of John A. Ashton for his visit of March 12, 2004 (attached as Exhibits "A" and "B"), the Affidavit of Dr. Peter Zloty (attached as Exhibit "C"), the Affidavit of Dr. James C. Jones, D.O. (attached as Exhibit "D") the Affidavit of Blair Henson (attached as Exhibit "E") and extracts from the deposition testimony of the

Plaintiff, John A. Ashton (attached as Exhibit "F"). Exhibits A, B, C and D have been also offered by Dr. Russell Page in support of his pending Motion for Summary Judgment. (Doc. 55)

This Motion is further based upon the failure of the plaintiff to identify any expert witness within the meaning of §6-5-548, Code of Alabama, 1975 as recompiled, who is qualified to offer testimony that any defendant breached the standard of care so as to cause injury or damage to the plaintiff as alleged in the complaint (See par. 3 of Doc. 30 and Doc. 50). The Motion is further based upon the arguments and authorities contained in your Movants' Brief in Support of their Motion for Summary Judgment.

BALL, BALL, MATTHEWS & NOVAK, P.A.


s/Tabor R. Novak, Jr. - NOV001
As Attorneys for the Defendants
Blair Henson and Florala Memorial
Hospital


2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, Alabama 36102-2148
Telephone: 334/387-7680
Telecopier: 334/387-3222

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of March, 2007, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following registered persons and that those persons not registered with the CM/ECF system were served by U.S. mail:


A. Riley Powell, IV, Esq.
P. O. Drawer 969
Andalusia, Alabama 36420

Alan Livingston, Esq.
Lee & McInish
P. O. Box 1665
Dothan, Alabama 36302


/s/ Tabor R. Novak, Jr.

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN ASHTON, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION NO. CV2:06cv226-D |
| | ) | |
| FLORALA MEMORIAL HOSPITAL; | ) | |
| BLAIRE HENSON; RUSSELL PAGE, | ) | |
| M.D. ; and SAMUEL E. POPPELL, | ) | |
| M.D., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
BY DEFENDANTS BLAIR HENSON AND FLORALA MEMORIAL HOSPITAL**

**A. PROCEDURAL HISTORY**

The procedural history of this case, as it relates to the defendants Blair Henson

("Henson") and the medical facility designated by the plaintiff as Florala Memorial

Hospital ("Florala Memorial") is well articulated in this Court's Memorandum Opinion

and Order of October 5, 2006. (Doc.27) Thus it will not be repeated in detail in this Brief.

John Ashton presented to the emergency room at Florala Memorial on March 12,

2004 with an injury to his eye. (Exhibit B) The essence of his complaint as to Henson

and Florala Memorial is that Florala Memorial, Henson (individually and acting through

Dr. Russell Page) "... failed to treat and stabilize this condition to John Ashton's eye

when John Ashton needed immediate surgery". (See par. 7, Doc. 31)

Ashton does not visit responsibility on Henson or Florala Memorial for events that

occurred when Ashton arrived at his destination for specialized care. He contends

(without any admissible expert evidence) that "Due to the delay between the injury and

the emergency surgery, John Ashton has lost nearly all of the sight in the injured eye and was forced to go through hours of excruciating pain." (See Doc. 31 par. 7)

Ashton contends that the events complained of in his complaint as amended constituted a breach of the applicable standard of care as defined by the Alabama Medical Liability Act  so as to impose liability both upon Florala Memorial and upon Henson. In addition he claims that Florala Memorial is liable to him pursuant to the provisions of 42 U.S.C. §1395dd (e), otherwise known as the Emergency Medical Treatment and Active Labor Act (EMTALA).  This Court has already ruled that no claim can be made against Henson for a purported violation of EMTALA. (Doc. 27)

## B. SUMMARY JUDGMENT STANDARD

The summary judgment standard is that summary judgment is appropriate where there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Rule 56 (c) *Fed.R.Civ. Pro.* This burden can be met by the movant by negating an essential element of the nonmovant's claim, or by demonstrating the non-movant's evidence is insufficient to support the essential element of the claim. *Celotex Corp. v Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986). The burden then shifts to the nonmovant to set forth by affidavit or other appropriate means, facts sufficient to show that there is a genuine issue for trial. Rule 56 (c) *Fed. R.Civ. Pro.; Hempfleng v. Smith* 753 So.2d 506, 508 (Ala. Civ. App. 1999)  In doing so the Court refrains from deciding material factual issues and views the underlying facts in a light most favorable to the nonmovant. *Early v. Champion International Corp.* 907 F.2d 1077, 1080 (11th Cir. 1990)

## C. THE CLAIMS OF THE PLAINFIFF

The plaintiff's claims as to Florala Memorial and Henson fail in their entirety for multiple reasons.  The claims can be broken down into two distinct categories:

1)    The "state law claims" against Henson and Florala Memorial;

2)    The EMTALA claims against Florala Memorial.

For that reason, the two types of claims will be analyzed separately.


### 1.    The "state law claims" against Henson and Florala Memorial.

All of the state law claims against Florala and Henson made by Ashton emanate from his contention that the medical care and service which he was provided in the emergency room at Florala Memorial on March 12, 2004 (including his related transfer) was substandard. Despite the fact that the plaintiff characterizes some of his claims as being other than for "medical malpractice" (i.e. the "outrage claim") §6-5-542 "...provides the applicable standard of care that governs all actions against health care providers specified in the act..." *Collins v Ashurst,* 821 So.2d 173,176 (Ala.S.Ct. 2001); and *Black v. Comer,* 920 S.2d 1083 (Al. S. Ct. 2005)

Claim Six (Doc. 31) asserts Henson and Florala were negligent in appointing or supervising Dr. Page.  This claim is predicated on the contentions: a) that a master-servant relationship creating a duty to supervise existed between these defendants and Dr. Page see *Big B, Inc. v Cottingham* 634 So.2d 999, (Ala. 1993), *Lane v. Central Bank of Alabama, N.A.* 425 So. 2d 1098, 1100 (Ala.1983) and *Thompson v Harvard*, 285 Ala.

718,723, 235 So.2d 853 (1970); and b) that Dr. Page breached his duty under the Alabama Medical Liability Act when providing care to Ashton.

This *respondeat superior*/vicarious liability claim is contradicted by the affidavits of Henson and Dr. Page. These affidavits disclaim any duty on the part of Henson/Florala to supervise or control Dr. Page's medical decisions, disclaim an employment relationship between Dr. Page and Henson/Florala Memorial (see Henson Affidavit Exhibit "E") and affirmatively assert that Dr. Page met or exceeded the applicable standard of care in treating Ashton. (See Page and Jones Affidavits Exhibits "A" and "D")

Claim Seven (Doc.31) asserts the tort of Outrage for the failure of Dr. Page to perform definitive care in the Florala Memorial Hospital. This claim is addressed by the Affidavits of Dr. Page, Dr. Zloty and Dr. Jones. (Exhibits "A", "C", "D")  Henson was totally uninvolved in the care and transfer. (Henson Affidavit Exhibit "E") Both the emergency room care and the decision to transfer were in all respects appropriate and medically sound. (See Affidavits of Dr. Page, Dr. Zloty and Dr. Jones Exhibits "A", "C" and "D")

The testimony of Ashton offers no evidence that would allow him to cross the threshold of proof necessary to support an Outrage claim. *Tinker v Beasley* 429 F.3d 1324 (11th Cir. 2005). There is no proof of intent to inflict emotional distress or conduct so extreme and egregious that no reasonable person could be expected to endure it. (See Ashton dep. pps. 59-69)

Claim Eight repeats the claim of medical negligence or wantonness for the failure to operate, treat or stabilize the injury. Again these contentions are negated by the Affidavits of Dr. Page, Dr.Zloty and Dr. Jones (Exhibits "A", "C" and "D").

Finally the affidavit of Dr. Zloty affirmatively establishes that any permanent injury was the product of Ashton's own conduct as opposed to the purported delay in his receipt of surgical care. (See Zloty Affidavit Exhibit "C")

It must be noted that Henson (a hospital administrator) is not a health care provider within the meaning of §6-5-542(1) <u>Code of Alabama</u>, 1975. (See also §6-5-481, <u>Code of Alabama</u> 1975.) Nor was Henson involved in any manner in delivering any type of care and service to Ashton when he visited the emergency room on March 12, 2004. Indeed, Henson was totally unaware that Ashton was even in the hospital on March 12, 2004 (See Henson Affidavit Exhibit "E").

Since these are "state law claims" seeking damages for improper medical care, they are necessarily governed by the provisions of the Alabama Medical Liability Act. Under that Act, the pleading requirements imposed upon the plaintiff are set out in §6-5-551 of the <u>Code of Alabama</u> and obligate the plaintiff to set out in his complaint a detailed specification and factual description of each act and omission alleged by the plaintiff to render a "health care provider" liable to the plaintiff.

As this Court noted in its Memorandum Opinion and Order (Doc. 27) the state law claims in Counts 5, 6, 7 and 8 are "not a model of clarity". (See p. 27 Doc. 27) Indeed they fail to meet the pleading requirements that should be imposed upon the plaintiff in this action.

Regardless, however, Ashton's state law claims hinge on his ability to prove that the medical care and services he received in the emergency room did not meet the standard of care as defined in the Alabama Medical Liability Act in §6-5-542(2).  The burden of proof imposed upon a plaintiff pursuing such a claim is to offer substantial evidence of such a breach.  §6-5-549, Code of Alabama, 1975.  This can be done only through the testimony of an expert witness credentialed and similarly situated as the defendant medical care provider as set out in §6-5-548, Code of Alabama, 1975.

This Court has imposed certain deadlines upon the plaintiff to identify expert witnesses who will offer testimony against the defendants in this case. (see § 7 of Doc. 30) The plaintiff has not offered by expert report, or identified any expert witness, qualified to offer testimony that any provider of medical care who delivered medical or nursing care or services to John Ashton in the emergency room on March 12, 2004 breached the applicable standard of care so as to cause him injury or damage. The time for the plaintiff to identify experts has passed.

Dr. Page has asserted in his Affidavit in Support of a Motion for Summary Judgment which he has filed (Doc. 55), that he is familiar with the standard of care that applied to emergency room physicians on March 12, 2004 and, that the medical care and services which he rendered to John Ashton met or exceeded the applicable standard of care. (See Page Affidavit Exhibit "A")  A further offer of similar proof is made through the affidavit of Dr. Jones. (Exhibit "D")

To the extent that the complaint lodges any claims against Dr. Page, they are effectively rebutted by these affidavits.  No other medical provider is identified in the complaint, or in Ashton's testimony, as one who breached the standard of care so as to

cause Ashton injury or damage. Neither Henson nor Florala Memorial can be pursued for any claim of vicarious liability except as to the assertions they had some legal responsibility for the acts of Dr. Page.

As noted, the burden of proof under the Alabama Medical Liability Act is to demonstrate that a health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers, in the same general line of practice, ordinarily would have and exercise in a like case.    §6-5-548 and §6-5-549, Code of Alabama, 1975 as recompiled.

Such evidence is an absolute requisite in actions of this nature.  *Jones v. Bradford*, 623 So.2d 1112 (Ala. 1993);  *Parrish v. Spink*, 284 Ala. 263, 224 So.2d 621 (Ala. 1969); *Zills v. Brown*, 382 So.2d 528 (Ala. 1980). The plaintiff must offer substantial evidence by a similarly situated healthcare provider, that the acts, omissions or breaches of duty complained of in the complaint are indeed a breach of the standard of care on the part of the defendant physician and caused or contributed to the injuries and/or damages complained of.

The affirmative disclaimer by Dr. Page, through his Affidavit offering evidence that his medical care to John Ashton was in accordance with the applicable standard of care (as supported by the affidavit of Dr. Jones), constitutes a *prima facie* case, showing that he has met the standard of care in administering medical care to John Ashton. *Dews v. Mobile Infirmary Association*, 695 So.2d 61 (Ala. 1995). (Exhibits "A" and "D")

When a defendant health care provider offers expert testimony on his own behalf establishing compliance with the standard of care, that defendant is entitled to summary

judgment, unless the plaintiff counters the defendant's evidence with expert testimony admissible under the provisions of the Alabama Medical Liability Act, in support of the plaintiff's claim.  *Montanez v. QuestCare, Inc.*, 675 So.2d 466 (Ala. Civ. App. 1996); *Liner v. Temple*, 373 So.2d 638 (Ala. 1979); *Monk v. Vesely*, 525 So.2d 1364 (Ala. 1988) and *Lightsey v. Bessemer Clinic, P.A.*, 495 So.2d 35 (Ala. 1986)  Ashton is barred from offering such counter testimony in that he failed to identify any health care provider similarly situated to Dr. Page in the time frames set out by this Court for doing so. He provided no expert report for Rule 702 witnesses as required by this Court.

No party can be liable to the Plaintiff under any state law theory set out in the complaint absent substantial evidence of a breach of the standard of care by Dr. Page. All state law claims fail absent that proof.

In addition, Florala Memorial and Henson disclaim any legal relationship with Dr. Page that would give rise to liability on them for the purported breaches of the standard of care the Plaintiffs attribute to him. (See Henson Affidavit Exhibit "D")

Neither Henson nor Florala Memorial directed, controlled or reserved the right to control the means and methods by which Dr. Page delivered care to Ashton. (See Henson Affidavit Exhibit "D") By this disclaimer, neither movant suggests in any way, that such care was substandard or in violation of the applicable Standard of Care. The medical care and services rendered to Ashton by Dr. Page were based upon Dr. Page's own decisions, his own training and experience. Indeed there is no allegation in the complaint as amended that Henson or Florala are vicariously liable for the acts attributed to Dr. Page. However, absent substantial evidence of a breach of the

standard of care by him, the claims as to Henson and Florala Memorial set out in Claims 6, 7 and 8 must fail.

Finally, the Affidavit of Dr. Zloty effectively rebuts the naked allegations of the complaint that some injury or damage was suffered by Ashton which could be attributed to any "delay" in securing surgical treatment. (See Zloty Affidavit Exhibit "C")  Dr. Zloty notes in that Affidavit, "In fact, any loss of vision in the left eye was probably due to Mr. Ashton's non-compliance as a patient post-operatively.  Mr. Ashton failed to keep follow-up appointments with retina specialists after he was discharged from the hospital and this non-compliance more likely than not, caused or contributed to any loss of vision."

Dr. Zloty also notes "There is nothing that the emergency room could or should have done other than make arrangements to have the patient transferred to the care of an ophthalmologist." (Exhibit "C") Dr. Jones confirms the propriety of care in the emergency room, and the stability of the patient upon transfer. (Exhibit "D")

A medical liability action cannot travel on the allegations of the complaint alone. The allegations are all that is before the Court in support of the Plaintiff's claims. The Affidavits of Dr. Page, Dr. Zloty, Dr. Jones and Henson, along with the testimony of the plaintiff defeat the "state law claims" asserted by the plaintiff as to Henson and Florala Memorial.

## 2.    The EMTALA claims.

The Emergency Medical Treatment and Labor Act ("EMTALA") was passed in 1986 amid growing concern over the availability of emergency health care services to

the poor and uninsured. *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C.Cir. 1991)   The Act was designed principally to address the problem of patient dumping, whereby hospital emergency rooms deny uninsured patients the same treatment provided paying patients, either by refusing care outright or by transferring uninsured patients to other facilities. H.R. Rep. No. 241, 99th Cong., 1st Sess., pt.3 at 5, (1986) *reprinted in* 1986 U.S.C.C.A.N. 42, 579, 726; 131 Cong. Rec.H9503 (Oct. 31, 1985) 131 Cong. Rec.S13903. "Patient dumping is the practice whereby hospital emergency rooms deny uninsured patients the same treatment accorded paying patients either by refusing care outright or transferring them to other facilities." *Holcomb v. Humana Medical Corp.*, 83 F.Supp. 829, 832 at FN 4 (M.D.Al. 1993)

EMTALA addresses two primary concerns:  (1) the provision of an "appropriate medical screening examination" to determine whether a patient has an emergency medical condition" 42 U.S.C.A. §1395dd (a) and (2) the provision of necessary stabilizing treatment before release or transfer of a patient.  42 U.S.C.A. §1395dd (b) and (c).

As articulated by the Honorable Harold Albritton in *Holcomb v. Humana Medical Corporation, Inc.*, 831 F. Supp. 829, 832(MD Al.1993):

> The purpose of EMTALA was not to guarantee all patients a proper diagnosis or even to insure that they receive adequate care but rather to provide an adequate first response to a medical crisis for all patients and send a clear signal to the hospital community … that all Americans regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress (quoting 131 Cong. Rec. S13904 (October 23, 1985)).

EMTALA is not a federal statute creating a cause of action for substandard medical care. That remedy for Mr. Ashton, is provided by the Alabama Medical Liability Act. Rather, EMTALA is designed to protect patients such as Mr. Ashton from being turned away for financial reasons.

There is nothing in the record to suggest that Mr. Ashton was transferred from Florala Memorial because of his financial status, and for any other reason other than the hospital was not equipped to provide him definitive care for his eye injury. (See Affidavits of Dr. Page, Dr. Zloty, Blair Henson, Exhibits "A", "C" and "E" and deposition testimony of John Ashton pp.28, 47-48, and 59-69 Exhibit "F".) The affidavits of Drs. Page and Jones confirm that Ashton was "stable" when transferred from Florala Memorial for further care. (Exhibits "A" and "D")

Ashton must offer substantial evidence that Florala Memorial deviated from providing the type of care and/or screening examination that it would have provided any patient presenting to the emergency room with a similar condition in order to prevail on his EMTALA claim.

Mr. Ashton has no claim against Henson that he can state. (Ashton dep. 59-61 Exhibit "F") While he knew he had sued the hospital, he did not know why. (Ashton dep. 64-65 Exhibit "F") Ashton's own testimony (Ashton dep.61-62 Exhibit "F") and the Affidavit of  Henson (Exhibit "D") establish that Mr. Ashton has been treated in the emergency room at Florala Memorial Hospital at least 35 times since 1999 for various conditions. At no time has Ashton ever paid the hospital, or any other provider of medical care, anything for these services. (Ashton Deposition p. 64 Exhibit "F") Ashton has been a frequent visitor at the Florala Memorial Hospital since March 12, 2004 and

has been provided treatment though he has never paid Florala Memorial a cent for his visits. (Ashton Deposition pp. 64-65 Exhibit "F") Ashton offers no evidence that either the treatment plan or decision to transfer were acts which would constitute EMTALA violations.

Dr. Page affirmatively states in his Affidavit that it was his decision to transfer Ashton because there was no physician on staff at Florala Memorial who could address his particular medical needs. (See Page Affidavit Exhibit "A") Ashton himself confirms that he knows no reason that he was transferred other than that he was told he needed further care on his eye. (Exhibit "F") Henson confirms that Florala Memorial did not have a physician on staff credentialed to do eye surgery. (See Henson Affidavit Exhibit "E") The naked allegation in the complaint that the plaintiff was not "stabilized adequately" prior to transfer is unsupported by any medical evidence and is opposed by the affidavits of Dr. Page and Dr. Jones (Exhibits "A" and "D"). The plaintiff has offered no expert witness who opines that Mr. Ashton was "unstable" within the meaning of EMTALA prior to transfer.

As noted in *Holcomb v. Monahan*, 30 F.3d 116 (11th Cir. 1994) once the hospital has provided the care to the patient within its capabilities, it has discharged its EMTALA obligations regarding stabilization. The Affidavits of Drs. Zloty and Page conclude that there was nothing else the emergency department could or should have done prior to transfer. (See Zloty and Page Affidavits Exhibits "C" and "D")

In this instance, the hospital carried out all orders of the emergency room physician who determined the patient was stable before he was transferred to an appropriate facility. This evidence defeats any claim that the provisions of EMTALA

were violated with respect to the transfer. *Robinson v. Henry Ford Health Systems*, 892 Fed. Supp. 176 (ED Mich. 1994); Holcomb *v. Humana Medical Corp. Inc.*, 831 Fed. Supp. 829 (M.D. Ala. 1993) affirmed 30 Fed. 3d 116 (11th Cir. 1994); *Ingram v. Muscogee Regional Medical Center*, 235 F.3d 550 (10th Cir. 2000).

Finally, there is no evidence that the events of transfer which led to any delay in treatment (Doc. 31, par.8), were the result of the decision to transfer, nor is there any admissible evidence from a qualified provider of medical care that any causal link existed between the decision to transfer Mr. Ashton and in his loss of vision. Rather the evidence before the Court is to the contrary.  (See Zloty Affidavit Exhibit "C")

## CONCLUSION

The plaintiff's state law claims and his EMTALA claims cannot survive motion for summary judgment.  There is no genuine issue of material fact between the plaintiff and these defendants and each is entitled to a judgment as a matter of law.  The Motions for Summary Judgment of Henson and Florala Memorial Hospital are due to be granted in full.

BALL, BALL, MATTHEWS & NOVAK, P.A.

S/Tabor R. Novak, Jr. - NOV001
As Attorneys for the Defendants
Blair Henson and Florala Memorial
Hospital

2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, Alabama 36102-2148
Telephone:  334/387-7680
Telecopier:  334/387-3222


## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of March, 2007, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following registered persons and that those persons not registered with the CM/ECF system were served by U.S. mail:

A. Riley Powell, IV, Esq.
P. O. Drawer 969
Andalusia, Alabama 36420

Alan Livingston, Esq.
Lee & McInish
P. O. Box 1665
Dothan, Alabama 36302


/s/ Tabor R. Novak, Jr.
OF COUNSEL

EXHIBIT "A"

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN ASHTON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:06CV-226-D |
| | ) | |
| | ) | |
| FLORALA MEMORIAL | ) | |
| HOSPITAL; BLAIRE HENSON; | ) | |
| RUSSELL PAGE, D.O., and | ) | |
| SAMUEL E. POPPELL, M.D., | ) | |
| | ) | |
| Defendants. | | |

EXHIBIT

" A "

## AFFIDAVIT IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Before me, the undersigned authority, personally appeared Russell Page, D.O., who being by me first duly sworn, did depose and say as follows:

My name is Russell Page, D.O., and I am a physician licensed to practice medicine in the State of Alabama and I have been so licensed at all times material to this affidavit. I am one of the Defendants named in the above entitled action pending before the United States District Court for the Middle District of Alabama. I have personal knowledge of the things and matters set forth in this affidavit and I make the same in support of the Motion for Summary Judgment filed on my behalf in this case.

I practice medicine in the field of emergency medicine and I was so practicing on March 12, 2004. On March 12, 2004, I was covering the emergency room at Florala Memorial Hospital in Florala, Alabama. At such time, I was practicing my specialty of emergency room medicine. At approximately 1:30 PM, I was notified that a patient by the name of John A. Ashton had arrived in the emergency room at Florala Memorial Hospital. I saw Mr. Ashton in the emergency room and I took a history from him and examined his injury. The patient had suffered a trauma to his left eye. He stated that he had been "poked in the eye" and he could

see light only out of the eye.  It is my recollection that the patient was brought to the emergency room by the Florala Police Department.  The patient was examined by me and it was clear to me that he needed care and treatment beyond that which was available at Florala Memorial Hospital.  It was my opinion that the patient needed to be seen by an ophthalmologist.   Florala  Memorial  Hospital  did  not  have  an ophthalmologist on its staff.  Consequently, I contacted Dr. Poppell in Fort Walton Beach, Florida about the patient's injury.  Dr. Poppell is an ophthalmologist and Mr. Ashton's injury would be within the scope of Dr. Poppell's specialty.  I spoke with Dr. Poppell by telephone about Mr. Ashton's injury and Dr. Poppell agreed to accept the patient.  Dr. Poppell asked me to transfer the patient to his office in Fort Walton Beach, Florida for further treatment.

Mr. Ashton did not have any means of transportation to Dr. Poppell's office and he stated that he had no family who could take him to Dr. Poppell's office in Fort Walton Beach, Florida.  Consequently, it was necessary for the patient to be transported by the rescue squad.  I then arranged for a transfer of this patient from Florala Memorial Hospital to Dr. Poppell's office for further treatment.  Subsequently, the rescue squad came to Florala Memorial Hospital and transported Mr. Ashton from the hospital.  I understood that he was being transported to Dr. Poppell's office.  After the patient left Florala Memorial Hospital, I had no further contact with him, Dr. Poppell or the rescue squad. I was unaware of any difficulties encountered by the patient in Florida and no one contacted me with a request for any further instructions, care or treatment of this patient.

At the time the patient was transferred from Florala Memorial Hospital, the patient's condition was stable.  I complied with all of the instructions of Dr. Poppell regarding stabilization of the patient's eye injury, including the placement of a protective eye patch.  At no time did I refuse to treat Mr. Ashton, however, his injury was not within the scope of my specialty, emergency room medicine and Mr. Ashton needed to be seen by an ophthalmologist such as Dr. Poppell.

Florala Memorial Hospital emergency room is not equipped or staffed to perform eye surgery and I am not trained in eye surgery.  It would have been inappropriate for me to undertake any kind of surgical procedure on the Plaintiff's eye at Florala Memorial Hospital because I am not trained in eye surgery and the appropriate equipment for eye surgery was not available to me at Florala Memorial Hospital emergency room.

During the time that John A. Ashton was a patient at the Florala Memorial Hospital on March 12, 2004, I acted within the standard of care for emergency room physicians practicing emergency room medicine and at no time did I deviate from the applicable standard of care in my dealings with Mr. Ashton. The fact that Mr. Ashton may have been uninsured did not affect any of the medical decisions that I made, nor did his lack of health care insurance change anything that I did in connection with this emergency room visit. I would have done exactly the same for any other patient, insured or uninsured, who presented with such an injury. Referral to an ophthalmologist is the standard of care for a person with an eye injury such as that suffered by Mr. Ashton.

Attached to this affidavit is a true and correct copy of all of the emergency room records of John A. Ashton for the date of March 12, 2004.

RUSSELL PAGE, D.O.

STATE OF ALABAMA,

COUNTY OF Houston

Sworn to and subscribed before me this the 15th day of February, 2007.

NOTARY PUBLIC

My commission expires: 1-16-08



EXHIBIT "B"

Case 2:06-cv-00226-ID-SRW     Document 83     Filed 11/21/2007     Page 6 of 34

# OUTPATIENT AND EMERGENCY RECORD

| TIME/DATE | HOSPITAL | DOCTOR NOTIFIED | DOCTOR ARRIVED | PHYSICIAN | FAMILY PHYSICIAN |
|---|---|---|---|---|---|
| 27-3372  3-12-04 | 13 | 18 | 1330 | 1070 | |

PATIENT NAME (LAST, FIRST, MIDDLE): Ashton  John  A  PHONE (HOME) · PHONE (WORK)

BILLING ADDRESS: 1417 East 7 Dr  CITY: Ave Florala  STATE: Al.  ZIP: 36442  EMPLOYER  SS# 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

BIRTHDATE: 1-27-52  AGE: 51  SEX: M  BROUGHT BY: ☐ SELF ☐ RELATIVE ☐ AMBULANCE ☒ POLICE ☐ OTHER

GUARANTOR NAME (LAST, FIRST, MIDDLE)     PHONE (HOME)     PHONE (WORK)

BILLING ADDRESS     CITY     STATE     ZIP     EMPLOYER

**EXHIBIT "B"**

## FINANCIAL CLASS: ☒ Self pay
BC/BS 2. MEDICARE 3. COMMERCIAL
SELF-PAY 5. MEDICAID 6. WORKMAN'S COMP.
M/C-MCAID 8. OTHER

## INSURANCE INFORMATION
NAME OF INS. CO. _____  CONTRACT# _____  GROUP# _____
INSURED THROUGH _____  RELATIONSHIP _____  PHONE _____

**NURSING ASSESSMENT:** C/O trauma to left
eye, states he was poked in eye
Rt has pink drainage from left eye &
red area to inner lid

R.N. SIGNATURE: C Bradly RN

CONDITION ON ADMISSION: Stable
LAST TETANUS (U.T.J)
ROUTINE MEDS: 0
ALLERGIES: PCN

**PHYSICIAN'S REPORT:**
Iris is detatched —
+ small hyphema
of the left eye

| T 97° | P 86 | R 20 | BP 119/71 | TIME 1320 |
|---|---|---|---|---|
| T | P | R | BP | TIME |
| T | P | R | BP | TIME |

MEDS GIVEN | TIME – SITE – ROUTE – SIGNATURE
Antibiotic oint left eye

**DIAGNOSIS:** Blunt trauma to L. Eye. Iris detached  

**PHYSICIAN'S ORDERS:** Metal protective patch

On out 96.90

TREATMENTS DONE | TIME – SIGN.

**BRIEF HISTORY:** Assaulted by another person
Stand thumbs O.S.

DISPOSITION OF CASE: ☒ DISMISSED ☐ ADMITTED ☒ TRANSFERRED  to Dr. Poppell MD (office) in Fort Walton
HOW DISMISSED: ☐ AMBULATORY ☐ WHEELCHAIR ☐ STRETCHER ☐ OTHER
ACCOMPANIED BY: ☐ SELF ☐ RELATIVE ☐ POLICE ☐ OTHER     TIME OUT 1600
CONDITION ON DISMISSAL: Stable

## CHARGES
DOES NOT INCLUDE ATTENDING PHYSICIAN'S FEE

| EMERGENCY | $ |
| CENTRAL SUPPLY | |
| LABORATORY | |
| X-RAY | |
| PHARMACY | |
| OXYGEN | |
| LOCAL ANES. | |
| OTHER | |
| TOTAL | $ |

PHYSICIAN'S FEE $
BILL TO
ADDRESS
BILLED ☐ PAID ☐ DATE

### AUTHORIZATION FOR MEDICAL AND/OR SURGICAL TREATMENT
I, THE UNDERSIGNED, A PATIENT AT THE ABOVE-NAMED HOSPITAL, HEREBY AUTHORIZE THE ATTENDING PHYSICIAN (AND WHOMEVER HE MAY DESIGNATE AS HIS ASSISTANTS) TO ADMINISTER SUCH TREATMENT AS IS NECESSARY, WITH THE EXCEPTION OF

PATIENT SIGNATURE OR RESPONSIBLE PARTY

### AUTHORIZATION FOR RELEASE OF INFORMATION
I, THE ABOVE-NAMED PATIENT AT THE ABOVE-NAMED FACILITY, HEREBY AUTHORIZE THE SAID FACILITY TO FURNISH SUCH PROFESSIONAL INFORMATION, IN ACCORDANCE WITH THE POLICY OF THE FACILITY, AS MAY BE NECESSARY FOR THE COMPLETION OF MY PATIENT CARE INSURANCE CLAIMS BY THE ABOVE-NAMED THIRD PARTY (HEALTH INSURANCE CARRIER) FROM THE MEDICAL RECORDS COMPILED DURING MY PRESENT PATIENT STAY AND I HEREBY RELEASE THE SAID FACILITY FROM ALL LEGAL LIABILITY THAT MAY ARISE FROM THE RELEASE OF THE INFORMATION REQUESTED.

PATIENT SIGNATURE OR RESPONSIBLE PARTY

### AUTHORIZATION OF HOSPITAL BENEFITS/GUARANTEE OF PAYMENT
IN CONSIDERATION FOR SERVICE RENDERED OR TO BE RENDERED BY THE ABOVE-NAMED HOSPITAL, I HEREBY ASSIGN TO SAID HOSPITAL THE BENEFITS DUE ME COVERING HOSPITAL EXPENSE UNDER THE ABOVE-NAMED INSURANCE POLICY INSOFAR AS THEY ARE NECESSARY TO COVER SUCH EXPENSE.
I AGREE THAT, SHOULD THE AMOUNT BE INSUFFICIENT TO COVER THE ENTIRE HOSPITAL EXPENSE, I WILL BE RESPONSIBLE FOR PAYMENT OF THE DIFFERENCE, AND THAT IF THE NATURE OF THE DISABILITY BE SUCH THAT IT IS NOT COVERED BY THE SAID POLICY, I WILL BE RESPONSIBLE TO THE HOSPITAL FOR PAYMENT OF THE ENTIRE BILL.
AGREEMENT TO PAY: THE UNDERSIGNED ACCEPTS THE FEE CHARGED AS A LAWFUL DEBT AND PROMISES TO PAY SAID FEE AS OUTLINED ABOVE INCLUDING THE COST FOR COLLECTION, ATTORNEY FEES, AND COURT COSTS IF SUCH BE NECESSARY, WAIVING HOW AND FOREVER THE RIGHT TO CLAIM EXEMPTION UNDER THE CONSTITUTION AND LAWS OF THE STATE OF ALABAMA, OR ANY OTHER STATE.

PATIENT SIGNATURE OR RESPONSIBLE PARTY

**INSTRUCTIONS TO PATIENT:** Dr Poppell appoint   911-A Mar Walt Dr
Ft Walton — 2:15 PM   RP

FLO 62

Case 2:06-cv-00226-ID-SRW    Document 55    Filed 02/27/2007    Page 7 of 34

TIME – SIGNATURE

DIAGNOSIS: _Blunt trauma to L. Eye_ _Dr. ___ _level_

PHYSICIAN'S ORDERS: _Metal protective metal_ _(his detached)_

_Ant. ____ _point left eye_

_O₂ sat 96 %_

TREATMENTS DONE                    TIME – SIGN.

BRIEF HISTORY: _Assulted by another person_
_Swell thinks it O.S_                    _to Dr. Poppell MD (above) in Fort Walton_

DISPOSITION OF CASE: ☐ DISMISSED ☐ ADMITTED ☐ TRANSFERRED

HOW DISMISSED: ☐ AMBULATORY ☐ WHEELCHAIR ☐ STRETCHER ☐ OTHER

ACCOMPANIED BY: ☐ SELF ☐ RELATIVE ☐ POLICE ☐ OTHER        TIME OUT ___ _1600_

CONDITION ON DISMISSAL: _Stable_

## CHARGES
(DOES NOT INCLUDE ATTENDING PHYSICIAN'S FEE)

☐ EMERGENCY        $ _____
☐ CENTRAL SUPPLY   _____
☐ LABORATORY       _____
☐ X-RAY            _____
☐ PHARMACY         _____
☐ OXYGEN           _____
☐ LOCAL ANES.      _____
☐ OTHER            _____
          TOTAL    $ _____

PHYSICIAN'S FEE $ _____
BILL TO _____
ADDRESS _____
BILLED ☐ PAID ☐ DATE _____

### AUTHORIZATION FOR MEDICAL AND/OR SURGICAL TREATMENT
I, THE UNDERSIGNED, A PATIENT IN THE ABOVE-NAMED HOSPITAL, HEREBY AUTHORIZE THE ATTENDING PHYSICIAN (AND WHOMEVER HE MAY DESIGNATE AS HIS ASSISTANTS) TO ADMINISTER SUCH TREATMENT AS IS NECESSARY, WITH THE EXCEPTION OF

PATIENT SIGNATURE OR RESPONSIBLE PARTY

### AUTHORIZATION FOR RELEASE OF INFORMATION
I, THE ABOVE-NAMED PATIENT AT THE ABOVE-NAMED FACILITY, HEREBY AUTHORIZE THE SAID FACILITY TO FURNISH SUCH PROFESSIONAL INFORMATION IN ACCORDANCE WITH THE POLICY OF THIS FACILITY, AS MAY BE NECESSARY FOR THE COMPLETION OF MY PATIENT CARE, INSURANCE CLAIMS BY THE ABOVE-NAMED THIRD PARTY (HEALTH INSURANCE CARRIER) FROM THE MEDICAL RECORDS COMPILED DURING MY PRESENT PATIENT STAY AND HEREBY RELEASE THE SAID FACILITY FROM ALL LEGAL LIABILITY THAT MAY ARISE FROM THE RELEASE OF THE INFORMATION REQUESTED.

PATIENT SIGNATURE OR RESPONSIBLE PARTY

### AUTHORIZATION OF HOSPITAL BENEFITS/GUARANTEE OF PAYMENT
IN CONSIDERATION FOR SERVICE RENDERED OR TO BE RENDERED BY THE ABOVE-NAMED HOSPITAL, I HEREBY ASSIGN TO SAID HOSPITAL THE BENEFITS DUE ME COVERING HOSPITAL EXPENSE UNDER THE ABOVE-NAMED INSURANCE POLICY, INSOFAR AS THEY ARE NECESSARY TO COVER SUCH EXPENSE.
I AGREE THAT, SHOULD THE AMOUNT BE INSUFFICIENT TO COVER THE ENTIRE HOSPITAL EXPENSE, I WILL BE RESPONSIBLE FOR PAYMENT OF THE DIFFERENCE, AND THAT IF THE NATURE OF THE DISABILITY BE SUCH THAT IT IS NOT COVERED BY THE SAID POLICY, I WILL BE RESPONSIBLE TO THE HOSPITAL FOR PAYMENT OF THE ENTIRE BILL.
AGREEMENT TO PAY: THE UNDERSIGNED ACCEPTS THE FEE CHARGED AS A LAWFUL DEBT AND PROMISES TO PAY SAID FEE AS OUTLINED ABOVE INCLUDING THE COST FOR COLLECTION, ATTORNEY FEES, AND COURT COSTS IF SUCH BE NECESSARY, WAIVING NOW AND FOREVER THE RIGHT TO CLAIM EXEMPTION UNDER THE CONSTITUTION AND LAWS OF THE STATE OF ALABAMA, OR ANY OTHER STATE.

PATIENT SIGNATURE OR RESPONSIBLE PARTY

INSTRUCTIONS TO PATIENT: _Dr. Poppell_ _appts_ _911-A Mar Walt Dr_ _Ft Walton — 315 Pm — RP_

X _____                         _____
PATIENT SIGNATURE    DATE    MEDICAL RECORDS        TIME        PHYSICIAN'S SIGNATURE
                                                              FORM 10-ER-1

## OUT-PATIENT AND EMERGENCY RECORD

FLO63

Case 2:06-cv-00226-ID-SRW     Document 55     Filed 02/27/2007     Page 8 of 34

**OPALIKA MEMORIAL HOSPITAL**
P.O. Box 19 • 24273 Fifth Avenue • Florala, Alabama 36_ _
(334) 858-3287

### Emergency Department
# MEDICAL SCREENING EXAMINATION

☑ 1-Emergent

☐ 2-Urgent

☐ 3-Non-Urgent

Patient Name _Ashton, John_ _____ Age _____ DOB _____

Address _____ City _____ State ____ Zip ____

# _____ Phone# _____

Chief Complaint _____

Nursing Assessment _Jaw ? Right_ _____

_____

_____

_____

_____

_____

ALLERGIES _____

_____

_____

Present Medication (including Dosage & Frequency) _____

_____

_____

**Patient Preference**

ER MD ✓  Private MD ____

ER MD Per Private MD ____

**VITAL SIGNS**

BP _____ Date _____

T _____ Time _____

P _____

R _____   HT 5'6'

WT _103_

| Visual Acuity | Time to Tx Area |
|---|---|
| OU | |
| OS | MD Notified |
| OD | |

| PMH | YES | NO | SOCIAL HX | | MIS HX | Means of Arrival |
|---|---|---|---|---|---|---|
| Cardiac | | ✓ | Tobacco | Yes | LMP | __ W/C |
| Diabetes | | ✓ | Alcohol | Yes | IMMUNIZATIONS | __ Stretcher |
| Kidney | | ✓ | DASA: YES NO | | UTD | ✓ Walked |
| Respiratory | ✓ | | Emphysema COMMENTS | | >5YRS | __ Carried |
| Psychiatric | | ✓ | | | TX PTA | __ Ambulance |
| Seizures | | ✓ | | | ASA/Tylenol | |
| Cancer | | ✓ | | | Splints | Condition on Arrival |
| Sickle Cell | | ✓ | | | Bandages | ✓ Satisfactory |
| Hypertension | | ✓ | appendectomy | | Bleeding Control | __ Serious |
| Surgery | ✓ | | shoulder | | | __ Critical |
| | | | knee sur | | | __ DOA |

__ Trauma     Other Agencies Notified:
✓ Medical    Police _____
__ OB        Coroner _____
__ Other     DHR _____

NURSES SIGNATURE _C Bradly R N_     R.N.

FLO 64

FHH-61

...ARTMENT
...ORD
FL...RALA MEMORIAL HOSPITAL

| ...NT NAME (LAST, FIRST, MIDDLE) | | REV CAT | BASE D/S | DUE DATE YY MM DD | ADMIT CLERK | DATE 3-12-04 | TIME |
|---|---|---|---|---|---|---|---|
| Ashton, John | | | | | | | |
| ...ARANTOR NAME (LAST, FIRST, MIDDLE) | STREET ADDRESS | | | CITY STATE | | ZIP | TELEPHONE NO. |

## SPRAIN, FRACTURE & SEVERE BRUISES

Elevate the injured part above level of heart to lessen swelling. If pillows flatten, use chair cushions, with pillows or blanket for comfort.

Ice packs also help prevent swelling, especially during the first 48 hours.

Place ice in plastic or rubber bag, cloth covering, after 48 hours, use heat.

If you have an elastic bandage, rewrap it if too tight or loose. Remove at bedtime and replace in A.M.

If you have a cast, keep it perfectly dry at all times.

Wiggle toes or fingers to help prevent swelling in the cast - this should be done often if it does not cause pain.

If the part swells anyway, or gets cold, blue or numb or pain increases markedly, have it checked promptly.

Use crutches.

## BACK AND NECK INJURY INSTRUCTIONS

☐ USE HEAT OR COLD ON THE INJURED AREA - whichever seems to help the most. Be careful not to burn yourself.

☐ Rest as much as possible until you are improved.

☐ Avoid positions and movement that make the pain worse.

☐ Relax emotionally - if you are tense the problem will only be worse.

☐ Gentle but firm massage to reduce circulation in sore muscles and helps to clear the soreness.

☐ Wear special collar when out of bed.

## HEAD INJURY INSTRUCTIONS

Persons who receive blows to the head may have injuries that cannot always be seen by X-ray or examination soon after accident. For the next 24 hours it is important that these instructions be followed:

☐ Awaken the patient every two hours, even at night to be sure he knows where he is and is not confused.
☐ Check eyes to see that both pupils are of equal size.
☐ Prevent the taking of sleeping pills, tranquilizers or alcohol.
☐ Restrict excessive work or play.

Call your family doctor or local hospital immediately if the patient:
☐ Develops severe headache.
☐ Vomits more than twice within a short time.
☐ Is confused, faints or is hard to awaken.
☐ Has a pupil of one eye larger than the other.
☐ Complaints of double vision.
☐ Shows abnormal behavior such as staggering or walking into things.

## X-RAY INSTRUCTIONS

our X-rays have been read by the attending physician in the emergency Dept. For your added protection, your X-rays will be ...read the next day by Radiology Dept. If any abnormalities are ...und that have not been called to your attention, you and your ...octor will be called immediately. (Please be certain that the ...mergency Dept. has a phone number where you can be ...ached.) Sometimes fractures or abnormalities may not show ...p on X-rays for several days. If your symptoms continue or get ...orse, call your doctor. More X-rays may need to be taken. If ...ou are referred to another physician, come by the hospital and ...ick up copies of your X-rays and take them with you to the ...octor's office.
...lease call ahead to X-ray Dept.

## WOUND CARE (Cuts, Abrasions, Burns, Stitches

☐ Keep the dressings clean and dry ..........................

☐ Elevate the wound to help relieve soreness and to help speed wound healing.

☐ Despite the greatest care any wound can be infected. If your wound becomes red, swollen, shows pus or red streaks, or feels sore instead of less sore as days go by, you must report to your doctor right away.

☐ Dressing should be changed in _____ days.

☐ Treatment rendered _____

☐ Tetanus Toxoid given _____
250 units of tetanus immune globulin was given. To complete your immunization, you must receive two additional doses of toxoid 4-5 weeks apart. Call your physician for the next dose.

☐ Warm soaks to area 4 times daily, 20-40 minutes each time.

☐ Continuous warm compresses.

## VOMITING & DIARRHEA

☐ Do not feed anything for 4 hours.

☐ After 4 hours, if there is no vomiting and/or diarrhea, offer 2 tablespoons (1 ounce) of any of the following clear liquids: Coke, Gingerale, 7-up, weak tea, Gatorade or Jello water. If patient is hungry you may add 1 teaspoon of sugar to each ounce of fluid.

☐ UNDER NO CIRCUMSTANCES USE MILK OR MILK PRODUCTS.

☐ The 2 tablespoons of liquid may be offered every hour. If after 4 hours no vomiting has occurred, the amount may be slowly increased.

☐ Using no more than 1/2 glass (4 ounces) of liquid at a time continue this treatment for 24 hours.

☐ Contact your doctor's office for further instructions after 24 hours.

## GENERAL INSTRUCTIONS

) Stay in bed / may go to bathroom.

) Use vaporizer.

) Drink large amounts of liquids.

) Take _____ aspirin every 4 hours.

) Avoid any use of injured part.

) You need not necessarily limit activity.

) Fill prescriptions given to you from Emergency Dept. and take as treated.

## FEVER OVER 102

☐ Sponge with lukewarm water in the tub.

☐ If temperature increases or persists for 24 hours, see your family doctor.

## EYE INJURY

☐ Any eye injury is potentially hazardous

☐ Any increasingly severe discomfort, redness or sudden impairment of vision should be reported immediately to your physician or eye specialist below.

☐ Do not drive with eye patch.

## ANIMAL OBSERVATION

Instructions for observation of any animal that may have bitten a human if that animal is available for observation.

☐ Have animal taken to veterinarian for observation.

☐ If the owner should refuse to take the animal to the veterinarian, notify the County Health Officer of the situation.

ADDITIONAL INSTRUCTIONS _Transferred by Ambulance to MD office_

I hereby acknowledge receipt of all instructions indicated above. I understand that I have received EMERGENCY treatment only and that I may be released before all my medical problems are known or treated. I will arrange for follow-up care as indicated above. I understand that if my conditions worsen or new symptoms appear, I should contact my Doctor immediately.

| PATIENT'S SIGNATURE | NURSES SIGNATURE C. Braal R.N. | PHYSICIAN'S SIGNATURE |
|---|---|---|
| | | DATE |

SCHOOL AND WORK EXCUSE  PATIENT NAME _____

☐ No work for _____ days
☐ Light duty for _____ days
☐ May return to work on _____

☐ No school for _____ days
☐ No Physical Education for _____ days
☐ May return to school on _____

PHYSICIAN'S SIGNATURE _____

FLO 65

Case 2:06-cv-00226-ID-SRW    Document 55    Filed 02/27/2007    Page 10 of 34

LORALA MEMORIAL HOSP    1L • P.O. Box 189 • 24273 Fifth Avenue • Flor    Alabama 36442

## EMERGENCY DEPARTMENT

| GUARANTOR NAME AND ADDRESS | PATIENT NO. | PATIENT NAME | DR. NO. | DATE |
|---|---|---|---|---|
| | 107-3372 | Ashton, John | | 3-12-04 |

| DATE OF BIRTH | TELEPHONE NO. | CODE | INSURANCE DESCRIPTION | CERTIFICATE NO. |
|---|---|---|---|---|
| 9-27-52 | | | Self | |

| DESCRIPTION | CODE | FEE | DESCRIPTION | CODE | FEE | DESCRIPTION | CODE | FEE | DESCRIPTION | CODE | FEE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **E/M Care** | | | **E N T** | | | 2.6 - 7.5 cm | 12002 | | | | |
| New Patient | | | Control Nasal Hemorrhage | | | 7.6 - 12.5 cm | 12004 | | | | |
| Level 1 | 99281 | | Simple Anterior | 30901 | | 12.6 - 20.0 cm | 12005 | | | | |
| Level 2 | 99282 | | Complex Anterior | 30903 | | 20.1 - 30 cm | 12006 | | | | |
| Level 3 | 99283 | | Posterior | 30905 | | Simple Face, Ears, Eye, | | | | | |
| Level 4 | 99284 | | **Nails** | | | Nose, Lips | | | | | |
| Level 5 | 99285 | | Avulsion, Simple | 11730 | | Up to 2.5 cm | 12011 | | | | |
| **Emergency Procedures** | | | Subungual Hematoma | 11740 | | 2.6 - 5.0 cm | 12014 | | | | |
| Endotracheal Intubation | 31500 | | Nailbed Reconstruction | 11760 | | 7.6 - 12.5 cm | 12015 | | | | |
| IVP Line | 36489 | | | | | **Burn & Debridement** | | | | | |
| A Line Percutaneous | 36620 | | **Arthrocentesis** | | | Initial 1st Degree Burn | 16000 | | | | |
| IV Therapy, MD present | 90780 | | Small Joint / Bursa | 20600 | | Debr. Burn & Dressing | | | | | |
| Thrombolysis by IV | 92977 | | Intermed. Joint / Bursa | 20605 | | Small 5% | 16020 | | | | |
| C P R | 92950 | | Major Joint / Bursa | 20610 | | Medium 5 - 10% | 16025 | | | | |
| | | | | | | Large > 10% | 16030 | | | | |
| **Critical Care** | | | **Wound & Lacer. Repair** | | | Debrid. Eczematous | | | | | |
| Critical Care, 1st Hr. | 99291 | | Complicated or Over | | | Infected Skin | | | | | |
| Care, 1/2 x ___ units | 99292 | | 7.5 cm Any Area | 13300 | | Up to 10% | 11000 | | | | |
| | | | Complex Trunk | | | Partial Thickness | 11040 | | | | |
| **Additional Procedures** | | | 1.1 - 2.5 cm | 13100 | | | | | | | |
| Tube Thoracostomy | 32020 | | 2.6 - 7.5 cm | 13101 | | **Dislocation** | | | | | |
| Direct Life Line Support | 99288 | | Complex Scalp, Arms, Legs | | | TM Joint | 21480 | | | | |
| Paracentesis | 49080 | | 1.1 - 2.5 cm | 13120 | | A/C Separation | 23540 | | | | |
| Emerg Vaginal Delivery | 59409 | | 2.6 - 7.5 cm | 13121 | | Shoulder | 23650 | | | | |
| Lumbar Puncture | 62270 | | Complex Face, Genitalia, | | | Elbow, Nursemaid | 24640 | | | | |
| Ipecac Administration | 99175 | | Hands, Feet 1.1 - 2.5 cm | 13131 | | Finger, Metacarpophalangeal | 26700 | | | | |
| NG Tube Lavage / Asp | 91105 | | 2.6 - 7.5 cm | 13132 | | Finger, IP Joint | 26770 | | | | |
| Change Gastrostomy Tube | 43760 | | Comp. Eye, Nose, Ear, Lip | | | Patella | 27560 | | | | |
| Urine Cath, Simple | 53670 | | 1.0 cm or less | 13150 | | Toe, IP Joint | 28660 | | | | |
| Urine Cath, Complex | 53675 | | 1.1 - 2.5 cm | 13151 | | | | | | | |
| Transcutaneous Pacing | 92953 | | 2.6 - 7.5 cm | 13152 | | ICDA CODE | | DATE OF LAST PAYMENT | | | |
| Elective Cardioversion | 92960 | | Layered Scalp, Trunk, | | | | | | | | |
| | | | Extremities, Up to 2.5 cm | 12031 | | | | PREVIOUS BALANCE | INSURANCE | PATIENT | |
| **Minor Surgery** | | | 2.6 - 7.5 cm | 12032 | | | | | | | |
| Incision / Drainage | | | 7.6 - 12.5 cm | 12034 | | | | TODAY'S CHARGES | | | |
| Abscess, Simple | 10060 | | 12.6 - 20.0 cm | 12035 | | | | | | | |
| Abscess, Complicated | 10061 | | Layered Neck, Hands, | | | | | PAID ON ACCOUNT | | | |
| Hematoma, Simple | 10140 | | Feet, External Genitalia | | | | | CHECK | CASH | | |
| Aspiration Abscess | 10160 | | Up to 2.5 cm | 12041 | | ADJ. | | | | | |
| Other: (Name Site) | | | 2.6 - 7.5 cm | 12042 | | | | | | | |
| | | | 7.6 - 12.5 cm | 12044 | | | | TOTAL DUE | | | |
| Foreign Body Removal | | | 12.6 - 20.0 cm | 12045 | | **Closed Fracture** | | | | | |
| Subcutaneous, Simple | 10120 | | Layered Face, Ears, | | | Nasal Fracture | 21310 | | | | |
| Subcutaneous, Complic. | 10121 | | Nose, Lips | | | Rib, uncomplicated | 21800 | | | | |
| Muscle, Simple | 20520 | | Up to 2.5 cm | 12051 | | Clavicular | 23500 | | | | |
| Intranasal | 30300 | | 2.6 - 5.0 cm | 12052 | | Phalangeal, Shaft | 26720 | | | | |
| Pharynx | 42809 | | 5.1 - 7.5 cm | 12053 | | Phalangeal, Distal | 26750 | | | | |
| Ear | 69200 | | 7.6 - 12.6 cm | 12054 | | Great Toe | 28490 | | | | |
| Eye, Superficial | 65205 | | Simple Neck, Trunk, | | | Other Toe | 28510 | | | | |
| Impacted Cerumen | 69210 | | Genitalia, Extremities | | | | | | | | |
| | | | Up to 2.5 cm | 12001 | | | | | | | |

DIAGNOSIS: _Blunt Trauma to Eye_

PHYSICIAN SIGNATURE:

FLO66

y agree and give my consent for the admission/treatment. _J. Ashton_ (myself or name of pt____ ) to
ALA MEMORIAL HOSPITAL, hereinafter referred to as the Hospital, under the care of the attending physician, his associates, partners,
ts or designees. I consent to any and all hospital care, which encompasses radiological examinations, laboratory procedures, diagnostic procedures,
iia, and nursing or medical/surgical treatment which my physician, his associates, partners, assistants or designees may deem necessary or advisable,
he general and special instructions of the same, during my hospitalization.

.ideration of the hospital care and treatment to be rendered to me by the Hospital, I agree and consent to the following conditions:

NERAL DUTY NURSING. The Hospital provides only general duty nursing care. Under this system nurses are called to the bedside of the
by a signal system. If the patient is in such condition as to need continuous or special duty nursing care, it is agreed that such must be arranged by the
or his legal representative, or his physicians, and the Hospital shall in no way be responsible for failure to provide the same and is hereby released from
all liability arising from the fact that said patient is not provided with such additional care.

IDICAL AND SURGICAL TREATMENT. I agree and understand that all physicians, dentists and oral surgeons treating me or the patient in
are responsible and liable for their own acts or omissions and the Hospital is not responsible or liable for the acts and omissions of the
.ntioned. I am aware that the practice of medicine is not an exact science and further state that no guarantee has been or can be made as to the results of
tments of examinations in the Hospital. The undersigned recognizes that all doctors of medicine furnishing services to the patient, including the
.ist, pathologist, anesthetist and the like are independent contractors and are not employees or agents of the hospital.

SIGNMENT OF INSURANCE BENEFITS. In order to correctly process your insurance claim, the patient or responsible party is responsible
riding at the time of service, the most current address, phone number and insurance information. The undersigned hereby assigns and authorizes
t directly to the Hospital, of any hospital benefits, sick benefits, injury benefits due because of liability of a third-party, or proceeds of all claims
g from the liability of a third-party, payable by any party, organization, et cetera, to or for the patient unless the account for this hospital, outpatient
nt or series of outpatient treatments is paid in full upon discharge or completion of outpatient treatments. If eligible for Medicare, the undersigned
s Medicare services and benefits. The undersigned further agrees that this assignment will not be withdrawn or voided at any time until this account for
.pitalization is paid in full. The undersigned understands that they are responsible for any hospital charges not covered by their insurance company and
ually obligates himself to pay the account of the Hospital in accordance with the regular rates and terms of the Hospital.

.YMENT AGREEMENT. The undersigned individually obligates himself to the payment of the Hospital account incurred by the patient in
ance with the regular rates and terms of the Hospital at the time of patient's discharge. If the patient fails to make payment when due and the account
es delinquent or is turned over to a collection agency or an attorney for collection, the undersigned shall pay all collection agency fees, court costs and
y's fees. The undersigned agrees that any patient or guarantor overpayments collected on the above admission or outpatient treatments may be applied
r to any delinquent account for which the patient or guarantor is legally responsible at the time of collection of the overpayment.

SIGNMENT OF PHYSICIAN BENEFITS. In the event that I, the patient, in addition to hospital benefits, am entitled to any physician's
s of any type whatsoever arising out of a policy of insurance insuring me or any other party's liability to me, I hereby assign said benefits to any
an rendering care or treatment during this stay or outpatient visits, to be applied to my bill.

:LEASE OF MEDICAL INFORMATION. I authorize the Hospital and any physician rendering care or treatment to release medical and
.ting documentation of same as compiled in the medical records during this admission or outpatient visit for purposes of benefit payment.

EDICARE PATIENT CERTIFICATION. I certify that the information given by me in applying for payment under Title XVIII of the Social
y Act is correct. I authorize any holder of medical or other information about me to release to the Social Security Administration or its intermediaries or
s any information needed for this or a related Medicare claim. I permit a copy of this authorization to be used in place of the original and request
nt of authorized benefits be made on my behalf.

IVATE ROOM DIFFERENCE. I agree and understand that if I request a private room for myself or the patient, I am responsible for the entire
. room difference.

ERSONAL VALUABLES AND BELONGINGS. It is understood and agreed that the Hospital maintains a safe for the safekeeping of money,
.les and personal belongings and the Hospital shall not be liable for the loss or damage to any articles or personal property while I am hospitalized unless
.ticles are deposited with the Hospital in the safe and receipts are issued describing said items.

.DVANCE DIRECTIVE ACKNOWLEDGEMENT: Please read and initial the following statements:
   1. I have been given written materials about my right to accept or refuse medical treatments. _____ (initial)
   2. I have been informed of my rights to formulate Advance Directives. _____ (initial)
   3. I understand that I am not required to have an Advance Directive in order to receive medical treatment at this facility. _____ (initial)
   4. I understand that the terms of any Advance Directive that I have executed will be followed by the Hospital and my caregivers to the
      extent permitted by law. _____ (initial).
   5. I have executed an Advance Directive _____ (initial) OR I have not executed an Advance Directive. _____ (initial)

'ATIENT RIGHTS: The patient has the right to:
   1. considerate and respectful care;
   2. obtain from his physician complete current information concerning his diagnosis, treatment, and prognosis in terms the patient can be reasonably
      expected to understand. When it is not medically advisable to give such information to the patient, the information should be made available to an
      appropriate person in his behalf. He has the right to know, by name the physician responsible for coordinating his care;
   3. receive from his physician information necessary to give informed consent prior to the start of any procedure and/or treatment. Except in
      emergencies, such information for informed consent should include but not necessarily be limited to the specific procedure and/or treatment, the
      medically significant risks involved, and the probable duration of incapacitation. Where medically significant alternatives for care or treatment
      exist, or when the patient requests information concerning medical alternatives, the patient has the right to such information. The patient also has
      the right to know the name of the person responsible for the procedure and/or treatment;
   4. refuse treatment to the extent permitted by law and to be informed of the medical consequences of his action;
   5. every consideration of his privacy concerning his own medical care program. Case discussion, consultation, examination, and treatment are
      confidential and should be conducted discreetly. Those not directly involved in his care must have the permission of the patient to be present;
   6. expect that all communications and records pertaining to his care should be treated as confidential;
   7. expect that within its capacity the Hospital must make reasonable response to the request of a patient for services. The Hospital must provide
      evaluation, service, and/or referral as indicated by the urgency of the case. When medically permissible, a patient may be transferred to another
      facility only after he has received complete information and explanation concerning the needs for and alternatives to such a transfer. The
      institution to which the patient is to be transferred must first have accepted the patient for transfer;
   8. obtain information as to any relationship of the Hospital to other health care and educational institutions insofar as his care is concerned. The
      patient has the right to obtain information as to the existence of any professional relationships among individuals, by name, who are treating him.
   9. be advised if the hospital proposes to engage in or perform human experimentation affecting his care or treatment. The patient has the right to
      refuse to participate in such research projects;
   10. expect reasonable continuity of care. He has the right to know in advance what appointment times and physicians are available and where. The
       patient has the right to expect that the hospital will provide a mechanism whereby he is informed by his physician or delegate of the physician of
       the patient's continuing health care requirements following discharge;
   11. examine and receive an explanation of his bill regardless of source of payment;
   12. know what Hospital rules and regulations apply to his conduct as a patient.

NOTICE OF PRIVACY PRACTICES: _Required pursuant to Health Insurance Portability and Accountability Act of 1996 (HIPAA)._ I
.wledge that I have received a copy of the Facility's Notice of Privacy Practices that provides information about how the facility may use and disclose my
.cted health information.

undersigned certifies that they have read this entire document and are the patient, or are duly authorized by the law to execute
bove agreement and accepts and understands its terms.

_Bradley, RN_                              X _[signature]_                    _3-12-06_
                                           Patient                            Date
                                           X _[signature]_
                                           Patient's Agent/Guarantor/Relationship            Date

FLO67

## PHYSICIAN'S CERTIFICATION STATEMENT (PCS)
## FOR AMBULANCE TRANSPORT

• Medicare requires that ambulance providers obtain a signed PCS for the provision of non emergency transports. The completion of this form rests with the attending physician and should be with the medical records or information at the time of transport.

PATIENT: _John A Ashton_    DATE OF TRANSPORT: _03-12-04_

DATE OF BIRTH: _9-27-52_    SOC. SEC. # _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_

PLACE OF ORIGINATION: _Flmah Memorial_    DESTINATION: _Samuel E. Poppell MD_
_911 A Mar Walk Drive_
_Ft Walton Bch, FL_
_1-800-862-4001_

OPTION 1: Ambulance Is Not Medically Necessary.

_____NO    In my professional medical opinion, this patient does not require transport by ambulance and can safely be transported by other means because the patient can safely support him/herself while seated in wheelchair or car and does not require monitoring by trained personnel.

_____NO    This transfer is at the request of the patient or representative and is not medically necessary.

OPTION 2: Ambulance Medically Necessary.

1. Ambulance transport is required because:

_____ Bedbound. At time of service: The HCFA definition of *bedbound* is the inability to get up from bed without assistance, the inability to ambulate and the inability to sit in a chair, including wheelchair.

_____ Needs Continual Medical Supervision. This patient needs continual medical supervision and transport by other means may place the patient's general welfare in jeopardy or cause impairment of bodily function.

_____ ALS Care Required. Due to current or potential condition, an ALS (IV, ETT, EKG, etc.) attendant is required.

. Describe current *physical* condition of patient that makes transportation by ambulance medically necessary (i.e. Contractures; Must be turned every 2 hours. May exhibit aggressive behavior without warning, Persistent Vegetative State, etc).

_____

_____

_____

The patient is being:
_____ Transferred to another facility for a higher level of care because required services, equipment, or personnel are not available at this facility. Specify: _____

_____ Discharged to: _____ Home, _____ ECF, _____ SNF, or _____ Rehab Facility.

_____YES _____NO    This was the closest appropriate facility for this patient's needs.

.certify that the above information represents an accurate assessment of the patient's medical condition(s) and that In my professional medical opinion, this patient requires transport by ambulance and should not be transported by any other means. I understand that this information will be used HCFA to support the determination of medical necessity for ambulance service.

tending Physician _____

thorized Signature _C Bradly RN_    Date: _03-12-04_    FLO68
RN, PA, CNS, or DISCHARGE PLANNER (circle one)

# FLORALA MEMORIAL HOSPITAL

P.O. BOX 189 • FLORALA, ALABAMA 36442
(334) 858-3287

## Procedure: Documentation of Transfer

Date: _3-12-04_    Name _John Ashton_    MR # _____ ER# _____

**Florala Hospital Physician:**

☒ A. Decision to transfer due to diagnosis    ☐ B. Decision to transfer due to patient request

Receiving Physician called:    Dr. _Russell_

Receiving Hospital: _Office Hamilton_    Person Accepting: _B Russell_

**Transfer by:**

☐ A. Private Car    ☐ C. Emergency transfer with paramedic or nurse
☒ B. Non-emergency ambulance with EMT    ☐ D. Helicopter Service: _____
                                         Time Called: _____

If helicopter, follow hospital procedure for chopper.

---

**Stabilization of Patient: (Complete A, B or C below:)**

A. I certify that the patient suffered from an emergency medical condition but was stabilized at the time of transfer.

Dr. _____

*If the physician is not physically present at the time of transfer, signature of a qualified medical person after direct consultation with the physician.*

For physician by: _____

Subsequent countersignature of Dr. _____

B. I certify that patient suffered from an emergency medical condition and was in an unstabilized condition and based upon the reasonable risks and benefits and upon the information available at the time, the benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risk to the individual's condition from effects of the transfer.

The unstabilized patient -- or a person acting on the patient's behalf -- has requested the transfer in writing and has been informed of the hospital's obligations and of the risks and benefits of transfer.

Dr. _____

*If the physician is not physically present at the time of transfer, signature of a qualified medical person after direct consultation with the physician.*

For physician by: _____

Subsequent countersignature of Dr. _____

The risks and benefits to the unstabilized patient (and to the fetus if the patient is in labor) . . .

are: _____

_____

C. The patient or the patient's representative is requesting transfer in writing and against medical advice and after being informed of the risks and benefits of transfer. unstable, complete the risks and benefits summary above.)

Dr. _____

*If physician is not physically present at the time of transfer, signature of qualified medical person after direct consultation with physician.*

For physician by: _____

Subsequent countersignature of Dr. _____

FL069

Page 1 of 2.

FHH-90

mentation of Transfer          FLORALA MEMORIAL HOSPITAL                          Page 2 of 2

List name and address of any on-call physician who failed or refused to appear within a reasonable time after being called:

Dr. _____                        Dr. _____

Address _____                    Address _____

**Sent to receiving facility:**
☑ Records related to emergency medical condition          ☑ Observation of signs or symptoms
☑ Preliminary diagnosis                                    ☑ Treatment provided
Results of any tests: *(circle)*    lab.    x-ray    ABG    EKG
☐ Informed Written Consent of Patient (copy)              ☐ Other _____

Nursing Information communicated to receiving nurse:
☑ Yes    Name of Receiving Nurse: _affins_

0. **Personal belongings:**
☐ Sent with patient
☐ Sent with family

1. Departure Time: _1600_                    Signature: _C. Bradly RN_
                                             Signature of Person Completing Form

## Transfer

his is to certify that I _John Ashton_ _____ have been examined at
_____ and that I have:

**table Patient (check one)**

☐ 1. Given my consent to a transfer from this hospital to another facility. I acknowledge that I have been fully informed of the risks and benefits involved in the transfer. I hereby release the attending physician and the hospital from all responsibility for ill effects that may result from the transfer.

☐ 2. Refused to consent to transfer to another facility against the advice of my attending physician. I acknowledge I have been fully informed of the risks involved and hereby release the attending physician and hospital from all responsibility for ill effects that may result from the Refusal to Consent to Transfer.

**Unstable Patient (check one)**

☐ 1. Requested a transfer from this hospital to another facility. I acknowledge that I have been fully informed of the risks and benefits involved in the transfer and I have requested the transfer. I hereby release the attending physician and the hospital from all responsibility for any ill effects that may result from the transfer.

☐ 2. Have not requested a transfer from this facility. I acknowledge that I have been fully informed of the risks and benefits involved. I hereby release the attending physician and the hospital from all responsibility for any ill effects that may result from my failure to request a transfer.

**R atients (check one)**

☐ 1. Consented to treatment or examination.

☑ 2. Refused to consent to treatment or examination or both against the advice of the attending physician. I acknowledge that I have been informed of the risks and benefits involved and hereby release the attending physician and hospital from all responsibility for any ill effects that may result from my Refusal to Consent to Treatment or Examination.

**LL atients**

☑ 1. The risks and benefits of transfer are (include risks and benefits to fetus if patient is in labor):
_R = Not Significant_
_B = Other Signs available_

**R Patients**

☐ 2. I acknowledge that I have been told of the hospital's obligation to provide screening and emergency medical treatment.

_(signature)_

atient's Signature

_____
gnature of Legally Responsible Person for Patient

_____
itness    _C. Bradly RN_

itness                                                                      FLO 70

Case 2:06-cv-00226-ID-SRW     Document 55     Filed 02/27/2007     Page 15 of 34

515 E
P.O. BOX 189
FLORALA, AL  36442

| ATIENT NAME | | ACCOUNT NO. | ROOM NO. | | ADMIT DATE | DISCHARGE DATE | P. |
|---|---|---|---|---|---|---|---|
| FON JOHN A | | 3828505 | 0 | 0 | 3/12/04 | 3/12/04 | 1 |

| ANTOR NO. | GUARANTOR ADDRESS | | FINANCIAL CLASS | INSURANCE PLANS | | BILLING DATE |
|---|---|---|---|---|---|---|
| | ASHTON JOHN A | P | 0 | 0 | 0 | 3/13/04 |
| | 1617 SEVENTH AVE | | | | | |
| | FLORALA AL 36442 | | | | AGE | DOCTOR NAME |

| ATE OF ERVICE | SERVICE CODES | CHARGE DESCRIPTION | QUANTITY | 51 UNIT PRICE | PAGE R AMOUNT | INSURANCE CODE |
|---|---|---|---|---|---|---|
| 12/04 | 264002 | ER LEVEL 2 | 1 | 0.00 | 75.00 | |
| 12/04 | 274012 | ER ROOM PHYSICIAN | 1 | 0.00 | 75.00 | |
| 12/04 | 213149 | CS EYE PADS | 1 | 0.00 | 9.00 | |
| | 519657 | Antibotic eye oint. | 1 | | 63.00 | |

```
******* DEPARTMENTAL SUMMARY *******
Pharmacy                             63.00
CENTRAL SUPPLY NON-STERIL             9.00
EMERGENCY ROOM                       75.00
ER PHYSICIAN'S FEES                  75.00
                                    -------
                                    222.00
```

| | | | | | | |
|---|---|---|---|---|---|---|
| | | TOTAL CHARGES | | | 159.00 | |
| | | LESS PAYMENTS | | | 0.00 | |
| | | PAY THIS AMOUNT ➡ | | | | |
| | | | | | 159.00 | FLO71 |

EXHIBIT "C"

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN ASHTON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:06CV-226-D |
| | ) | |
| | ) | |
| FLORALA MEMORIAL | ) | |
| HOSPITAL; BLAIRE HENSON; | ) | |
| RUSSELL PAGE, M.D., and | ) | |
| SAMUEL E. POPPELL, M.D., | ) | |
| | | |
| Defendants. | | |

EXHIBIT
" C "

## AFFIDAVIT

Before me, the undersigned authority, personally appeared Peter Zloty, M.D., who being by me first duly sworn, did depose and say as follows:

My name is Peter Zloty, M.D., and I have personal knowledge of the things and matters set forth in this affidavit. I am a physician licensed to practice medicine in the State of Alabama and I have been so licensed during all time material to this affidavit. I practice the specialty of ophthalmology in the City of Dothan, Alabama, and I am on the medical staff of Flowers Hospital and Southeast Alabama Medical Center. A true and correct copy of my curriculum vitae is attached to this affidavit as Exhibit "A."

On March 12, 2004, I saw John Ashton as a patient in the emergency room at Flowers Hospital in Dothan, Alabama. On the night of March 12-13, 2004, I performed surgery on Mr. Ashton's left eye as a result of an injury which he had received earlier in the day. Mr. Ashton's injury was consistent with having been struck in the eye with a fist or some other blunt object. Mr. Ashton told me that he had been punched in the eye by a person wearing brass knuckles. His injury was not consistent with having been stuck in the eye with the blade of a screwdriver.

In my examination and subsequent treatment of John Ashton, I found that he had suffered a ruptured globe but the injury was contained within the eye itself. Thus, the injury was contained and sterile until the time that I opened the eye surgically. Consequently, it is my opinion that any delay in surgical treatment of the injury had no effect on the ultimate outcome in the case. In fact, any loss of vision in the left eye was probably due to Mr. Ashton's non-compliance as a patient post-operatively. Mr. Ashton failed to keep follow-up appointments with retina specialists after he was discharged from the hospital and this non-compliance more likely than not, caused or contributed to any loss of vision. I felt that the patient achieved a good surgical outcome and that his prognosis was reasonably good after surgery. However, it was essential that he receive follow-up care after discharge from the hospital, which he did not do.

The type injury received by Mr. Ashton is an injury that requires the treatment of eye surgeon and it not typically treated by emergency room physicians. It is my understanding that Mr. Ashton was brought to the emergency room at Florala Memorial Hospital following his injury on March 12, 2004. I understand that he was seen in the emergency room by the emergency room physician on call. There is nothing that the emergency room could or should have done other than make arrangements to have the patient transferred to the care of an ophthalmologist. An emergency room physician such as Dr. Russell Page in Florala should not attempt to perform any surgical or other procedures on an eye injury such as that suffered by John Ashton. It would have been inappropriate in my opinion for Dr. Page to have undertaken any type of surgical or other operative procedure on Mr. Ashton's eye. It was appropriate and proper for Dr. Page to arrange for the transfer of the patient to the care of an ophthalmologist. In my opinion, the ultimate outcome in this case was in no way influenced by anything that occurred at Florala Memorial Hospital. Had this patient received surgery earlier in the day on March 12, 2004, his outcome would almost certainly have been the same.

PETER ZLOTY, M.D.

STATE OF ALABAMA,

COUNTY OF HOUSTON.

Sworn to and subscribed before me this the 20 day of _February_, 2007.

_Elizabeth Ann Shein_
NOTARY PUBLIC

My commission expires: _8-6-07_

# CURRICULUM VITAE

PETER ZLOTY, M.D.
103 CREEK RIDGE ROAD
DOTHAN, ALABAMA 36301
(334) 794-3440

## Personal Info

Birthdate:     April 16, 1960
Birthplace:   Buffalo, New York

## Education:

Rensselaer Polytechnic Institute
Troy, New York 12181
Biomedicine Major (Accelerated two year program)
Bachelor of Science, 1980

Albany Medical College of Union University
Albany, New York 12208
Doctor of Medicine, 1984

Albany Medical Center Hospital
Albany, New York 12208
Categorical Diversified Medical Internship, 1984-1985

Diplomat of the National Board of Medical Examiners, 1985
NBME Number 299152

Combat Casualty Care Course (C4) Certification
Fort Sam Houston, Texas, July 1985

Albany Medical Center Hospital
Albany, New York 12208
Residency in Ophthalmology, 1988-91

Albany Medical College of Union University
Albany, New York 12208
Fellowship, Corneal and External Diseases, Anterior Segment Surgery 1991-92
Michael W. Belin, M.D. Preceptor

Board Certification, American Board of Ophthalmology, 1993

Current Position:

> Staff Physician, Cornea, External Disease, and Refractive Surgery
> Southeast Eye Clinic, 102 Doctors Drive,
> Dothan, Alabama 36301    March 2006 – Present

Previous Positions:

> Director, Cornea, External Disease, and Refractive Surgery
> Eye Institute of the South, 2800 Ross Clark Circle SW,
> Dothan, Alabama 36301    July 1992 – March 2006

> Director, General Ophthalmology Service
> Albany Medical College
> Albany, New York 12208    July 1991-1992

> Staff Physician
> On Call Medical Services
> 76 North Greenbush Road
> Troy, New York 12180    March 1989 – June 1992

Military Services:

> Staff Physician, Newport Naval Hospital 1985 to 1988
> Lieutenant, Medical Corps, United States Navy
> Emergency Room Physician, General Medical Officer
> Brig Medical Officer, Surgical Support Team Leader
> Emergency Medical Technician Instructor

Licensure:

> Alabama Medical License, June 1992 #16585
> Georgia Medical License, October 1992 #36327
> Florida Medical License, April 1994 #ME0066014
> New York State Medical License, October 1988 #175610-1 (inactive status)
> Rhode Island and Providence Plantations Medical License, August 1985 #6736 (inactive status)
> Advanced Cardiac Life Support Instructor Certification, April 1988
> Advanced Cardiac Life Support Provider Certification, August 1993
> Advanced Trauma Life Support Provider Certification, August 1989

Awards and Honors:

Medical Student Research Award, 1981
Albany Medical College
Albany, New York

Sigma Xi Research Society Induction, 1982
Albany Chapter
Albany, New York

American Medical Association Physician Recognition Award
Continuing Medical Education 1988

Promoted to Lieutenant Commander, Medical Corps
United States Naval Reserve
Date of rank: February 1990
Honorable Discharge April 1993

Organizations, Societies, Activities:

Member, American Academy of Ophthalmology 1993 – Present

Member, Ocular Microbiology and Immunology Group 1991 – Present

Student Council Class Representative, 1981-1982
Albany Medical College, Albany, New York

Sigma Xi Research Society Associate member, 1982 – Present

Research:

Summer Research Fellowship, 1981
Department of Thoracic Surgery
Albany Medical College, Albany, New York

Summer Research Fellowship, 1982
Department of Thoracic Surgery
Albany Medical College, Albany, New York

Naval Blood Research Laboratory, July – August 1983
Boston University Medical School
Boston, Massachusetts
"Evaluating the functional characteristics of SRBC rosette-reactive T cells derived from
non-human primates."

Albany Medical Center Giant Papillary Conjunctivitis Clinical Studies 1989-90
Bausch and Lomb In Vision Research Grant Finalist

Co-Investigator: Allergan Pharmaceutical Corporation
Topical .3% Ofloxacin Sstudy, 1990-1992

Co-Investigator: Chiron Pharmaceutical Corporation Ophthalmic Surgical Solution
Additive Study, 1991 – 1992

Assistant Investigator: Sandimmune Topical Cyclosporine High Risk Corneal
Transplantation Study, 1991-1992

Assistant Investigator: PAR Corneal Topography System, Development of a
Photoablative Subsystem, 1990 – 1992

Presentations:

Albany Medical College Research Recognition Presentation
"Outstanding Research Endeavor"
"Non-specific suppressor cell development in tumor-bearing mice"
Zloty, P, Bennett JA, McKneally MF
Presented November 1981

Optic Nerve Head Compliance During Artificially Induced Ocular Hypertension
Mehta NJ, Zloty P, Cutro JA, Simmons SI
ARVO Poster Presentation, April 1990

Albany Ophthalmologic Update
"A Rational Approach to Antibiotic Prophylaxis"
Zloty P
Presented May 1991

Ocular Microbiology and Immunology Group
"Granulocyte Colony Stimulating Factor in an HIV Patient with Pseudomonas Corneal
Ulcer"
Zloty P, Scroggins SA, Belin NW
Presented October 12, 1991

Contact Lens Association of Ophthalmologists
"Clinical Performance of the Acuvue, NewVues, and SeeQuence disposable contact lens
in Giant Papillary Conjunctivitis"
Bucci FA, Lapatynsky MO, Zloty P
Poster Presentation January 1992

Contact Lens Association of Ophthalmologists
"PAR CTS: Development of a Photoablative Subsystem, The Imaging of Post Operative Corneas"
Belin MW and Zloty P
Lecture presentation January 1992

American Society of Cataract and Refractive Surgery
Evaluation of a Low Cost, Hand Held, Direct Reading Microscope for Measuring RK Blade Extension
Belin MW, Zloty P, Battu V
Lecture Presented May 1993

Publications:

Bennett JA, Zloty P, McKneally MF:  Cimetidine blocks the development of tumor-induced suppressor T cell activity.  International Journal of Immunopharmacology, Vol 4 (4); 280, July 1982 (presented at the Second International Conference on Immunopharmacology), Washington, D.C., July 5-9, 1982.

"Clinical Performance of the Acuvue, NewVues, and SeeQuence Disposable Contact Lens in Giant Papillary Conjunctivitis",
Bucci FA, Lopatynsky MO, Zloty P
CLAO Journal (in press).

Zloty P, Belin MW, Antibiotics, Steroids and Tetanus Immunization.
In RA Catalano (Ed), "Ocular Emergencies" Philadelphia: W.B. Saunders,  1992; Chap 17, pp.497-512.

Belin MW, Zloty P.  Accuracy of the Par Corneal Topography System with spatial misalignment.  CLAO J 1993; 19:64-68.

Zloty P, Belin MW, Ocular Infections Caused By Pseodomonas Aeruginosa.  In Baltch-Smith (Ed), "Psuedomonas Aeruginosa Infections and Treatment" New York: Marcel Dekker, Inc., 1994; Chap 12, pp.371-400.

EXHIBIT "D"

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN ASHTON,              )

      Plaintiff,         )

vs.                  ) CIVIL ACTION NO. 2:06CV-226-D

FLORALA MEMORIAL    )
HOSPITAL; BLAIRE HENSON; )
RUSSELL PAGE, M.D., and   )
SAMUEL E. POPPELL, M.D.,  )

      Defendants.

**EXHIBIT**
" D "

## AFFIDAVIT

Before me, the undersigned authority, personally appeared James C. Jones, D.O., who being by me first duly sworn, did depose and say as follows:

My name is James C. Jones, D.O., and I am a physician licensed to practice medicine in the State of Alabama and I have been so licensed during all times material to this affidavit. I am board certified in the specialty of emergency medicine and I have been so certified for more than ten years. I practice emergency medicine in the emergency department of Southeast Alabama Medical Center, located in Dothan, Alabama. I was so practicing on March 12, 2004 and for more than one year prior to that date.

I have reviewed the medical records of Florala Memorial Hospital for the emergency department visit of John Ashton, which occurred on March 12, 2004. I have also reviewed the subsequent medical records of Flowers Hospital regarding the hospitalization and surgery of John Ashton.

I have been retained to review these records on behalf of Russell, Page, D.O., the emergency room physician on call on March 12, 2004 at Florala Memorial Hospital.

I am familiar with the standard of care for physicians practicing emergency medicine and the treatment required for patients presenting with eye injuries such as Mr. Ashton. Based upon my review of the records, it is my opinion that Dr. Page met the applicable standard of care for physicians practicing emergency medicine in a hospital such as Florala Memorial Hospital. A hospital such as Florala Memorial Hospital would not typically have an ophthalmologist on staff, nor would such a hospital have the necessary equipment to perform eye surgery on a patient with an injury such as the injury suffered by John Ashton. Consequently, it was appropriate, and within the standard of care, for Dr. Page to arrange for the transfer of the patient to the care of an ophthalmologist or eye surgeon. A patient suffering an injury such as that suffered by Mr. Ashton requires the care of an eye surgeon and an emergency physician would not be trained or qualified to perform surgery on such a patient. Therefore, it is my opinion that transfer of the patient to the care of an ophthalmologist was appropriate and required under the circumstances of this case. It is my opinion that Dr. Page properly stabilized the patient prior to the transfer of the patient to the care of the ophthalmologist. There was nothing else that could have been done to stabilize the patient prior to transfer and there was no treatment that Dr. Page could have or should have undertaken in connection with this patient. All of the actions undertaken by Dr. Page in connection with this patient were appropriate, given the fact that the patient presented at a small, rural hospital without the facilities or staff necessary to care for an injury such as that suffered by Mr. Ashton.

This the 26 day of February, 2007.

_____
JAMES C. JONES, D.O.

STATE OF ALABAMA,

COUNTY OF HOUSTON.


Sworn to and subscribed before me this the 26th day of _February_____, 2007.

_Cathy Barclay_____
NOTARY PUBLIC

My commission expires: _2-9-2010_

EXHIBIT "E"

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN ASHTON, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CIVIL ACTION NO. CV2:06cv226-D |
| | ) | |
| FLORALA MEMORIAL HOSPITAL; | ) | |
| BLAIRE HENSON; RUSSELL PAGE, | ) | |
| M.D. ; and SAMUEL E. POPPELL, | ) | |
| M.D., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**AFFIDAVIT**

| | |
|---|---|
| STATE OF ALABAMA | ) |
| COVINGTON COUNTY | ) |

BEFORE ME THE UNDERSIGNED AUTHORITY personally appeared Blair Henson, who being first duly sworn did state and depose:

I am Blair Henson and I am a resident of Okaloosa County, Florida. I am over the age of 21 and make this Affidavit on my own personal knowledge.

I am the Administrator of Florala Memorial Hospital which is a medical facility located in Florala, Alabama. I am not trained in medicine and am not a physician. My duties as Administrator do not include rendering any form of medical care and services to any patient, nor do they include supervising or directing medical care which is provided to patients of the hospital by members of the medical staff.

Each member of the medical staff of the hospital exercises his or her own medical judgment when rendering medical care and services to a particular patient.

Neither I, nor any other employee of Florala Memorial Hospital control, or reserve the right to control the means and methods by which members of the medical staff practice medicine.

I am personally acquainted with John Ashton.  Mr. Ashton is a frequent visitor in the emergency room at Florala Memorial Hospital.  He has been treated in the emergency room at Florala Memorial Hospital at least 35 times since May of 1999.  I am not aware of any payment made by Mr. Ashton to Florala Memorial Hospital for any of the care and services he has ever been provided in the emergency room of Florala Memorial Hospital.  He has always been treated at the emergency room and been given all care ordered by the physician treating him.

It is the policy of Florala Memorial Hospital to provide treatment to all persons who present to the emergency room.  Treatment and care is rendered to emergency room patients without regard to their ability to pay. This policy would have applied to John Ashton each time he visited the emergency room at Florala Memorial.

I am familiar with the claim made by Mr. Ashton against Florala Memorial Hospital in the United States District Court for the Middle District of Alabama.  I personally attended Mr. Ashton's deposition.  I am aware that Mr. Ashton claims that he needed emergency surgery to his eye when he presented to the emergency room on March 12, 2004.  Florala Memorial Hospital does not have a physician on its medical staff who is trained or credentialed to do eye surgery.  The care that Mr. Ashton sought is beyond the capability of any physician who is a member of our medical staff.

I am aware that a decision was made by the emergency room physician, Dr. Russell Page to transfer Mr. Ashton to the care of another physician who is trained for

the type of care which Mr. Ashton sought.   Dr. Page was not an employee of the

hospital, nor did the hospital dictate to Dr. Page what the disposition of Mr. Ashton

should be on March 12, 2004.  I am not aware of any financial consideration which was

involved in the decision to transfer Mr. Ashton.  It is my understanding that Dr. Page,

and the other members of our medical staff, were unable to provide definitive care to

Mr. Ashton's eye injury and that Dr. Page's best medical judgment was that transfer for

further treatment and care by an eye specialist was in Mr. Ashton's best interests.

     I was not even aware that Mr. Ashton was in the emergency room on March 12,

2004 until he filed suit against me.


_____

BLAIR HENSON


STATE OF ALABAMA          )

COVINGTON COUNTY       )

     SWORN TO and SUBSCRIBED before me this _12th_ day of _Feb_ , 2007.

_____

NOTARY PUBLIC

Commission Expires: _6-30-2008_

EXHIBIT "F"

**Page 1**

```
1          IN THE UNITED STATES COURT FOR THE

2             MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4   JOHN ASHTON,              )
         Plaintiff,           )
5                             )
    VS.                       )
6                             )
    FLORALA MEMORIAL HOSPITAL; )  CASE NO. 2:06CV-226-D
7   BLAIRE HENSON; RUSSELL    )
    PAGE, M.D., and SAMUEL E. )
8   POPPELL, M.D.,            )
         Defendant.           )
9
```

10        The deposition of JOHN ASHTON, taken by

11  the Defendants, pursuant to the Federal Rules of

12  Civil Procedure, before Kimberly B. Faucette, Certified

13  Court Reporter and Notary Public in and for the State of

14  Alabama at Large, at the Powell Law Firm, Andalusia,

15  Alabama, on the 15th day of December, 2006, at 10:00

16  a.m., pursuant to notice.

17              *     *     *     *     *

```
    APPEARANCES:
18  FOR THE DEFENDANTS:
    FOR RUSSELL PAGE, M.D.:        FOR THE PLAINTIFF:
19  MR. ALAN C. LIVINGSTON         MR. COREY D. BRYAN
    MR. WILLIAM NICHOLS            Attorney at Law
20  Attorney at Law                Andalusia, Alabama
    Dothan, Alabama
21
    FOR FLORALA HOSPITAL:          ALSO PRESENT:
22  MR. TABOR NOVAK                MR. BLAIRE HENSON
    Attorney at Law
23  Montgomery, Alabama

24  FOR SAMUEL POPPELL, M.D.:
    MR. JACK B. HINTON
25  Attorney at Law
    Montgomery, Alabama
```

**Page 2**

1              S T I P U L A T I O N S

2        It is stipulated by and between counsel for

3  the parties that this deposition is taken at this time

4  by Kimberly B. Faucette, Court Reporter and Notary

5  Public, State at Large, who is to act as commissioner

6  without formal issuance of commission to her; that said

7  deposition shall be taken down stenographically,

8  transcribed, and certified by the commissioner.

9        Except for objections as to the form

10  of questions, no objections need be made at the time of

11  the taking of the deposition by either party, but may be

12  interposed by either party at the time the deposition is

13  read into evidence, which shall be ruled upon by the

14  Court on the trial of the cause upon the grounds of

15  objection then and there assigned.

16

17

18

19

20

21

22

23

24

25              *     *     *     *     *

**Page 3**

JOHN ASHTON

2  having been first duly sworn, testified as follows,

3  to-wit:

4

5                  EXAMINATION

6

7  BY MR. LIVINGSTON:

8

9     Q    Tell us your name, please, sir.

10    A    John Kevin Ashton.

11    Q    What was the middle name?

12    A    Kevin.

13    Q    K-E-V-I-N?

14    A    Yes, sir.

15    Q    What is your home address?

16    A    1618 East 7th Avenue, Florala, Alabama.

17    Q    How long have you lived at that address?

18    A    About seven years.

19    Q    Who lives at that address with you?

20    A    Nobody.  I live by myself.

21    Q    Are you married?

22    A    No, sir.

23    Q    Have you ever been married?

24    A    Yes, sir.

25    Q    How many times?

**Page 4**

1     A    Once.

2     Q    Did that marriage end in divorce?

3     A    Yes.

4     Q    What is your ex-wife's name?

5     A    Beth Ann Nuss.

6     Q    N-U-S-S?

7     A    N-U-S-S.

8     Q    Where was Ms. Nuss from?

9     A    Danville, Pennsylvania.

10    Q    And how long were y'all married?

11    A    About two years.

12    Q    And where did you live during the term of that

13  marriage?

14    A    In a town called Washingtonville,

15  Pennsylvania.

16    Q    Were there any children born of that marriage?

17    A    Two.

18    Q    Where do they live?

19    A    Danville, Pennsylvania.

20    Q    What are your children's names?

21    A    John, Junior, and Zabrina Marie,

22  Z-A-B-R-I-N-A.

23    Q    Is John, Junior, married?

24    A    Yes, sir.

25    Q    What is his wife's name?

25

1  hospital in Florala did you actually see Dr. Page, just
2  that one time in the hallway or more than one time?
3      A    That's it.
4      Q    That was it?
5      A    Yeah.
6      Q    Did you see any nurses?
7      A    I don't remember.  Everything that was going
8  on, I don't remember.
9      Q    You don't remember whether there were any
10 nurses that provided any care to you?
11     A    I didn't get any care.
12     Q    Did they take you back to a room or did you
13 just remain in the hallway?
14     A    In the hallway.
15     Q    You never left the hallway?
16     A    No, sir.
17     Q    Never went to an exam room?
18     A    No, sir.
19     Q    Did anyone ever look at your eye?
20     A    No, sir.
21     Q    Did you think that Dr. Page was an eye
22 specialist?
23     A    No, sir.
24     Q    You knew that he was an emergency room doctor,
25 because you had seen him before?

26

1      A    Yes, sir.
2      Q    And you understood that eye injuries were not
3  his specialty?  You knew that, didn't you?
4      A    He is a doctor.
5      Q    Did you want him to operate on you or did you
6  want an eye specialist to operate on you?
7      A    The best I could get is what I wanted.
8      Q    Which would be an eye specialist; right?
9      A    More or less.
10     Q    I mean, you wouldn't want a foot doctor
11 operating on your eye, would you?
12     A    I don't believe so, sir.
13     Q    You would want somebody who is trained in eye
14 surgery to do the surgery on your eye, if that was
15 necessary?
16     A    Yes, sir.
17     Q    Did you have any reason to believe that Dr.
18 Page was an eye surgeon?
19     A    Excuse me.
20     Q    Did you have any reason to believe that Dr.
21 Page was an eye surgeon?
22     A    No, sir.
23     Q    Did you understand that he was making the
24 arrangements to have you seen by an eye specialist?
25     A    I didn't know anybody was doing anything.

27

1      I was just in the hallway.
2      Q    You told me that Dr. Page told you it was
3  beyond his care and that he needed to get you seen by a
4  specialist, is that not correct?
5      A    He said he wasn't going to look at it.
6      Q    Did he say why?
7      A    No, sir.
8      Q    And, then, he said he was making arrangements
9  to have you transferred elsewhere?
10     A    Nobody told me nothing.
11     Q    So you didn't know what was going on?
12     A    No, sir.
13     Q    You are waiting out in the hallway and didn't
14 know why you were being transferred, but you knew that
15 Dr. Page was not an eye specialist?
16     A    I didn't know what was going on, period.
17     Q    So they didn't tell you one way or the other?
18     A    No, sir.
19     Q    They just let you wait until the ambulance
20 came?
21     A    Yes, sir.
22     Q    And when the ambulance came, what did they
23 tell you?
24     A    The paramedic told me to get on the stretcher
25 and get in the ambulance.

1      Q    Did anybody from the hospital tell you where
2  you were going or why?
3      A    No, sir.
4      Q    Did Dr. Page ever talk to you again?
5      A    No, sir.
6      Q    Back up just a minute to the time that Dr.
7  Page first saw you in the hallway and you said that he
8  looked at you and told me that it was something that he
9  could not handle.  Tell me what you recall he did say to
10 you.
11     A    Just that he couldn't touch that.
12     Q    Anything else?
13     A    (Witness shakes head.)  I was standing there
14 with the chief.  I was lucky, I think, to be breathing
15 at that time.
16     Q    Why were you lucky to be breathing?
17     A    I was in a lot of pain.  It just didn't make
18 any sense to me.
19     Q    So you were confused?
20     A    A little bit.
21     Q    And your memory of this event is somewhat
22 vague, I understand?
23     A    I remember who done it and where it was.
24     Q    But I am talking about at the hospital.  You
25 told me you couldn't remember whether any nurses saw you

45

```
1      Q    Completely?
2      A    I see light and dark, but that is it.
3      Q    But you can't read an eye chart with that eye
4  at all?
5      A    No.  I have had numerous surgeries on it.
6      Q    Where have you been treated, when you say
7  numerous surgeries?
8      A    Eye Center South.
9      Q    Dr. Zloty again?
10     A    Yes.
11     Q    Are you still seeing him?
12     A    No, sir.
13     Q    The first surgery was performed at Flowers
14 Hospital?
15     A    Yes, sir.
16     Q    And then the subsequent procedures, however
17 many were done, were done at Eye Center South; is that
18 correct?
19     A    Yes, sir.
20     Q    Have you ever been back in the hospital as a
21 result of this eye injury?
22     A    No, sir.
23     Q    So whatever follow-up treatments that
24 Dr. Zloty did were all done at his office?
25     A    Yes, sir.
```

46

```
1      Q    Had you ever been to Flowers Hospital before?
2      A    No, sir.
3      Q    How about since then?
4      A    No, sir.
5      Q    Have you ever been a patient at any other
6  hospitals in Alabama where you were admitted to the
7  hospital?
8      A    Southeast and Florala.
9      Q    Tell me why you were at Southeast.
10     A    I had a heart attack.
11     Q    When was that?
12     A    Two years ago.
13     Q    Was that after the eye injury or before?
14     A    After.
15     Q    Who was your heart doctor?
16     A    I can't think of his name.
17     Q    Did they have to do surgery?
18     A    They kept me for a week and put me through all
19 kinds of tests and everything else.
20     Q    But they didn't have to do bypass surgery?
21     A    No, sir.
22     Q    Other than Florala, and I guess, Opp, very
23 briefly, Southeast and Flowers Hospital, does that cover
24 all of the hospitals you have been in, in Alabama?
25     A    Yes, sir.
```

47

```
1      Q    What about Florida?
2      A    No, sir, never been to one.
3      Q    Never been to a hospital in Florida?
4      A    Never.
5      Q    How many times have you been treated at the
6  hospital in Florala?
7      A    A lot.
8      Q    Multiple occasions?
9      A    Yes, sir.  I had to get stitches.  I had a
10 spider bite that they kept me for a week.
11     Q    Have they ever refused to see you at the
12 hospital in Florala?
13     A    When I go there, they see me.
14     Q    What about Dr. page, has he ever refused to
15 see you?
16     A    He did that time.
17     Q    You told me he looked at you and said you
18 needed to go somewhere else?
19     A    But he wouldn't examine me or looking at.
20     Q    But you told me you didn't want him to operate
21 on you; you wanted to see a specialist?
22     A    I needed somebody.
23     Q    But you knew that Dr. Page was not an eye
24 specialist?
25     A    I just knew he was a doctor.
```

48

```
1      Q    And you think he could treat anything that
2  walked in the door?
3      A    I just knew he was a doctor.
4      Q    Did you expect him to operate on your eye?
5      A    I didn't know who was going to operate on my
6  eye.
7      Q    You wanted the right person to operate on your
8  eye; correct?
9      A    I wanted something at that time.  I was in
10 that frame of mind that I needed something done.
11     Q    If he was not trained in eye surgery and
12 doesn't practice eye surgery, would you want him doing
13 surgery on your eye for the first time ever?
14     A    That, I couldn't tell you.
15     Q    Well, would it have been okay for him --
16     A    If they were going to do it right then and
17 there, I guess so, because I was there.
18     Q    Even though he had never done it before and
19 wasn't trained, you wanted him to do it?
20     A    Sir, I don't know.  I am not a doctor.
21     Q    But my question is:  If he is not an eye
22 surgeon and is not trained as an eye surgeon and has
23 never done it before, if those are the facts, would you
24 want him to operate on you anyway?
25     A    No, sir.  Not if I already knew.
```

57

1  blind.

2     Q.   So you think you are probably going to be

3  blind?  Have they told you that or is that just your

4  suspicion?

5     A    I asked him, he said, if it keeps going the

6  way it is, that is what's going to happen.

7     Q    And that is Dr. Bennett who said that?

8     A    Yes, sir.

9     Q    When Dr. Zloty was treating you in the

10 hospital at Flowers on the first occasion, did he tell

11 you if you had gotten there earlier, he could have

12 repaired the eye?

13    A    I would have had a better chance.

14    Q    A better chance.  So you have lost the chance,

15 is what you are saying, not that it would have or would

16 not have been?

17    A    Because it took so long to get me into the

18 operating room, he said the longer it took, the less

19 chance I have of being able to see out of it.

20    Q    But he hasn't told you that he could have

21 saved the eye had it been earlier?

22    A    He said he could have had a better chance.

23    Q    I've got you.  That is fine.

24        Have you seen any doctors for your eye injury that

25 you and I haven't already talked about?

58

1     A    No, sir.

2     Q    Have you had any other appointments with

3  anyone else about your eye injury?

4     A    No, sir.  Eye Center South is the only ones I

5  have dealt with.

6     Q    So all of your eye injury records would either

7  be at Flowers Hospital or Eye Center South?

8     A    Yes, sir.

9     Q    And you spent five days at Flowers Hospital?

10    A    Yes, sir.

11    Q    And once you were discharged, how did you get

12 home?

13    A    Eye Center South, they took me to Dr. Zloty's

14 office.  After he looked at it, he said he would make an

15 appointment for me for two weeks later.  They gave me a

16 ride back to Florala.

17    Q    On their van?

18    A    On their car.

19    Q    And when you have appointments now, how do you

20 get there?

21    A    They come and get me.

22    Q    You just call them and they come get you?

23    A    They call me.

24    Q    Good to know.  And what is your home phone

25 number?

59

1     A    I use a lady's phone at Kendrick's Florist.

2  That is how I get my messages.

3     Q    Is that just a personal friend?

4     A    She is a florist.  Yes, she is a friend.

5     Q    So you don't have a phone at your home?

6     A    No, sir.

7        MR. LIVINGSTON:  Okay.  That's all I have for

8        now.

9

10                    EXAMINATION

11

12 BY MR. NOVAK:

13

14    Q    Mr. Ashton, my name is Tabor Novak.  I am the

15 hospital lawyer in this case.  Can you go on for a

16 little while?  Are you okay?  Do you need to take a

17 break or anything?

18    A    I would like to have a cigarette, if I may.

19    Q    Why don't you do that, and then we will ask

20 you some more questions.

21    A    Thank you.

22        (Thereupon, a break was taken.)

23    Q    As I said, my name is Tabor Novak.  I am

24 The hospital lawyer in this case.

25        Do you know who all you have sued in this case?

60

1     A    No.  I leave that to the lawyers.  I have no

2  idea.

3     Q    When you came here today, i-

4  did you know you sued the hospital?

5     A    Oh, yes, sir.

6     Q    Do you know a man named Blaire Henson?

7     A    Mr. Henson is right there.

8     Q    Did you know you have sued him?

9     A    Kind of.

10    Q    What do you mean "kind of"?

11    A    Well, he is the administrator of the hospital.

12    Q    Did you know when you came to this deposition

13 today that you had sued Mr. Henson in federal court?

14    A    Yes, sir.

15    Q    Why did you sue him?

16    A    I leave that up to the lawyers, you know.

17    Q    As you sit here today in this office, tell me

18 every complaint you have about Mr. Henson as it relates

19 to the care you got that you have been talking to

20 Mr. Livingston about.

21    A    Well, he is the hospital administrator.

22    Q    Well, we have established that.

23        Do you say he did anything wrong to hurt you or

24 injure you in any way?

25    A    Physically, no, sir.

61

1    Q    In any fashion?

2    A    I couldn't tell you.

3    Q    What I am trying to do, when a complaint like

4 this is filed, sometimes a person who is the plaintiff

5 actually has a reason to sue the defendant, and they

6 tell us about that.  Like, you ran a stop sign and you

7 hit my car and you hurt me.  What I am trying to find

8 out, as we sit here today, can you tell me anything

9 about the reason Mr. Henson is a defendant in this case,

10 other than the fact he is the administrator of the

11 hospital?

12    A    That is all I can tell you.

13    Q    So you personally don't have anything bad to

14 say about him?

15    A    No.  I know Mr. Henson.

16    Q    Has he been pretty decent to you?

17    A    He is a good fellow.

18    Q    Now, you also frequently go to the emergency

19 room there at the Florala Hospital, don't you?

20    A    If I need to.

21    Q    Do you have any other doctor in town that you

22 see?

23    A    No, sir.

24    Q    Before we got here, I went through some

25 records and I found, since 1999, about thirty-five

62

1 visits that you have made to the emergency room.  Would

2 that seem about right?

3    A    That is probably about right.

4    Q    On each occasion when you have come in, has

5 the nursing staff been polite and cooperative with you?

6    A    They are pretty good people.

7    Q    And have you generally received good care in

8 the emergency room, as far as you are concerned?

9    A    Pretty much so, yes, sir.

10    Q    Do you have any complaints at all about

11 anything that has ever happened there in the emergency

12 room at the hospital other than the time you got stuck

13 in the eye with the screwdriver?

14    A    That is the only complaint I have.

15    Q    When you have come in and seen a doctor, have

16 doctors ordered tests to be done on you in the emergency

17 room?

18    A    Yes, sir.

19    Q    You have had CT scans?

20    A    Yes, sir.

21    Q    X-rays?

22    A    MRIs.

23    Q    MRIs?

24    A    X-rays.

25    Q    Been sewn up?

63

1    A    A couple of times.

2    Q    Have they ever turned you away when you have

3 came to the hospital and said, I have been hit with a

4 bat or I have been cut or I have been in a fight, or

5 anything like that?

6    A    No, sir.

7    Q    Have they turned you away at any time you have

8 come to the hospital and sought care in the emergency

9 room?

10    A    Just when I sign myself out.

11    Q    When you sign yourself out.  But have they

12 ever told you, Mr. Ashton, we can't treat you or we

13 won't treat you, for any complaints you have had?

14    A    I have never been told that, no, sir.

15    Q    Now, you have, on a number of occasions, made

16 a decision personally that you wanted to leave before

17 treatment?

18    A    Yes, sir.

19    Q    And the hospital hasn't suggested that you

20 needed to leave for any reason, have they?

21    A    No, sir.

22    Q    Each time you have made that decision, it is

23 for your own personal reasons, whatever they might be?

24    A    Yes, sir.

25    Q    Fair enough.

64

1    Who pays the hospital for the treatment and care

2 you have had, and by that, I mean the hospital in

3 Florala?

4    A    I believe I owe them.

5    Q    Have you ever paid them anything?

6    A    I can't remember anything that I have or

7 haven't.

8    Q    Do you remember paying them anything for the

9 thirty-five visits you have had there?

10    A    I don't remember.

11    Q    Is there anyone else who would or could have

12 paid on your behalf, like an insurance company or Social

13 Security?

14    A    I don't know if anybody has.

15    Q    So each time you have come, whether or not you

16 could pay, they have accepted you and they have treated

17 you and they have given you good care?

18    A    Pretty much so.

19    Q    Do you have a reason that you sued the

20 hospital in this case, personal reason, or is that

21 something you left up to the lawyers?

22    A    That is a legal matter.  I don't have enough

23 reading for that.

24    Q    Again, like sometimes somebody will go to the

25 emergency room and they will say, I am suing the

65

1   emergency room because they dropped hot water on my foot
2   and it burned me.  You don't have any particular
3   complaint that you are saying about the hospital in this
4   case that you can tell me today?
5       A    No, sir.
6       Q    Fair enough.  If you needed care again in
7   Florala, would you return to Florala Memorial Hospital?
8       A    If I needed to.
9       Q    In looking at the records I have here, it
10  looks like, if I am counting right, you have been back
11  about fifteen times to the hospital in Florala, Florala
12  Memorial, since you got stuck in the eye with the
13  screwdriver?
14      A    Yes, sir.
15      Q    Would that seem about right?
16      A    Yes, sir.
17      Q    And they have continued to accept you and
18  treat you?
19      A    Yes, sir.
20      Q    The eye doctors that have cared for you that
21  you have told us about, have they operated on both of
22  your eyes or just your left eye?
23      A    I have had cataract surgeries on both of them.
24      Q    And what kind of surgeries have you had on
25  your right eye other than cataract surgery?

66

1       A    That's it.
2       Q    Did that improve your vision?
3       A    It helped.
4       Q    Which doctor told you that the problems you
5   are having in your right eye are somehow associated with
6   your left eye?
7       A    Actually, all of them.
8       Q    All of them did?
9       A    That it's being strained, is the way they put
10  it to me.  It is being strained to the point to where it
11  is overworking itself.
12      Q    Dr. Fortin told you that?
13      A    Yes, sir.
14      Q    Dr. Bennett?
15      A    Dr. Bennett, Dr. Zloty.
16      Q    Dr. Heersink?
17      A    Dr. Heersink.
18      Q    And the lady doctor?
19      A    And the lady, and I can't think of her name.
20      Q    Fair enough.  Not trying to get you to tell me
21  anything that you have already told Mr. Livingston, or
22  repeat anything.  That is not my purpose here.  But I
23  was a little confused about a couple of things.
24           Did you say you had been sentenced to ten years in
25  the penitentiary for possession of marijuana?

67

1       A    Yes, sir.
2       Q    How much marijuana did you have in your
3   possession that led to that kind of sentence?
4       A    I had more than an ounce.
5       Q    Do you remember how much more?
6       A    Not exactly.
7       Q    Which penitentiary did you do your time in?
8       A    Camp Hill, Pennsylvania, and Rockford,
9   Pennsylvania.
10      Q    Did you actually serve the full ten years?
11      A    Pretty much so.
12      Q    Were you paroled after that?
13      A    Yes, sir.
14      Q    Have you ever been on parole or probation for
15  any offense other than that possession charge?
16      A    Public intox.
17      Q    I am not going to ask you all about the public
18  intoxication again.  Have you ever been arrested for any
19  offense other than public intoxication and the
20  marijuana?
21      A    Disorderly conduct.
22      Q    Nothing that you haven't already told us about
23  before?
24      A    No, sir.
25      Q    Do you remember when you were in the emergency

68

1   room -- and this would have been, I think, this
2   particular visit was March 12th, 2004.  Does that sound
3   right?  I will just call it the time you got poked in
4   the eye with the screwdriver.
5       A    It was in March.
6       Q    These records show what your temperature was
7   then.  Do you remember anybody taking your temperature?
8       A    I stood in the hallway.
9       Q    I understand that.  I am not questioning you
10  about that.  But do you remember somebody coming out
11  there and taking your temperature then?
12      A    No.  I don't think so.  I don't remember.
13      Q    Are you able to say it didn't happen or are
14  you just not able to remember one way or the other?
15      A    I don't know.
16      Q    And these records also show that someone took
17  your blood pressure.  Do you remember that happening?
18      A    I remember a paramedic took it.
19      Q    Was that there in the hospital?
20      A    In the hallway.
21      Q    So your blood pressure was taken in the
22  hallway, and it shows what your pulse rate was and your
23  respirations.  Do you remember anybody --
24      A    I don't remember at all.
25      Q    The records, when you got to the hospital in

**Page 69**

1 Dothan, show that you had an eye patch on. Do you
2 remember that?
3    A    I remember the ambulance personnel put a patch
4 on my eye.
5    Q    Where did that take place?
6    A    In the ambulance.
7    Q    Do you know who ordered that patch be put on?
8    A    I just know they done it.
9    Q    Was it a metal batch?
10   A    I don't remember if it was metal or cloth.
11   Q    Mr. Ashton, there is some times, if I am
12 correct in my review of these records, that you have
13 actually left the hospital on your own when it was a
14 doctor other than Dr. Page?
15   A    Yes, sir.
16   Q    Any particular reason sometimes you just
17 decide you don't want treatment?
18   A    At the moment, I thought the best thing to do
19 was go home.
20   Q    But, again, that would be your own decision,
21 what you thought was in your own best interest then?
22   A    Yes, sir.
23       MR. NOVAK:  I think that is it for me.  That
24          wasn't too bad, was it?
25       THE WITNESS:  No, it wasn't.  Thank you.

**Page 70**

2              EXAMINATION

4 BY MR. HINTON:

6    Q    Just a couple just to clear up some areas that
7 I may be confused about.
8       When you were at the hospital emergency room, on
9 the day of, like Mr. Novak said, the screwdriver
10 incident, do you know whether Dr. Page called
11 Dr. Poppell?
12   A    I have no idea.
13   Q    And if he did call, you were not anywhere
14 where you could hear any conversation?
15   A    No, sir.
16   Q    Did anybody else tell you while you were there
17 at the emergency room that Dr. Page had talked to
18 Dr. Poppell and what was said between the two of them?
19   A    Nobody said nothing.
20   Q    Did the ambulance personnel ever tell you
21 about any conversation with Dr. Poppell?
22   A    All they told me, they was taking me to Fort
23 Walton Beach.
24   Q    Did either of those persons tell you that they
25 knew what Dr. Page and Dr. Poppell had talked about?

**Page 71**

1    A    No, sir.
2    Q    When you got to Fort Walton, do you know about
3 what time that was?
4    A    It was in the afternoon.
5    Q    Let me see if I can help put it in context.
6 You said the poke in the eye occurred about 11:00 or
7 11:30 in the morning, roughly?
8    A    About that.
9    Q    And then you went to Florala, the chief of
10 police took you there?
11   A    Yes, sir.
12   Q    And you stayed there how long?
13   A    Maybe thirty or forty-five minutes.
14   Q    And then got in the ambulance?
15   A    Yes, sir.
16   Q    And the ambulance took you to Fort Walton?
17   A    Yes, sir.
18   Q    Was it still light outside when you got to
19 Fort Walton?
20   A    Yes, sir.  It was in the afternoon.
21   Q    Did the ambulance folks tell you they were
22 going to be taking you to a hospital?
23   A    They said they were taking me to a doctor in
24 Fort Walton Beach.
25   Q    But you didn't know if it was Dr. Poppell or

**Page 72**

1 Dr. Jones or Dr. Smith?
2    A    I didn't have no idea.
3    Q    Did anybody tell you that you were going to
4 the name of a particular place?
5    A    No.  Just said the doctor's office, and I
6 didn't ask.
7    Q    When you said earlier about your eyesight,
8 that you are losing sight, you can still read the
9 newspaper, I think you were talking about?
10   A    I catch a few words out of it, and then I fill
11 in.
12   Q    But you can actually read the newspaper;
13 right?
14   A    I have a very difficult time, though.
15   Q    I am not so much now asking you about how you
16 see as much as you can see because you read words on a
17 page and understand them?  Do you know what I am talking
18 about, the difference between being able to see versus
19 understanding?
20   A    I have to fight myself to be able to read it,
21 yes.
22   Q    When you got down to this office in Fort
23 Walton, what did it look like, this office?
24   A    I don't remember.
25   Q    Was it a two-story building or five-story